David S. Kupetz (CA Bar No. 125062)
  dkupetz@sulmeyerlaw.com
Steven F. Werth (CA Bar No. 205434)
  swerth@sulmeyerlaw.com
Claire K. Wu (CA Bar No. 295966)
  ckwu@sulmeyerlaw.com
**Sulmeyer**Kupetz
A Professional Corporation
333 South Grand Ave, Suite 3400
Los Angeles, California 90071
Telephone: 213.626.2311
Facsimile: 213.629.4520

Attorneys for Glostation USA, Inc. and
related debtors

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re<br><br>GLOSTATION USA, INC., a Delaware corporation,<br><br>    Debtor.<br><br>Federal EIN: 37-1875688 | Case No. 1:20-bk-11435-MB<br><br>Chapter 11<br><br>**OMNIBUS DECLARATION OF STEVEN ZHAO IN SUPPORT OF DEBTORS' "FIRST-DAY" EMERGENCY MOTIONS**<br><br>Date:    [To Be Determined]<br>Time:    [To Be Determined]<br>Place:   U.S. Bankruptcy Court<br>         Courtroom 303<br>         21041 Burbank Blvd.<br>         Woodland Hills, CA 91367 |

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

**SulmeyerKupetz,** A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

I, Steven Zhao, declare:

## **PRELIMINARY STATEMENTS AND BRIEF OVERVIEW**

1.   I am over the age of 18 years.

2.   I have personal knowledge of the facts stated herein.  I can testify that these facts are true and correct.

3.   I am the President and Chief Executive Officer of Glostation USA, Inc., a Delaware corporation ("Glostation").

4.   I am the President and Chief Executive Officer of Sandbox VR, Inc., a Delaware corporation ("Parent").  Parent holds a 100% equity interest in Glostation.  I own a 29.443% equity interest in Parent.

5.   I am the President and Chief Executive Officer of Glostation Core, Inc., a Delaware corporation ("Core").  Glostation holds a 100% equity interest in Core.

6.   I am the Manager of Sandbox VR Mission Valley, LLC, a Delaware limited liability company ("Mission Valley").  Core holds a 100% equity interest in Mission Valley.

7.   I am the Manager of Sandbox VR San Mateo, LLC, a Delaware limited liability company ("San Mateo").  Core holds a 100% equity interest in San Mateo.

8.   I am the Manager of Sandbox VR Cerritos, LLC, a Delaware limited liability company ("Cerritos").  Core holds a 100% equity interest in Cerritos.

9.   I am the Manager of Sandbox VR Topanga, LLC, a Delaware limited liability company ("Topanga").  Core holds a 100% equity interest in Topanga.

10.   I am the Manager of Sandbox VR Ridge Hill, LLC, a Delaware limited liability company ("Ridge Hill").  Core holds a 100% equity interest in Ridge Hill.

11.   I am the Manager of Sandbox VR Austin, LLC, a Delaware limited liability company ("Austin").  Core holds a 100% equity interest in Austin.

12.   I am the Manager of Sandbox VR Colony, LLC, a Delaware limited liability company ("Colony").  Core holds a 100% equity interest in Colony.

13.   I am the Manager of Sandbox VR Oakbrook, LLC, a Delaware limited liability company ("Oakbrook").  Core holds a 100% equity interest in Oakbrook.

14.    I am the Manager of Sandbox VR Pop-Up, LLC, a Delaware limited liability company ("Pop-Up").  Core holds a 100% equity interest in Pop-Up.

15.    I refer to Glostation, Core, and the entities identified in paragraphs 6 through 14 collectively as the "Debtors".  An enterprise organization chart including Parent, the Debtors, and other affiliates (collectively, the "Company") is attached hereto as **Exhibit 1** and is incorporated herein by this reference.

16.    The Debtors are part of a business enterprise established to develop, operate, and franchise facilities offering full-body tracking, free roaming, virtual reality experiences for private groups (meaning no strangers can play together), operating under the name "Sandbox VR ™" (the "Business").  The website for the Business is www.sandboxvr.com.

17.    Immediately prior to the onset of the COVID-19 pandemic, the Business was starting to emerge from the initial, start-up phase of its existence.  It had seven operating locations, anticipated obtaining a "Series B" round of equity funding, and then opening at least another 20 stores within the next year.  Unfortunately, COVID-19 struck and, as a result, in mid-March, 2020, the Business was forced to shut down its operations, postpone the opening of any new stores, close all its existing stores, and furlough and lay-off employees.

18.    The Business currently is in the process of reopening, re-hiring employees, and implementing a recovery process.  Among other things, as set forth in more detail below, immediately prior to the Petition Date, the Debtors negotiated and entered a restructuring term sheet with their secured creditors, as well as a plan support agreement that will form the basis for the principal terms of the Debtors' restructuring under a chapter 11 plan.  In addition, the Debtors already reached out to their various landlords in an effort to commence negotiations regarding necessary lease modifications.  Despite the challenging and uncertain economic environment, the Debtors intend to move as quickly as feasible through this case and overall recovery process.

19.    The Debtors each commenced a bankruptcy reorganization case by filing a voluntary chapter 11 petition on August 13, 2020 (the "Petition Date").  Subject to Court approval, the cases are to be jointly administered.  The Debtors' bankruptcy cases are as follows:

Entity                                                          Bankruptcy Case No.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

| | |
|---|---|
| Glostation USA, Inc., a Delaware corporation | 1:20-bk-11435-MB |
| Glostation Core USA, Inc., a Delaware corporation | 1:20-bk-11436-MB |
| Sandbox VR Mission Valley, LLC,<br>a Delaware limited liability company | 1:20-bk-11437-MB |
| Sandbox VR San Mateo, LLC,<br>a Delaware limited liability company | 1:20-bk-11438-MB |
| Sandbox VR Cerritos, LLC,<br>a Delaware limited liability company | 1:20-bk-11439-MB |
| Sandbox VR Topanga, LLC,<br>a Delaware limited liability company | 1:20-bk-11434-MB |
| Sandbox VR Ridge Hill, LLC,<br>a Delaware limited liability company | 1:20-bk-11440-MB |
| Sandbox VR Austin, LLC,<br>a Delaware limited liability company | 1:20-bk-11441-MB |
| Sandbox VR Colony, LLC,<br>a Delaware limited liability company | 1:20-bk-11442-MB |
| Sandbox VR Oakbrook, LLC,<br>a Delaware limited liability company | 1:20-bk-11443-MB |
| Sandbox VR Pop-up, LLC,<br>a Delaware limited liability company | 1:20-bk-11444-MB |

20.     The Debtors continue to manage and operate their businesses as debtors in possession. No trustee or creditors' committee has been appointed in any of the Debtors' chapter 11 cases.

21.     To minimize the adverse effects of the commencement of the Debtors' chapter 11 cases, while at the same time preserving value for the benefit of stakeholders, the Debtors have filed a number of emergency motions requesting various forms of "first day" relief (collectively, the "First Day Motions").

22.     I submit this declaration in support of the First Day Motions. The various forms of relief requested in the First Day Motions are intended and necessary to minimize further harm and disruption to the Business, maximize the value of the Debtors' estates (the "Estates"),

1   and allow the Debtors to sustain and enhance their current business operations in chapter 11 while

2   the reorganization moves forward.

3     23. I am familiar with the contents of each of the First Day Motions and, to the

4   best of my knowledge, believe that the relief sought in each of the First Day Motions: (a) will

5   enable the Debtors to avoid disruption to their operations and sustain their operations while in

6   chapter 11; (b) are critical to the Debtors' ability to maximize the value of their Estates; and (c)

7   best serves the interests of the Estates and creditors. Further, it is my belief that the relief sought

8   in the First Day Motions is, in each case, narrowly tailored and necessary to achieve these goals.

9     24. Each of the Debtors has filed, in their own bankruptcy case, an emergency

10  motion to jointly administer that bankruptcy case with the cases of the other Debtors.

11    25. The Debtors are not all of the entities involved in the Business. There are

12  several affiliates of Glostation who have not commenced a bankruptcy case. As indicated above, a

13  chart of the enterprise's organization structure, including the Debtors, is attached hereto as Exhibit

14  1. The significant entities involved in the Business that have not commenced bankruptcy cases

15  are: (1) Sandbox VR, Inc. a Delaware corporation, the parent company of Glostation, (2)

16  Glostation Franchising USA, Inc., a Delaware corporation ("Franchising"), in which Glostation

17  has a 100% interest, (3) Glo Big Boss Ltd., a Hong Kong limited company, in which Parent has a

18  100% interest ("Glo Big Boss"), and (4) four other foreign entities in which Parent has a 100%

19  interest.

20           **BACKGROUND**

21       **Brief History and Description of the Business**

22    26. I founded Sandbox VR, Inc. in 2016, when the hype of Virtual Reality

23  ("VR") was palpable. I graduated with an Electrical Engineering degree from UC San Diego. In

24  2009, I relocated from the United States to Hong Kong to run a PC and mobile gaming business.

25  With the growing popularity of VR, I decided to form my own VR company.

26    27. At that time, other immersive VR arcades were beginning to emerge in

27  major cities. Most experiences were seated and for a single person. I desired to create an

28  experience that placed a greater emphasis on immersion by developing a technology platform that

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1  allowed full-body tracking of up to six players within the same room.

2      28.    My first experience with running a VR company was in Hong Kong. There,

3  I headed a team of six people and we successfully built a pop-up venue with a small but

4  enthusiastic customer following. I then decided to develop this business in the United States. I

5  launched a Sandbox VR center in San Francisco and quickly signed up investors to get on board.

6      29.    Glostation was formed on November 28, 2017. Each of the other Debtors

7  were formed after that date.

8      30.    While I am the primary decision maker for the Business and the Debtors,

9  prior to the COVID-19 pandemic, an office located at 4695 Chabot Drive, Suite 200, Pleasanton,

10  California 94588, was identified and treated as the headquarters of the Debtors. Glostation leased

11  this office space until July 31, 2020. Additionally, the Debtors leased nine store locations. At

12  seven of those locations, the Debtors conducted business operations. These stores are located in

13  California, Illinois, and Texas. The Debtors entered two leases shortly prior to the pandemic (one

14  located in New York, and the other located in Texas), never took possession of those premises,

15  and do not intend to open stores at those locations.[1]  With one exception,[2] all nine of these store

16  leases, remain unexpired as of the Petition Date. I am located in Hong Kong and Parent's

17  registered office is 3500 South DuPont Highway, Dover, DE 19901.

18      31.    The virtual reality experience the Business provides includes placing

19  customers in enclosed rooms--referred to as a holodeck or "deck"--after outfitting each customer

20  with a virtual reality headset, or "HMD" (head-mounted display), and equipment which transmit

21  information to, and can be read by, various electronic devices that surround the deck. The

22  electronic system can read the customer's position on the deck, and also transmits to the customer

23  a virtual image of the other persons on the deck, as well as a virtual image of what that customer

24  can "see" as that customer moves about the deck. There are no cords, so customers can move

25  around the deck freely.

26

27  [1] These are the stores leased by Ridge Hill and Colony.

28  [2] The landlord of the Debtors' store in Austin, Texas, leased by Sandbox VR Austin, LLC, asserts
that it terminated the lease on or about May 30, 2020, and has since re-possessed the premises.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1   32. The Debtors' electronic system makes use of two patents which Glostation

2 licenses from Glo Big Boss, which patents relate to the ability of a camera to project a fluid image

3 of an object that has moved behind another object, becoming "occluded" from view.

4   33. The Debtors' business model is that customers visit brick-and-mortar stores

5 which the Debtors lease from landlords.  Each such store has 2 to 4 enclosed decks, each of which

6 can hold between 2 to 6 customers.  The customers each pay for an approximately 40-minute

7 session on one of the decks.

8   34. Currently, customers can choose one of five different "experiences"--a

9 digital gaming experience with a narrative centered around the group of customers.  These

10 experiences are either horror-themed, science fiction-themed, or pirate-themed.  Because virtual

11 reality technology is still at its inception, there is no limit to the type of experiences that customers

12 could potentially experience using the Debtors' system.  The Debtors seek to expand into

13 additional types of games such as sports and fantasy.

14   35. The computer programs the Debtors utilize in the Business are all

15 developed and owned by Glo Big Boss.

16   36. The market for virtual reality is still in its infancy, but already several

17 "niches" have formed.  One is the personal headset market, in which consumers purchase a HMD

18 and other equipment to plug into a home computer, then download games or other programs to use

19 with that system, much as a video game would be purchased and used.  One limiting factor in this

20 type of virtual reality experience is movement, which is generally bounded either because the user

21 is attached to a computer by a cord, or by the relatively small space that the typical customer has

22 to move about at home.  Another limiting factor is that this type of device does not recognize a

23 second person nearby who is also using the VR system.

24   37. A second type of VR experience utilizes physical props on the decks to

25 heighten the perceived reality of the experience--props such as doors and walls.  This is different

26 from the Debtors' system, as the Debtors do not use props that are fixed to the deck.  The deck is

27 empty and allows free movement.  This provides several benefits, including allowing the same

28 deck to be used for different types of simulations, with no change necessary to the deck between

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1  groups of customers.  This permits customers to choose from a wider variety of simulations to

2  play.  It also speeds up the turnover of the deck between customer groups.  Additionally, it

3  involves less start-up costs in building the deck and related equipment, and provides for a more

4  standardized experience across stores.

5      38.    Similar to laser tag or escape rooms, the Debtors provide team-oriented,

6  physical entertainment where teams collaborate to achieve a joint goal.  Because these events are

7  social and collaborative, they are ideal for families, small groups, and team outings.  Prior to the

8  COVID-19 crisis, the Debtors' locations had seen strong traction as venues for corporate team-

9  building events.

10     39.    A major selling point of the Business is that the Debtors' product is not only

11  a technological marvel of VR, but also can instill the feeling of accomplishment that comes with

12  customers overcoming simulated obstacles as a team.  Many of the games run on the Debtors'

13  system allow customers to "lose" if they fail to operate as an effective team, and I believe that this

14  makes the feeling of accomplishment connected with success in the game that much greater.

15     40.    Prior to the Coronavirus pandemic, as indicated above, the Debtors had

16  seven operating stores (the stores then very recently leased by Colony and Ridge Hill had not been

17  built out and were not yet operational, and will not be opened).  In mid-March, 2020, due to the

18  Coronavirus, the Debtors were forced to close all seven operating locations.

19     41.    Since then, (a) on June 25, 2020, the Mission Valley store reopened, but, by

20  government direction, was forced to re-close on July 7, 2020; (b) on July 7, 2020, the San Mateo

21  store reopened, then was also forced to reclose by government direction, (c) on July 3, 2020, the

22  Oakbrook store reopened and remains open as of the Petition Date; and (d) as noted above, the

23  Colony and Ridge Hill stores will not open (and, in fact, those Debtors are filing "first day"

24  motions to reject those leases in their respective bankruptcy cases).[3]  The other stores currently

25

26  [3] The landlord for the Ridge Hill location never delivered the premises to the Debtors, and is still
27  holding the Debtors' deposit in the amount of $45,012.50.  Additionally, the landlord for Colony
   never delivered the premises to the Debtors.  Neither of the landlords for the Colony location or
28  Ridge Hill location have agreed to terminate the Debtors' respective leases.  Colony and Ridge

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1    remain closed, but the Debtors intend to re-open the California-based stores (Mission Valley, San

2    Mateo, Cerritos, Topanga, and Pop-Up) as soon as feasible after the government-mandated closure

3    of the stores is lifted.  With respect to Austin, the Debtors have commenced negotiations with the

4    landlord regarding a potential new lease arrangement and re-opening of the store.

5                                           **Management Team**

6                42.        I have led the Debtors throughout their founding and growth and continue

7    to direct their development and day-to-day operations, with the assistance of, among others, David

8    Friedman, Global Vice President of Real Estate, Aylang Thay, Vice President of Retail

9    Operations, and Elaine Kwan, Financial Controller.  While they hold titles, Mr. Friedman, Ms.

10   Thay, and Ms. Kwan are not officers of the Debtors.

11                                   **Company's Financing History**

12               43.        The Debtors are each privately held companies, wholly-owned and

13   ultimately controlled by their indirect and direct (with respect to Glostation) corporate parent,

14   Sandbox VR, Inc.

15               44.        The Debtors' operations have historically been financed through three

16   sources.  The first is capital contributions from equity interest owners in Parent.  Parent obtained

17   $27,592,493.50 total in a series of fundraising through equity and convertible note raises.

18   Investors include Andreessen Horowitz, Craft Ventures, and Stanford University.  This funding

19   provided significant capital necessary to open the Debtors' stores in the fall of 2019 and in early

20   2020.

21               45.        The Debtors were on track to expand by another 20 or more stores in 2020.

22   Parent was in the middle of Series B funding--necessary to open the additional stores and sustain

23   operations for another year--when the Coronavirus pandemic hit.  At that point, the substantial

24   Series B funding stalled and was no longer available.

25               46.        The second source of funding the Debtors have obtained is from secured

26   lenders.  Pursuant to that certain Loan and Security Agreement dated as of January 3, 2019

27   _____

28   Hill are filing motions to reject those leases in their respective bankruptcy cases, with such
     rejection to be effective as of the Petition Date.

between Parent, certain of the Debtors, and SVB (as amended, supplemented, or otherwise

modified, the "SVB Loan Agreement" and, together with all other agreements, documents, and

instruments executed and/or delivered in connection therewith, as all of the same have been

amended, supplemented, or otherwise modified at any time prior to the Petition Date, the "SVB

Loan Documents"), the Debtors were indebted and liable, without defense, counterclaim, or offset

of any kind, to SVB in the aggregate principal amount of not less than $4,000,000.00 (the "SVB

Facility").  All obligations of the Debtors arising under the SVB Loan Agreement or any other

SVB Loan Documents, including under the SVB Facility, shall hereinafter be referred to

collectively as the "SVB Loan Obligations".

47.     Prior to the Petition Date, to secure the SVB Loan Obligations, the Debtors

granted to SVB first priority liens (the "SVB Liens") on substantially all of the Debtors' assets,

including, but not limited to, all goods, accounts, equipment, inventory, intellectual property,

contract rights, leases, general intangibles, commercial tort claims, cash, deposit accounts and

letters of credit (collectively, the "SVB Collateral").

48.     On or about August 10, 2020, the Debtors and SVB entered into an

amendment to the SVB Loan Agreement (the "SVB Amendment").  Pursuant to the SVB

Amendment, SVB has agreed to, among other things, interest-only payments under its loan

through December 31, 2020.

49.     As of the Petition Date, pursuant to that certain Plain English Growth

Capital Loan and Security Agreement dated as of January 3, 2019 among Parent, certain of the

Debtors, and TPC  (as amended, supplemented, or otherwise modified, the "TPC Loan

Agreement" and, together with all other agreements, documents and instruments executed and/or

delivered in connection therewith, as all of the same have been amended, supplemented, or

otherwise modified at any time prior to the Petition Date, the "TPC Loan Documents"), the

Debtors are indebted and liable, without defense, counterclaim, or offset of any kind, to TPC in

the aggregate amount of not less than $8,067,334.66 (the "TPC Facility").  All obligations of the

Debtors arising under the TPC Loan Agreement or any other TPC Loan Documents, including

under the TPC Facility, shall hereinafter be referred to collectively as the "TPC Loan

1  Obligations".

2        50.     Prior to the Petition Date, to secure the TPC Loan Obligations, the Debtors

3  granted to TPC first priority liens (the "TPC Liens"), subject to the SVB Liens, on substantially all

4  of the Debtors' assets, including, but not limited to, all goods, accounts, equipment, inventory,

5  intellectual property, contract rights, leases, general intangibles, commercial tort claims, cash,

6  deposit accounts and letters of credit (collectively, the "TPC Collateral").

7        51.     SVB and TPC entered into a subordination agreement pursuant to which

8  TPC agreed that its security interest in the Debtors' assets was junior to that of SVB.

9        52.     The third source of financing the Debtors have utilized is equipment

10  financing. On June 16, 2019, Glostation and Parent entered into a credit facility with ATEL

11  GROWTH CAPITAL, a California corporation, doing business as ATEL Ventures ("Atel"),

12  pursuant to which Atel agreed to finance Glostation and Parent's purchase of equipment necessary

13  to operate their stores. Atel made three loans to Glostation and Parent, with the following

14  principal balances currently outstanding: (1) loan #1 ($348,634.93); (2) loan #2 ($1,097,123.87);

15  and (3) loan #3 ($121,485.54), for a total currently outstanding principal balance of

16  $1,567,244.34. These loans are secured by a security interest in the Debtors' equipment purchased

17  through these funds. Atel does not have an interest in cash collateral that is the subject of the Cash

18  Collateral Motion.

19        53.     On or about August 6, 2020, the parties to the Atel facility entered into an

20  amendment pursuant to which Atel has agreed to, among other things, extend the term of its loan

21  from 36 to 49 months and to substantially reduced monthly payments through June 30, 2021.

22        54.     The Debtors' primary banking relationship has been with SVB since 2019.

23  Each of the Debtors has a bank account at SVB.

24        55.     On May 4, 2020, Parent sought and obtained a PPP loan through SVB in the

25  amount of $754,363, pursuant to which certain of the Debtors' employees have been and continue

26  to be paid. As of shortly before the Petition Date: (1) there is approximately $346,524 remaining

27  from PPP proceeds; (2) the Company will opt to extend the period for use of the PPP funds from 8

28  weeks to 24 weeks and expects all obligations under the PPP loan will be forgiven by the end of

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

the 24-week period; and (3) timing for use of the PPP loan proceeds and how long those funds will last depends when stores can open and how the Company staffs them to meet the expected occupancy of the stores.

56.    Prior to the Petition Date, Parent obtained the agreement of investors to make capital contributions of an additional approximately $5 million into Parent.  This funding was conditioned upon restructuring agreements being reached with the Secured Creditors.  Each of the Secured Creditors have entered into a restructuring term sheet (collectively, the "Term Sheets") with Parent and affiliated entities.  Further, the Debtors and the Secured Creditors have negotiated and agreed upon the principal terms of a consensual restructuring of the Debtors through a plan of reorganization with terms regarding treatment of the Secured Creditors' claims consistent with the Term Sheets (the "Plan").  The Debtors and the Secured Creditors have also entered a Plan Support Agreement ("PSA").  The restructuring provided for in the Term Sheets and to be implemented with respect to the Debtors through the PSA and the Plan provide for a modification of the Debtors' repayment obligations to the Secured Creditors necessary to facilitate a successful reorganization and advance the goal of the Debtors to emerge from this case as a viable business, recognizing the significant challenges and uncertainty facing businesses in this unprecedented economic environment.

57.    Further, the Debtors have access to funding through equity contributions from Parent to re-open, operate, and build the Business, fund the administrative expense of the chapter 11 cases, and move forward with their reorganization effort.

**The Debtors' Real Property Leases**

58.    In mid-March, 2020, due to the Coronavirus pandemic, the Debtors closed all of their retail locations.  At the time, the Debtors were party to ten leases as identified below:

| Lessee | Type of Lease | Location | Landlord |
| --- | --- | --- | --- |
| Glostation | Office | Pleasanton, CA | Pleasanton Business Solutions, Inc. |
| Glostation | Store (operated by Pop-Up) | San Francisco, CA | CB-1 Commercial Co., LLC |

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

| Mission Valley | Store | Mission Valley, CA | Westfield / Mission Valley Shoppingtown LLC |
|---|---|---|---|
| San Mateo | Store | San Mateo, CA | HSC Holdings, LLC |
| Cerritos | Store | Cerritos, CA | Macerich Cerritos, LLC |
| Colony | Store | The Colony, TX | LMG Ventures, LLC |
| Austin | Store | Austin, TX | Domain Northside Retail Property LP |
| Ridge Hill | Store | Yonkers, NY | Yonkers Associates, LLC |
| Topanga | Store | Topanga, CA | Westfield / West Valley Owner LLC |
| Oakbrook | Store | Oakbrook, IL | Oakbrook Shopping Center, LLC |

59.     Colony and Ridge Hill had not yet moved into their retail space by the time the Coronavirus hit.

60.     On July 31, 2020, Glostation's lease with Pleasanton Business Solutions was terminated. The Debtors now has an arrangement with Pleasanton Business Solutions, Inc. in which Pleasanton Business Solutions, Inc. forwards all of the Debtors' mail to the Debtors, for payment of $75.00 per month which is taken out of the lease deposit currently held by Pleasanton Business Solutions.

61.     Shortly after closing their stores, the Debtors furloughed the majority of their employees.

62.     A business plan for the business enterprise including the Debtors has been developed for re-opening stores, surviving the Coronavirus pandemic, and growing the Business once Coronavirus-related restrictions have eased. That plan includes: (1) Parent obtaining funding from investors, (2) the Secured Creditors agreeing to restructure secured debt obligations and support the chapter 11 process and the Debtors' reorganization, (3) the Debtors will immediately move for rejection of two leases (at locations where the Debtors never took possession and operations never commenced--the leases to which Ridge Hill and Colony are a

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

party), (4) the Debtors will negotiate with landlords as to the remaining leases to obtain landlord

concessions and lease modifications necessary to allow viable ongoing operations in the different

economic environment resulting from the pandemic and, if negotiations are not successful, may

need to quickly move to reject additional leases to avoid incurring potential administrative

expenses, (5) the Debtors will proceed with reopening stores (the store operated by Mission Valley

was reopened on June 25, 2020, but then forced to reclose by orders of the government, the store

operated by San Mateo was reopened on July 7, 2020, and also forced to reclose, and the store

operated by Oakbrook was reopened on July 3, 2020) and additional reopenings are currently

anticipated as set forth in paragraph 41 above, and (6) the Debtors intend to move forward

expeditiously with the presentation of a plan of reorganization designed to allow them to survive

as part of a viable ongoing business enterprise, despite the severe impact of COVID-19, with a

necessary restructuring of debt and lease obligations.

63.    The Debtors were just beginning to move beyond the start-up phase of their

business when the impact of the pandemic forced them to completely shut down their operations.

Prior to this shutdown, the Debtors generated revenue from customers' credit card payments at

stores or on the Debtors' website in which customers purchase sessions at the stores.

64.    The Debtors' leases largely consisted of long-term leases with more than

five years remaining on the lease term as of the Petition Date. As these leases were negotiated and

entered by the Debtors prior to the Coronavirus pandemic, they were negotiated during a time that

the Debtors anticipated being able to quickly make improvements to the store locations and then

open the store locations to customers. The anticipated revenue that justified the monthly lease

payment on each retail lease (which in all cases is in excess of $20,000 per month when taking

into account all expenses) is no longer occurring due to the effects of the pandemic. The Debtors

anticipate that for a significant period of time, revenues at the stores will be lower than the

revenues generated prior to the pandemic. Also, costs associated with reopening and operating

stores, and additional spend necessary to drive customers to the Debtors' locations in malls, will

place additional demands on the Debtors' limited resources. As a result of the pandemic, even

after the economy reopens, the Debtors anticipate that mall traffic and walk-ins will be highly

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1  limited.  In fact, prior to the pandemic, over 90% of the Debtors' customers came from online

2  bookings, which the Debtors pay for with growth marketing, including advertising in social media.

3  Further, depending upon how the pandemic progresses, future store closings may be mandated at

4  certain points in time.  As part of the Company's efforts to reduce costs, which the Company was

5  doing prior to the onset of the Coronavirus, the Company's central team in Hong Kong runs

6  technical support, deployment, and platform upgrades to support daily operations.  Accordingly,

7  there is no doubt that the pandemic has had a severe negative impact on the economy and on the

8  Debtors' operations and significant uncertainty exists on both fronts moving forward.  The Debtors

9  expect to be able to predict only between 13% to 50% of original projected revenue until there is a

10  widely-distributed vaccine.  Ideally, the Debtors need relief in the form of gross percentage rent,

11  which gives landlords upside if the impact is not as large, and keeps it manageable for the

12  Company to continue paying their fixed expenses and corporate overhead, including IT support.

13  This rent structure will enable the Debtors to get to a break-even cashflow in order to attract new

14  investors.

15      65.     Landlords have found that having a Sandbox VR in their center is a real

16  asset based on the following benefits:

17      a.     As noted above, the Company does not rely on mall traffic to obtain

18  customers.  Prior to the pandemic, over 90% of customers came from online bookings, which the

19  Debtors pay for with growth marketing, including advertising in social media.

20      b.     25% of store revenue will be spent on advertising and social media.

21  This brings thousands of customers a month into the store and center.  After customers go to

22  Sandbox VR, they typically go to neighboring restaurants and shops.

23      c.     The Debtors' operations team has created processes where customers

24  and staff feel safe.  Everyone wears masks throughout their experience.  Customers suit

25  themselves up in the decks with 6 feet social distancing staff.

26      d.     The sessions have always been private, meaning the Debtors do not

27  fill up or combine strangers in the decks.

28      e.     There are very few location-based entertainment concepts with free-

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1  roam, fully immersive VR experiences.  The Debtors typically draw from an entire market – far

2  beyond the trade area of just the center in which the store is located.

3          f.      The long-term goals for the Company are to attract new investors

4  once business returns to normal.  When this happens, the Company's plan is to restart growth with

5  new stores.  This is a very duplicatable business model.

6          66.     For these reasons, the Debtors engaged in discussions with their landlords

7  prior to the Petition Date regarding a renegotiation of the Debtors' lease terms.  Those negotiations

8  are ongoing.  In virtually all cases, the Debtors' landlords informed the Debtors that the landlords

9  believed that lease modification agreements could be achieved, but that the landlord would not

10  reach such an agreement prior to the Debtors commencing their Chapter 11 bankruptcy cases.  The

11  Debtors will continue to attempt to promptly reach agreement with their landlord on necessary

12  lease modifications in order for the Debtors to be able to move forward on a viable basis, restore

13  their operations, and ultimately emerge as a sustainable company despite the ongoing harm caused

14  and challenges imposed by the pandemic.

15          67.     As noted above, the Debtors have determined to reject the leases for the

16  locations of Ridge Hill and Colony.  The Debtors entered into these leases only recently, and did

17  not build out or move in to either location.  As such, the Debtors made no improvements to either

18  lease location, and there is no property of the Debtors located at either of the leased premises.  As

19  noted in footnote 3 above, it is my understanding that, prior to the Petition Date, each of the

20  landlords for these two locations already viewed the respective leases as terminated, and that the

21  landlord for the Colony location already re-let the premises to another party.  Nevertheless, out of

22  an abundance of caution, to ensure the estates do not accrue any administrative expenses with

23  respect to premises over which these Debtors never took possession and which provide no benefit

24  to the estates, Ridge Hill, in its bankruptcy case, and Colony, in its bankruptcy case, are filing a

25  motion to reject those leases as of the Petition Date.

26          68.     The Debtors' goal is to open additional stores during this bankruptcy case

27  and to reach lease modification agreements with landlords for all of their remaining leases.

28  Because the impact of the pandemic is changing, this situation is highly fluid and the Debtors

1    cannot anticipate with precision whether and when additional stores will reopen.

2                                    **Historical Financial Results**

3              69.    The Debtors started up the Business in recent years, and just as they were

4    beginning to move beyond the start-up phase of their business, the impact of the pandemic forced

5    them to completely shut down their operations.  Since the initial inception of the start-up business

6    operations in 2017, until the Debtors closed their stores in mid-March, 2020, the Debtors had

7    begun to generate revenue as follows:

8                           a.    For fiscal year 2017 (January 1, 2017, through December 31, 2017),

9    the Debtors had revenue of $0.00.

10                          b.    For fiscal year 2018, the Debtors had $545,594.30 in revenue.

11                          c.    For fiscal year 2019, the Debtors had $1,816,488.14 in revenue.

12                          d.    For January 1, 2020, through May 31, 2020, the Debtors had

13   $1,390,414.95 in revenue.

14                                 **The Debtors' Cash Management**

15             70.    As of the Petition Date, the Debtors utilized eleven bank accounts at SVB

16   (collectively, the "Debtor Accounts"), one held by each of the eleven Debtors, all of which

17   collectively form the Debtors' cash management system.  The Debtor Accounts are used solely for

18   the Business.

19             71.    The Debtors' main operating account is at SVB, Account No. x9836 (the

20   "9836 Account").  Although these amounts may slightly fluctuate, shortly before the Petition Date:

21   (a) the 9836 Account carried a balance of approximately $16,230; (b) Oakbrook's bank account

22   carried a balance of approximately $14,400; and (d) the Debtors' other bank accounts each carried

23   a balance of no more than $1,600.

24             ·72.    Pre-petition, the Debtors' cash management system generally ran as follows:

25                          a.    All revenues generated from sales made through the Debtors'

26   website (customers can reserve sessions through the website) were made through Stripe, Inc.,

27   which is a credit card processor ("Stripe").  Stripe collected funds from these credit card sales and

28   deposited these funds into the SVB account associated with that particular debtor, after subtracting

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1  a service charge.

2      b.    All revenues generated from sales made at a physical store location

3  were collected by Square, Inc., which is a credit card processor ("Square").  The Debtors do not

4  accept cash payments at any of their stores, so all store revenue is collected by Square.  Square

5  would then deposit these funds into the SVB bank account associated with that particular debtor,

6  after subtracting a service charge.

7      c.    Each of the Debtors paid expenses from its own bank account at

8  SVB, to the extent funds were available.  If such funds were not available, Glostation would

9  transfer funds from the 9836 Account to that account.  Alternatively, Core would transfer funds to

10  that Debtor's account.  Alternatively, Glostation or Core would pay third parties directly.

11      d.    As for the Debtors' employees: (i) San Mateo employs its own retail

12  store staff; (ii) Pop-Up employs its own retail store staff, as well as the retail store staff for all

13  other Debtors (except San Mateo); and (iii) Glostation employs all non-retail staff.  Payroll is

14  funded through the bank account of the respective Debtor employer and then, as applicable,

15  booked as an intercompany claim.  Upon Parent obtaining its PPP loan, the Debtors' payroll was

16  paid by the respective Debtor accounts, and if those accounts were short of funds, Parent

17  transferred funds to the relevant Debtor account and those transfers were booked as a payable to

18  Parent.

19      73.    As discussed in the Cash Management Motion, consistent with the Debtors'

20  pre-petition operations, and subject to Court approval of the Cash Management Motion, the

21  Debtors intend to maintain the eleven separate accounts for, at least, a transition period of 45 days.

22  in addition, Glostation intends to open a new tax and payroll account post-petition.

### The Debtors' Online Platform

24      74.    As noted above, the website for the Business is www.sandboxvr.com.  The

25  Debtors accept reservations made on this website, and accept credit card payments through their

26  agreement with Stripe.

### The Debtors' Assets

28      75.    The Debtors' primary assets consist of inventory,  equipment, and security

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1  deposits.

## The Debtors' Debt Structure

**Secured Debt**

76.     At or about the Petition Date, the Debtors have secured debt in the aggregate amount of approximately $13 million, held by the Secured Creditors.

77.     As of the Petition Date, the balance owing to SVB on account of its loan to the Debtors was approximately $4 million.

78.     As of the Petition Date, the balance owing to TPC on account of its loan to the Debtors was an amount not less than $8,067,334.66.

79.     As of the Petition Date, the balance owing to Atel on account of its loan to the Debtors was approximately $1,567,244.

80.     Additionally, some creditors may assert mechanic's liens against property which the Debtors lease.

**Unsecured Debt**

81.     As of about the Petition Date, the Debtors have general unsecured debt (not counting intercompany claims, or debts owed to affiliates who are non-Debtors) in the aggregate of approximately $1,590,000.[4]

82.     Of that amount, the amount owed to the Debtors' top 30 unsecured creditors is approximately $1,558,000.

## The Debtors' Employees

83.     Due to the Coronavirus, the Debtors laid off most of their employees. Prior to March, 2020, the Debtors had 147 employees. The Debtors have re-hired some employees at

---

[4] Many of the Debtors possess intercompany claims against one or more other Debtors. That is because of the way the Debtors operated the Business. Historically, Core paid expenses relating to preparing stores for opening. Once open, the individual stores (one store each operated by Mission Valley, San Mateo, Cerritos, Colony, Austin, Ridge Hill, Topanga, Oakbrook, and Pop-Up, although Colony and Ridge Hill had not opened their stores by the Petition Date) generated their own income and paid their own expenses. In some instances, shortfalls were covered by Glostation. For purposes of the discussion in this declaration regarding claims against the Debtors, intercompany claims are not taken into account.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

this point in connection with the re-opening of the Debtors' stores operated by Mission Valley, San Mateo, and Oakbrook. The Debtors now operate with a limited staff of 20 employees (the "Employees"). The Debtors anticipate hiring additional employees to the extent additional stores are re-opened. The Employees are all full-time employees, except for retail staff who are all part-time with the sole exception of the store manager who is full-time.

84.     I am not a salaried employee of the Debtors and do not intend to take a salary from the Debtors during this bankruptcy case.

85.     The Employees are paid biweekly. They are paid the Friday after the conclusion of each two-week period. The Employees' last pay period was July 20, 2020, to August 2, 2020, for which they received payment on August 7, 2020. The Employees' next payment is due on August 21, 2020, covering the period from August 3, 2020, to August 16, 2020.

86.     The Employees currently receive, collectively, approximately $53,500 each bi-weekly pay period.

### The Virus Precipitated These Chapter 11 Filings

87.     The Coronavirus and the economic reverberations resulting therefrom precipitated the Debtors' Chapter 11 filings.

88.     Due to the dramatic decrease in the Debtors' revenue as a result of store closings caused by the Coronavirus, the Debtors were forced to cease making rent payments to their landlords. The Debtors have attempted to negotiate with their landlords to amend the terms of their leases, substantially all of which are 10-year leases and were entered into in within the past two years. As indicated above, landlords have generally advised the Debtors that the landlords believe lease modification agreements can be achieved following the commencement of chapter 11 cases by the Debtors, but that landlords have generally been unprepared to reach such agreements prior to the Debtors commencing chapter 11 cases.

### THIS CHAPTER 11 CASE

89.     The Debtors commenced these reorganization cases to restructure their operations and debt. The Debtors believe that a successful overall reorganization will maximize the value of the Estates and allow the Debtors to emerge from chapter 11 as a reorganized and

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1  viable ongoing business.

2       90.    However, a successful restructuring likely will require cooperation of

3  certain stakeholders in the Debtors, including the Secured Creditors, as well as Parent and its

4  equity investors, the Debtors' landlords, and potentially others.  Significant progress toward

5  successful reorganization has already been made, with restructuring terms achieved with secured

6  creditors holding more than approximately $13 million in claims.

7      **FACTS IN SUPPORT OF "FIRST-DAY" EMERGENCY MOTIONS**

8      **Motion For Order Approving Stipulation Among Debtors, Silicon Valley Bank, And**

9      **Triplepoint Capital LLC Granting Consent To Use Cash Collateral On An Interim Basis,**

10      **And Setting Final Hearing On Motion (the "Cash Collateral Motion")**

11       91.    As a result of the loans the Debtors obtained from SVB and TPC, SVB and

12  TPC both assert security interests in the Debtors' cash collateral.  As far as I am aware, no other

13  entity asserts an interest in the Debtors' cash collateral.

14       92.    Prior to the Petition Date, the Debtors entered into an agreement with SVB

15  and TPC relating to the Debtors' use of cash collateral, embodied in an interim order.  A true and

16  correct copy of this order is attached to the Cash Collateral Motion as Exhibit 1.

17       93.    An immediate need exists for the Debtors to obtain access to cash collateral

18  in order to continue operations, fund payroll and operating expenses, and to administer and

19  preserve the value of their estates pending a final hearing on this Motion.  The ability of the

20  Debtors to operate through the use of cash collateral on an interim basis is vital to the preservation

21  and maintenance of the going concern value of the Debtors' estates, to maximize the value of the

22  Debtors' assets for the benefit of their creditors, and to avoid immediate and irreparable harm to

23  the Debtors, their estates, and their creditors.

24      **Motion for Order Authorizing Payment and/or Honoring of Prepetition Workforce**

25      **Obligations, Including Compensation, Benefits, Reimbursements, Withholding Taxes,**

26      **Accrued Vacation, and Related Claims (the "Workforce Obligations Motion")**

27       94.    A true and correct list of the Debtors' current Employees (with names

28  redacted), including each Employee's job title and wage information, is attached to the Workforce

Obligations Motion as Exhibit 1 (the "Employee List"). The Employees consist of Store Managers, Operations Managers, Accounting Managers, Franchise Development Managers, and heads of various departments including Design, Development, and Franchise Operations.

95.     The Debtors pay their Employees bi-weekly on Friday, covering the two week period ending the previous week. Annual salaries are divided equally over the same pay dates each year. The current average amount the Debtors need for any given payroll period is approximately $53,500 for wages only (not including benefits or employer taxes, and not including my salary). Not all Employees on the Employee List currently are active in light of the store closings; therefore, for any upcoming payroll periods that relate to work performed prior to the Petition Date, only those Employees identified on the highlighted line items in the Employee List will be paid.

96.     The Debtors offer their full-time Employees medical, vision, dental, and life insurance plans. Full-time salaried (exempt) employees have unlimited PTO upon approval of their manager with a minimum of 7 days required annually, and do not accrue vacation or sick leave. Full-time Employees also receive paid company holidays. Retail full time employees working a minimum of 40 hours per week primarily in a retail location are eligible for paid vacation leave benefits. Vacation will start to accrue for full time employees after 120 days of continuous service at the rate of 3.08 hours per pay period and eligible employees can accrue a maximum of 80 hours. Employees will be allowed to carry over their maximum accrual into the next calendar year. Upon termination of employment, employees will be paid for all accrued but unused vacation, pursuant to California law.

97.     The Debtors also offer the Employees the opportunity to participate in a 401(k) Plan.

98.     Employees are entitled to reimbursement of certain business-related expenses.

99.     It is possible that some of the Employees will not have timely submitted receipts and/or other documentation for a minimal amount of reimbursement of business expenses as of the Petition Date. The total of these unpaid expenses likely will be less than $1,000.

100.    The Debtors use Rippling (www.rippling.com) to process their payroll. Prior to the date that Parent obtained the PPP loan and began paying the Employees from the proceeds of the PPP loan, payroll and payroll taxes were wired out of the bank accounts at Silicon Valley Bank for each of Glostation, San Mateo, and Pop-Up for their respective employees by Rippling on the Wednesday before each pay date.

101.    As a result of the Debtors' commencement of their bankruptcy cases, absent Court order, the Debtors will be restricted from paying and/or honoring accrued and unpaid wages, salaries, vacation, and other forms of employee compensation and benefits attributable to the pre-petition period.

102.    In large part, the Debtors' ongoing operations, the ability of the Debtors to reopen their stores after the pandemic recedes, the opportunity for the Debtors to maximize the value of the Estates, and the Debtors' ability to meet their obligations is dependent upon a stable and productive workforce. Many of the Employees simply cannot afford to miss, or be deprived of, a pay period or payment or benefits they receive in the ordinary course of their engagement. As noted above, the next payroll payment date is July 24, 2020, covering the period from July 6, 2019, to July 19, 2020 (which includes fourteen pre-petition dates), followed by a payroll payment date of August 7, 2020, covering the period from July 20, 2020, to August 2, 2020 (which includes two pre-petition dates). And, to the extent the Debtors are not authorized to make a payroll payment to them on July 24, 2020, and August 7, 2020, I believe that some of the Employees will suffer extreme personal hardship and, in many cases, may be unable to pay basic living expenses.

103.    The stability of the workforce pool is tenuous. The labor pool is mobile. At the same time, it could be difficult for the Debtors to find qualified replacement employees and/or independent contractors with the unfavorable publicity of disrupted pay or benefits, combined with the recent layoffs the Debtors implemented in response to the Coronavirus pandemic. Even if replacements could be hired, it could take significant time before they could be fully trained and qualified for the jobs, resulting in further disruption and harm to the Business.

104.    Each of the Employees for whom the Debtors request the relief in the Workforce Obligations Motion is currently working for the Debtors. The Debtors will not pay

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1    pre-petition wages or compensation or claims to employees who are no longer engaged by the

2    Debtors or to those employees who have notified the Debtors that they will be leaving.

3        105.    The Debtors are not seeking to pay out the vacation pay to the Employees,

4    but only to honor accrued vacation days in the ordinary course of its business.  The Debtors will

5    not pay any Employee any amount for pre-petition claims in excess of $13,650.

6        106.    Subject to Court authorization to use cash collateral, the Debtors have

7    sufficient funds to make the payment to the Employees on July 24, 2020, and August 7, 2020,

8    without rendering the Estates administratively insolvent.

9    **Motion for Order (1) Deeming Utility Companies Adequately Assured of Future**

10    **Performance, (2) Establishing Procedures for Requests for Additional Assurance, and**

11    **(3) Restraining Utility Companies From Discontinuing Alternating or Refusing Service**

12    **(the "Utilities Motion")**

13        107.    In connection with the operation of the Business, the Debtors obtain

14    electricity, natural gas, water/sewage, trash removal/waste, telephone and other similar services

15    from a number of different utility suppliers (the "Utility Providers").  The Utility Providers are

16    identified in the chart attached to the Utilities Motion as Exhibit 1.  That Exhibit 1 details the

17    name and address of the Utility Providers, the type of service provided, the debtor entity to which

18    the service relates, the amount of the Debtors' average monthly expense, and the amount of the

19    deposit held by each Utility Provider, if any.

20        108.    Many of the Debtors' utilities are paid by their landlords, pursuant to the

21    relevant lease.  The Debtors pay only a few utility bills directly, and their monthly utility bill

22    aggregates to approximately $7,700.  The Debtors' phone and internet expenses average

23    approximately $4,500 per month.  The Debtors' other utility expenses (including electricity, gas,

24    and waste removal) average approximately $3,200.

25        109.    Prior to the onset of the COVID-19 pandemic and consequent closure of the

26    Debtors' stores, the Debtors were current on their obligations to Utility Providers.  More recently,

27    with closure of the stores in light of the pandemic, the Debtors were in default to several of the

28    Utility Providers.  However, the Debtors expect that revenue generated from their going-forward

1  business operations will be sufficient to pay all post-petition utility obligations, and intend to pay

2  all post-petition obligations to the Utility Providers in a timely manner.

3      110.    One Utility Provider, San Diego Gas & Electric, holds a deposit of the

4  Debtors totaling $2,230.  None of the other Utility Providers hold any deposits from the Debtors.

5      111.    The Debtors propose to provide adequate assurance to the Utility Providers

6  by making a deposit equal to one-half of the Debtors' average monthly expense for each Utility

7  Provider, as identified on Exhibit 1 to the Utilities Motion, into a segregated account, as adequate

8  assurance (the "Adequate Assurance Deposit") upon this Court's entry of the order on the Utilities

9  Motion.  The Debtors anticipate that the total amount of Adequate Assurance Deposits that the

10  Debtors will make if the Motion is granted is approximately $3,000.

11  **Motion for Order Directing Credit Card Processor to Honor Agreements with the Debtors**

12  **Pending Assumption or Rejection (the "Credit Card Motion")**

13      112.    In the ordinary course of business, the Debtors accept only credit card

14  payments from their customers.  The Debtors do not accept cash.  Stripe handles the Debtors'

15  credit card processing for all sales made via the Debtors' website.  Square (together with Stripe,

16  the "Processors") handles the Debtors' credit card processing for all sales made at the stores.

17      113.    The Debtors entered processing agreements with the Processors to facilitate

18  credit card transactions and online purchases (the "Processing Agreements").  Under the

19  Processing Agreements, the Debtors' credit card transactions, including both charges and credits,

20  are processed for payment.  The Debtors' processing agreement with Square is attached to the

21  Credit Card Motion as Exhibit 1.  The Debtors understand that this is the form agreement that all

22  customers of Square must accept in order to do business with Square, and that in order accept the

23  terms of this document, the customer must register for a Square account online.  The Debtors have

24  registered for Square accounts, and as such, the terms of this processing agreement apply to the

25  Debtors who use Square as a credit card processor—even though the processing agreement

26  attached as Exhibit 1 to the Credit Card Motion does not have the Debtors' signature on it.  The

27  Debtors' processing agreement with Stripe is attached to the Credit Card Motion as Exhibit 2.

28      114.    Granting the Debtors the relief requested in the Credit Card Motion is

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

crucial to the Debtors' ability to continue to operate their Business during this chapter 11 case
without interruption.  Any interruption in the Debtors' ability to handle credit card transactions or
online purchases would have a devastating impact on the Business, and customer support and
loyalty, the value of the Estates, and the interests of creditors in this case.

**Motion for Order Authorizing Debtors to Maintain Bank Accounts and Cash Management
System and Continue Use of Its Existing Business Forms (the "Cash Management Motion")**

115.    As set forth in more detail in the Cash Management Motion, one form of
relief sought through that motion is authority for the Debtors to maintain their existing cash
management system.  A description of the Debtors' general cash management system is set forth
above under the heading "The Debtors' Cash Management."

116.    Prior to the Petition Date, the Debtors utilized the following eleven Bank
Accounts:

| Debtor | Bank | Account No. |
|---|---|---|
| Glostation USA, Inc. | Silicon Valley Bank | x9836 |
| Glostation Core USA, Inc. | Silicon Valley Bank | x9855 |
| Sandbox VR Topanga, LLC | Silicon Valley Bank | x1300 |
| Sandbox VR Mission Valley, LLC | Silicon Valley Bank | x1315 |
| Sandbox VR San Mateo, LLC | Silicon Valley Bank | x1288 |
| Sandbox VR Cerritos, LLC | Silicon Valley Bank | x1292 |
| Sandbox VR Ridge Hill, LLC | Silicon Valley Bank | x1334 |
| Sandbox VR Austin, LLC | Silicon Valley Bank | x2086 |
| Sandbox VR Colony, LLC | Silicon Valley Bank | x2109 |
| Sandbox VR Oakbrook, LLC | Silicon Valley Bank | x2113 |
| Sandbox VR Pop-Up, LLC | Silicon Valley Bank | x0160 |

117.    The Debtors anticipate re-opening additional stores, and, therefore, the
Debtors will require a separate business account for each entity, and request authority to keep the
existing accounts at SVB open, at minimum, for a transition period of 45 days.

118.    Glostation intends to open a DIP payroll and DIP tax account.  It is

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

anticipated that Glostation will make payroll payments for all of the Debtors post-petition. To the extent other Debtor entities make post-petition payroll payments, a separate DIP payroll account will be opened for each such entity.

119.    If the Debtors are required to close their existing accounts immediately, open all new bank accounts and substantially alter their existing cash management system, there likely would be a significant disruption in the Debtors' ability to collect and disburse funds in the ordinary course of their operations. Such a disruption would negatively impact the Debtors' ability to make a smooth transition into chapter 11. Accordingly, in the Cash Management Motion, the Debtors request that the Court enter an order authorizing (but not directing) the Debtors' continued use of the pre-petition Debtor Accounts, rather than opening new debtor in possession accounts. In the alternative, to ensure a smooth transition into this case, the Debtors request authority to maintain their pre-petition bank accounts for a 45-day transition period, after which the Debtors will close those accounts and re-open the necessary debtor in possession accounts.

120.    If the Debtors are not permitted to maintain and utilize their cash management and banking system as more particularly set forth above and in the Cash Management Motion, the Debtors, the Estates, and creditors will be prejudiced by:  (a) the resulting disruption in the ordinary financial affairs and business operations of the Debtors; (b) potential delay in the administration of the Estates; and (c) the unnecessary cost to the Estates to set up new accounts and new systems.

121.    The Debtors do not utilize checks, therefore there is no risk of inadvertent cashing of outstanding prepetition checks.

### Debtors' Emergency Motion For Order Jointly Administering Cases
### ("__Administration Motion__")

122.    Glostation owns a 100% equity interest in Core, and Core owns a 100% equity interest in each of the remaining Debtors. Neither Glostation nor Core hold their securities "in a fiduciary or agency capacity without voting power or solely to secure debt." Accordingly, each of the Debtors are "affiliates" as defined by the Bankruptcy Code.

123.    There is significant overlap in the Debtors' creditor bodies.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

124.    There are no present existing actual conflicts among the Estates that would hinder or interfere with joint administration or prejudice creditors of the Estates by reason of joint administration.  While certain of the Debtors have intercompany claims against other Debtors, that is a result of the enterprise's cash management system and not reflective of conflicting interests among various debtor parties.

125.    Due to the close relationship among the Debtors, any actions taken by or against one of the Debtors will likely affect the other Debtors, at least indirectly.  Joint administration of the Debtors' estates will minimize duplication and unnecessary expense.

**Debtors' Emergency Motion For Order (1) Limiting Extent Of Notice Required For Administrative Matters; And (2) Authorizing Service By Electronic Mail ("Limit Notice Motion")**

126.    The Debtors collectively have over 70 creditors and other parties in interest identified on the Debtors' master mailing list.

127.    The Debtors may be required to bring numerous administrative matters before the Court during the prosecution of this chapter 11 case, including matters relating to the permissive use of cash collateral or authorizing the procurement of debtor in possession financing, the assumption or rejection of executory contracts, motions compromising or objecting to claims, and the like.

**Debtors' Emergency Motion For Order Extending Time To File Schedules, Statements And Related Papers By Fourteen (14) Days ("Schedules Extension Motion")**

128.    The Debtors have already commenced the process of gathering the necessary information to prepare and finalize the Schedules, Statements and Related Papers.  The Debtors, however, have limited accounting and administrative personnel (only approximately three individuals).

129.    The Schedules, Statements and Related Papers will be filed as soon as they are complete and, to that end, if the Debtors are able to finalize these documents by their original due date, the Debtors will file them then.  Nonetheless, the initial fourteen (14) day period of time to file the Schedules, Statements and Related Papers provided by Rule 1007(c) may not be

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL  213.626.2311 • FAX  213.629.4520

sufficient to permit completion of these documents.

**Debtors' Emergency Motion For Order Authorizing Debtors to File Consolidated List of Creditors And Consolidated List of Debtors' Thirty Creditors Holding Largest Unsecured Claims**

130.    As noted above, the Debtors collectively have over 100 creditors and other parties in interest identified on the Debtors' master mailing list, and the Debtors operate as a single business enterprise together with various non-debtor entities.  As reflected in the organizational chart (Exhibit 1 hereto), this business enterprise includes a single parent entity at the top of the organizational chart.

131.    The Debtors currently maintain in their books and records, including in computer files, and update, various lists of the names and addresses of each of their respective creditors and other parties in interest, if any, that I am informed will be entitled to receive notices and other pleadings filed in these bankruptcy cases.  The Debtors believe that consolidating this information would be the most efficient manner to provide the notices and other pleadings to parties in interest in these cases.

132.    Furthermore, as set forth above, the Debtors also filed, in each of the individual bankruptcy cases, a motion seeking joint administration of these cases.  I am informed that, if that motion is granted, the Debtors will be required to file a consolidated mailing list in the lead bankruptcy case.  For such reasons, the Debtors request authority to file the lists for each of the Debtors in one consolidated form.

//
//
//
//
//
//
//
//
//

1    133.    The Debtors also believe that a single consolidated list of their combined

2  thirty (30) largest unsecured creditors, excluding insiders, would be more reflective of the body of

3  unsecured creditors that have the greatest stake in these cases (rather than separate lists for each of

4  the Debtors).  For these reasons, the Debtors also request authority to file a single consolidated list

5  of their thirty (30) largest unsecured creditors in these cases.

6    I declare under penalty of perjury under the laws of the United States of America that the

7  foregoing is true and correct, and that this declaration was executed on August 10, 2020, in Hong

8  Kong.

9

10

Steven Zhao

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520