1  David S. Kupetz (CA Bar No. 125062)
     *dkupetz@sulmeyerlaw.com*
2  Steven F. Werth (CA Bar No. 205434)
     *swerth@sulmeyerlaw.com*
3  Claire K. Wu (CA Bar No. 295966)
     *ckwu@sulmeyerlaw.com*
4  **Sulmeyer**Kupetz
   A Professional Corporation
5  333 South Grand Ave, Suite 3400
   Los Angeles, California 90071
6  Telephone: 213.626.2311
   Facsimile: 213.629.4520
7
   Attorneys for Glostation USA, Inc. and
8  related debtors

9            UNITED STATES BANKRUPTCY COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11            SAN FERNANDO VALLEY DIVISION

12  | In re | Case No.  1:20-bk-11435-MB |
13  | GLOSTATION USA, INC., a Delaware corporation, | Chapter 11 |
14  | Debtor. | **MOTION FOR ORDER APPROVING ASSUMPTION OF PLAN SUPPORT AGREEMENT; DECLARATION OF STEVEN ZHAO** |
15  | |  |
16  | Federal EIN:  37-1875688 | Date:        September 22, 2020 |
17  | | Time:        1:30 |
    | | Place:       U.S. Bankruptcy Court |
18  | |              Courtroom 303 |
    | |              21041 Burbank Blvd. |
19  | |              Woodland Hills, CA 91367 |

20

21

22

23

24

25

26

27

28

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1

## TABLE OF CONTENTS

Page

2

3    I. INTRODUCTION ...................................................................................................................3

4    II. BACKGROUND ...................................................................................................................3

5    III. THE PLAN SUPPORT AGREEMENT ..............................................................................6

6    IV. THE PLAN TERM SHEET ...............................................................................................10

7    V. RELIEF REQUESTED .......................................................................................................14

8    VI. BASIS FOR RELIEF ........................................................................................................14

9       A.    Assumption of the Plan Support Agreement ............................................................14

10   VII. CONCLUSION.................................................................................................................17

11   DECLARATION OF STEVEN ZHAO ....................................................................................18

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

i

## TABLE OF AUTHORITIES

**Page**

### CASES

11 U.S.C. § 365(a) .................................................................................................................... 1, 14

*Agarwal v. Pomona Valley Medical Group,*
  *Inc. (In re Pomona Valley Medical Group, Inc.)*, 476 F.3d 665, 670 (9th Cir. 2007) ......... 15

*Burtch v. Masiz (In re Vaso Active Pharms., Inc.),*
  500 B.R. 384, 397-98 (Bankr. D. Del. 2013) ......................................................................... 15

*Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
  60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ............................................................................. 15

*Computer Sales Int'l v. Fed. Mogul (In re Fed. Mogul Global, Inc.)*,
  293 B.R. 124, 126 (Bankr. D. Del. 2003) .............................................................................. 15

*Durkin v. Benedor Corp. (In re G.I. Indust., Inc.)*,
  204 F.3d 1276, 1282 (9th Cir. 2000) ..................................................................................... 15

*Gantler v. Stephens*,
  965 A.2d 695, 705-06 (Del. 2009) ......................................................................................... 15

*In re Cent. Jersey Airport Servs., LLC*,
  282 B.R. 176, 183 (Bankr. D.N.J. 2002) ............................................................................... 15

*In re Genco Shipping & Trading Ltd.*,
  509 B.R. 455 (Bankr. S.D.N.Y. 2014) ................................................................................... 16

*In re Rickel Home Ctrs., Inc.*,
  209 F.3d 291, 298 (3d Cir. 2000) .......................................................................................... 15

*Nat'l Labor Relations Bd. v. Bildisco & Bildisco (In re Bildisco)*,
  682 F.2d 72, 79 (3d Cir. 1982), *aff'd*, 465 U.S. 573 (1984) ................................................. 15

*NLRB v. Bildisco & Bildisco*,
  465 U.S. 513, 523 (1984) ....................................................................................................... 16

*Omnicare, Inc. v. NCS Healthcare, Inc.*,
  818 A.2d 914, 928 (Del. 2003) .............................................................................................. 15

*Show Grp. v. Bechtel Jacobs Co. (In re IT Grp., Inc.)*,
  350 B.R. 166, 177 (Bankr. D. Del. 2006) .............................................................................. 15

### STATUTES

11 U.S.C § 363(b) ...................................................................................................................... 14

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

11 U.S.C § 507(a)(8) ................................................................................................ 12

11 U.S.C. § 105(a) .............................................................................................. 1, 14

11 U.S.C. § 1129(a)(4) .............................................................................................. 7

11 U.S.C. § 1129(a)(9)(C) ...................................................................................... 12

11 U.S.C. § 507(a)(2) ................................................................................................ 7

11 US.C. § 503(b) ..................................................................................................... 7

**<u>RULES</u>**

Fed. R. Bankr. P. 6004 ........................................................................................... 14

Fed. R. Bankr. P. 6006 ........................................................................................... 14

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1   **TO THE HONORABLE MARTIN R. BARASH, UNITED STATES BANKRUPTCY**

2   **JUDGE; THE OFFICE OF THE UNITED STATES TRUSTEE; AND ALL OTHER**

3   **INTERESTED PARTIES:**

4         Glostation USA, Inc., a Delaware corporation ("Glostation"), and its affiliated debtors and

5   debtors in possession (collectively with Glostation, the "Debtors"),[1] respectfully request the entry

6   of an order, substantially in the form attached hereto as **Exhibit 1** (the "Proposed Order"),

7   pursuant to sections 105(a) and 365(a) of Title 11 of the United States Code (the "Bankruptcy

8   Code") authorizing the Debtors' assumption of the Plan Support Agreement ("PSA"), entered into

9   among the Debtors, Silicon Valley Bank ("SVB"), TriplePoint Capital LLC ("TPC"), ATEL

10   GROWTH CAPITAL, a California corporation, doing business as ATEL Ventures ("Atel") and

11   Sandbox VR, Inc. ("Parent").  A true and correct copy of the PSA is attached hereto as **Exhibit 2**.

12         In the PSA, the Debtors, on the one hand, and SVB, TPC, and Atel (collectively, the

13   "Secured Creditors"), on the other hand, have negotiated and agreed upon the principal terms of a

14   consensual restructuring of the Secured Creditors' claims against the Debtors through a plan of

15   reorganization (the "Plan") on the terms set forth in a plan term sheet attached to the PSA as

16   Exhibit A (the "Plan Term Sheet").  By the PSA, the Secured Creditors have agreed to support the

17   reorganization of the Debtors containing certain terms, and have agreed to vote to accept

18   confirmation of the Plan.

19         The Debtors' access to funding and business operations were severely impacted the by the

20   COVID-19 pandemic.  As a result, a prompt restructuring of the Debtors' obligations is imperative

21   for the Debtors' survival.  The PSA is the lynchpin of the Debtors' consensual restructuring,

22   providing the roadmap for the Debtors' successful emergence from chapter 11.  The PSA

23   represents a comprehensive solution to the Debtors' needs and is supported by all of the Debtors'

24   secured creditors as well as Parent, which will contributing the funds necessary for the Debtors to

25   emerge from chapter 11.   The Secured Creditors, with total claims in the approximate amount of

26

27   [1] The Debtors have each filed a motion for joint administration in their respective bankruptcy
cases.

28

1    $13 million, hold the vast majority of the amount of claims against the Debtors.  The collective

2    goal of the Secured Creditors, Parent, and the Debtors is to emerge from chapter 11 as quickly as

3    feasible and in a manner that will facilitate the Debtors' ability to move forward on a viable basis,

4    even in the face of the ongoing impacts of the pandemic.  The Debtors believe that Court approval

5    of assumption of  the PSA is a crucial step toward achieving that goal.

6        This motion is based on the attached Memorandum of Points and Authorities, the

7    supporting exhibits attached hereto, the attached declaration of Steven Zhao, and the arguments of

8    counsel to be made at the hearing on the Motion.

9        **FOR THESE REASONS**, the Debtors respectfully request that the Court enter an order in

10   a form substantially similar to that attached hereto as **Exhibit 1**, approving assumption of the PSA,

11   and grant such other relief as the Court deems proper.

12   Dated:  August 14, 2020                          Respectfully submitted,

13                                                    **Sulmeyer**Kupetz
                                                      A Professional Corporation

14

15

16                                                    By:        */s/ David S. Kupetz*

17                                                               David S. Kupetz
                                                               Steven F. Werth

18                                                             Claire K. Wu
                                                             Attorneys for Glostation USA, Inc. and related

19                                                             debtors

20

21

22

23

24

25

26

27

28

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL  213.626.2311 • FAX  213.629.4520

## MEMORANDUM OF POINTS AND AUTHORITIES[2]

## I.

## INTRODUCTION

The Debtors are part of a business enterprise established to develop, operate, and franchise facilities offering full-body tracking, free roaming, virtual reality experiences for private groups (meaning no strangers can play together), operating under the name "Sandbox VR ™" (the "Business").  The website for the Business is www.sandboxvr.com.

Immediately prior to the onset of the COVID-19 pandemic, the Business was starting to emerge from the initial, start-up phase of its existence.  It had seven operating locations, anticipated obtaining a "Series B" round of equity funding, and then opening at least another 20 stores within the next year.  Unfortunately, COVID-19 struck and, as a result, in mid-March, 2020, the Business was forced to shut down its operations, postpone the opening of any new stores, close all its existing stores, and furlough and lay-off employees.

The Business currently is in the process of reopening, re-hiring employees, and implementing a recovery process.  Despite the challenging and uncertain economic environment, the Debtors intend to move as quickly as feasible through this case and overall recovery process. The PSA is the vehicle for driving a successful reorganization of the Debtors.  Even in the face of the pandemic, investors have provided funding to Parent that is available to the Debtors. subject to restructuring of the debt of Secured Creditors in accordance with the PSA and the plan term sheet attached thereto.

## II.

## BACKGROUND

The virtual reality experience the Business provides includes placing customers in enclosed rooms --referred to as a holodeck or "deck"--after outfitting each customer with a virtual reality headset, or "HMD" (head-mounted display), and equipment which transmit information to,

---

[2] Terms defined in the foregoing Motion shall have the same definition in this Memorandum of Points and Authorities.

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1    and can be read by, various electronic devices that surround the deck.  The electronic system can

2    read the customer's position on the deck, and also transmits to the customer a virtual image of the

3    other persons on the deck, as well as a virtual image of what that customer can "see" as that

4    customer moves about the deck.  There are no cords, so customers can move around the deck

5    freely.

6        The Debtors' business model is that customers visit brick-and-mortar stores which the

7    Debtors lease from landlords.  Each such store has 2 to 4 enclosed decks, each of which can hold

8    between 2 to 6 customers.  The customers each pay for an approximately 40-minute session on

9    one of the decks.  Currently, customers can choose one of five different "experiences"--a digital

10   gaming experience with a narrative centered around the group of customers.  These experiences

11   are either horror-themed, science fiction-themed, or pirate-themed.  Because virtual reality

12   technology is still at its inception, there is no limit to the type of experiences that customers could

13   potentially experience using the Debtors' system.

14       Prior to the Coronavirus pandemic, the Debtors had seven operating stores (the stores then

15   very recently leased by Colony and Ridge Hill had not been built out and were not yet operational,

16   and will not be opened).  In mid-March, 2020, due to the Coronavirus, the Debtors were forced to

17   close all seven operating locations.

18       On January 3, 2019, the Debtors, Sandbox VR. Inc., and another affiliate of the Debtors

19   entered into a loan agreement with SVB pursuant to which they obtained a $4 million loan,

20   secured by a first priority security interest in substantially all of the Debtors' personal property and

21   personal property of non-debtor affiliates, with the exception of equipment subject to purchase

22   money security interests and intellectual property.

23       On January 3, 2019, certain of the Debtors and non-Debtor affiliates also entered into a

24   loan agreement with TPC, pursuant to which the Debtors are indebted to TPC in an amount not

25   less than $8,067,334.66, secured by a subordinated lien on the Debtors' personal property.  On

26   June 16, 2019, Glostation and Sandbox VR, Inc. ("Parent"), the parent company of Glostation,

27   entered into a credit facility with Atel, pursuant to which Atel agreed to finance Glostation's

28   purchase of equipment necessary to operate the Debtors' stores.  Glostation and Parent

4

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1    subsequently purchased equipment from CDW Direct, LLC and Vicon using $1,567,244.34 of

2    these proceeds.  This loan is secured by a security interest in the Debtors' equipment purchased

3    through these funds.

4          As a result of these loans, SVB and TPC both assert a security interest in the Debtors' cash

5    collateral.  No other entity asserts an interest in the Debtors' cash collateral.

6          A business plan for the business enterprise including the Debtors has been developed for

7    re-opening stores, surviving the Coronavirus pandemic, and growing the Business once

8    Coronavirus-related restrictions have eased.  That plan includes: (i) Parent obtaining  funding from

9    its investors; (ii) the Secured Creditors agreeing to restructure secured debt obligations and to

10   support the chapter 11 process and the Debtors' reorganization; (iii) the Debtors moving for

11   immediate rejection of two leases (at locations where the Debtors never took possession and

12   operations never commenced prior to the pandemic--the leases to which Sandbox VR Ridge Hill,

13   LLC and Sandbox VR Colony, LLC are a party), to the extent that lease termination agreements

14   are not entered prepetition; (iv) the Debtors negotiating with landlords as to the remaining seven

15   leases for locations that the Debtors were operating prior to the pandemic to obtain landlord

16   concessions and lease modifications necessary to allow viable ongoing operations and, if

17   negotiations are not successful, rejecting additional leases to avoid incurring potential

18   administrative expenses; (v) the Debtors proceeding with reopening stores to the extent allowed

19   under applicable government requirements; and (vi) the Debtors moving forward expeditiously

20   with the presentation of the Plan designed to allow them to survive as part of a viable ongoing

21   business enterprise.

22         Prior to the Petition Date, the Debtors negotiated and entered the PSA and Plan Term

23   Sheet that will form the basis for the principal terms of the Debtors' restructuring under a chapter

24   11 plan.  The Debtors believe that the Court's approval of assumption of the PSA is imperative for

25   the successful advancement of the Debtors' cases, provides clear direction for the cases, minimizes

26   litigation and expense, and charts the best available path forward toward a highly beneficial

27   reorganization of the Debtors.

28

## III.

## __THE PLAN SUPPORT AGREEMENT__

Plan support agreements have become a commonly used tool, especially in larger chapter 11 cases.  The PSA in the Debtors' cases is designed to minimize cost, delay, and risk and to maximize the opportunity for rehabilitation of the Debtors.  The PSA has been entered with the Debtors' senior creditors holding an overwhelming majority of outstanding debt of the Debtors and allows the Debtors to move forward with a plan where they will able to access funding from Parent.  The funding was obtained by Parent from investors, subject to restructuring of the Secured Creditors' claims.  The heart of the PSA is the pledge of the Secured Creditors and Parent to support the Debtors' chapter 11 plan of reorganization as reflected in the Plan Term Sheet.

The PSA, attached as Exhibit 2, sets forth certain requirements and milestones that for the Debtors' performance in their bankruptcy cases.  The intent is for the cases to move forward in an expedited, cohesive, and efficient manner.  These requirements and milestones include the following:

       i.     file a motion to assume the PSA within one (1) business day of the Petition Date;

       ii.     file a motion to reject (A) that certain lease agreement between Sandbox VR Ridge Hill, LLC and Yonkers Associates, LLC and (B) that certain lease agreement between Sandbox VR Colony, LLC and LMG Ventures, LLC, in each case, *nunc pro tunc* to the Petition Date, within one (1) business day of the Petition Date;

       iii.     file a motion for consensual use of cash collateral during the pendency of the Debtors' cases within one (1) business day of the Petition Date requesting a hearing on interim relief requested therein within three (3) business days of the Petition Date;

       iv.     file the Plan, a disclosure statement relating to the Plan containing all of the information required under the Bankruptcy Code, and a motion to approve the Disclosure Statement by September 15, 2020;

       v.     provide draft copies of all documents, motions, orders, procedures, agreements and other papers any Debtor intends to file with the Bankruptcy Court within five (5) business days prior to the date the Debtor intends to file any such document, motion, order, procedure, agreement or other paper and use commercially reasonable efforts to consult in advance in good faith with the Parent and the Secured Creditors regarding the form and substance of any such proposed filing with the Bankruptcy Court;

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

vi.    timely file a formal objection and otherwise object to any motion filed with the Bankruptcy Court by any party seeking the entry of an order (A) directing the appointment of an examiner with expanded powers or a trustee, (B) converting any Case to case under chapter 7 of the Bankruptcy Code or (C) dismissing any Case;

vii.    timely file a formal objection and otherwise object to any motion filed with the Bankruptcy Court by any party seeking the entry of an order modifying or terminating any Debtor's exclusive right to file and/or solicit acceptances of a plan of reorganization;

viii.    provide to each Secured Creditor reasonable access to (A) the advisors of the Debtors, and (B) any other information reasonably requested by such Secured Creditor;

ix.    to the extent permitted by the Bankruptcy Court and not otherwise paid in connection with the Cases, indefeasibly pay in full in cash, all reasonable and documented fees and expenses of each Secured Creditor's professionals from the commencement of the Cases, pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise, which fees and expenses the Debtors acknowledge shall be entitled to treatment as administrative expense claims pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code;

x.    use commercially reasonable efforts to obtain any and all governmental, regulatory, licensing or other approvals necessary to the implementation or consummation of the Plan or the approval by the Bankruptcy Court of the transactions contemplated herein and therein;

xi.    otherwise use its best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and rules to obtain an order authorizing the Debtors to assume the PSA at the earliest practicable date; and

xii.    as soon as reasonably practicable, notify the Secured Creditors of any breach of the PSA or any other event or communication that could reasonably be expected to prevent, hinder, delay, or have a material impact on the consummation of the transactions contemplated in the PSA or the Plan; and

xiii.    otherwise use its best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and rules to present and obtain confirmation of the Plan, and consummate and make effective the transactions contemplated by the Plan at the earliest practicable date.

*See* PSA, §2.a.

The PSA also contains negative covenants, which prevent the Debtors from doing, or permitting to occur any of the following without the consent of the Secured Creditors and Parent:

7

i.      pursue, propose or support, or encourage the pursuit, proposal or support of, any plan of reorganization for the Debtors that is inconsistent with the Plan;

ii.      file a motion seeking to obtain post-petition financing or nonconsensual use of cash collateral;

iii.      grant or permit any liens or claims with priority to the liens and claims of the Secured Creditors having recourse to the assets to be encumbered or affected thereby;

iv.      materially amend or modify the Plan, in whole or in part, in a manner that is not consistent in any material respect with the PSA or the Plan Term Sheet;

v.      withdraw or revoke the Plan or publicly announce its intention not to pursue the Plan;

vi.      take any action in connection with the Debtors' cases that is not consistent in any material respect with this PSA or the Plan Term Sheet;

vii.      move for an order authorizing or directing the assumption or rejection of any executory contract or unexpired lease other than with the consent of Parent and any Secured Creditor for which such contract or lease constitutes such Secured Creditor's collateral;

viii.      commence any avoidance action or other legal proceeding that challenges the validity, enforceability or priority of any Secured Creditor's claim;

ix.      acquire or divest (by merger, exchange, consolidation, acquisition of stock or assets or otherwise) (A) any corporation, partnership, limited liability company, joint venture or other business organization or division or (B) assets of the Debtors, other than in the ordinary course of business; or

x.      enter into any commitment or agreement with respect to exit financing without the consent of the Parent and each Secured Creditor affected thereby.

*See* PSA, §2.b.

The PSA further states that subject to the Debtors fulfilling their obligations as set forth in the PSA, each of the Secured Creditors shall:

a.      support, and take all reasonable actions necessary to facilitate the implementation or consummation of, the Plan;

b.      subject to the Plan containing terms consistent with the Plan Term Sheet and being in form and substance otherwise reasonably acceptable to such Secured Creditor, (A) timely vote, or cause to be voted, all of its claims to accept the Plan, and (B) not change, withdraw or revoke such vote(s) (or cause or direct such vote(s) to be changed, withdrawn or revoked); and

8

c.      except in connection with the Plan, not (A) directly or indirectly seek, solicit or vote such Secured Creditor's claims for, support or encourage the termination or modification of the exclusive period for the filing of any plan of reorganization, proposal or offer of dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or restructuring of any Debtor, (B) take any other action, including, but not limited to, initiating or joining in any legal proceedings or enforcing rights as a holder of a secured claim (as applicable), that is inconsistent with the Plan Term Sheet or the Plan, or is reasonably likely to prevent, interfere with, delay or impede the implementation or consummation of the Plan, or (C) encourage any person or entity to take any of the actions described in the preceding clauses (A) and (B) herein; provided, however, that nothing in the PSA or the Plan Term Sheet (x) shall prohibit any Secured Creditor from appearing in or commencing any proceeding for the purpose of contesting whether any material fact is or results in a breach of, or is inconsistent with, the PSA or (y) prohibit any Secured Creditor from pursuing a claim against Parent for any breach by the Debtors and/or Parent of an obligation under the loan arrangements with Secured Creditor.

*See* PSA, §3.

The PSA also states that the Parent shall:

a.      support, and take all reasonable actions necessary to facilitate the confirmation, implementation or consummation of the Plan and the approval by the Bankruptcy Court of the Disclosure Statement;

b.      On or before August 3, 2020, and prior to the Petition Date, make a capital contribution to the Debtors in the amount of $260,000;

c.      after the Petition Date, provide the Debtors with financial liquidity on an as-needed basis consistent with the budget agreed to by the Debtors, SVB and TPC in connection with the order approving consensual use of cash collateral of the Debtors; provided that Parent shall be obligated to fund any amounts incurred by the Debtors that are in excess of such budget;

d.      not file, pursue, propose or support, or encourage the filing, pursuit, proposal or support of, any motion or pleading or other document (including a plan of reorganization) that is inconsistent with the PSA or the Plan;

e.      perform in accordance with, and subject to the terms and conditions of its loan arrangements with each of the Secured Creditors;

f.      promptly pay all prepetition and postpetition reasonable and documented fees and expenses of (i) Morrison & Foerster LLP and any other advisors retained by SVB, (ii) McDermott Will & Emery LLP and any other advisors retained by TPC, and (iii) counsel and any other advisors retained by the other Secured Creditors;

g.      otherwise use its best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and rules to present and obtain confirmation of the Plan, and consummate and make effective the transactions contemplated by the Plan at the earliest practicable date;

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

9

h.    not pursue, propose, support, or encourage the pursuit, proposal or support of, any chapter 11 plan or other restructuring or reorganization for, or the liquidation of, the Debtors (directly or indirectly) that is inconsistent with the Plan; and

i.    except in connection with the Plan, not (A) directly or indirectly seek, solicit, support or encourage the termination or modification of the exclusive period for the filing of any plan of reorganization, proposal or offer of dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or restructuring of any Debtor, (B) take any other action, including but not limited to, initiating or joining in any legal proceedings, that is inconsistent with the Plan Term Sheet or the Plan, or is reasonably likely to prevent, interfere with, delay or impede the implementation or consummation of the Plan, or (C) encourage any person or entity to take any of the actions described in the preceding clauses (A) and (B) herein; provided that nothing in the PSA or the Plan Term Sheet shall prohibit the Parent from appearing in or commencing any proceeding for the purpose of contesting whether any material fact is or results in a breach of, or is inconsistent with, the PSA.

*See* PSA, §4.

The PSA also provides that the parties, including the Debtors, may terminate the PSA, or their obligations thereunder, in the event of certain circumstances, including "upon receipt of written notice by the [Debtors] delivered to each Party in accordance with this Agreement that the governing board of any [Debtor] has determined in good faith, after consultation with outside legal counsel, to exercise its fiduciary out pursuant to Section 25 of this Agreement." PSA, §9.b. The PSA states, in Section 25, that the PSA does not prevent the Debtors from taking any action to comply with their fiduciary obligations.

Parties are requested to review the terms of the PSA and the Plan Term Sheet for further details of the Debtors' agreement with the Secured Creditors.

## IV.

## **THE PLAN TERM SHEET**

The Plan Term Sheet, attached as Exhibit A to the PSA, summarizes material terms of the chapter 11 Plan. The Plan Term Sheet states that the Debtors contemplate a "new value" plan pursuant to which Parent, as Plan Sponsor, will make an equity contribution to the Debtors' estates under the Plan, in an amount not less than $700,000, in exchange for 100% of the outstanding equity interests of the reorganized Glostation USA, Inc. – the "Funding".

The Plan Term Sheet also states, among other things, that the claims and interests under

10

the Plan are contemplated to be treated as follows:

1.    <u>Administrative Claims</u>.  In accordance with the requirements of the Bankruptcy Code, allowed administrative claims (to the extent not paid prior thereto) will be paid in full on the effective date of the Plan or as soon thereafter as practicable or pursuant to such other terms as may be agreed to by the holder of such claim and the Debtors; provided, that the foregoing treatment shall not apply to the claims of Parent on account of the Funding.

2.    <u>Funding Claims</u>.  Under the Plan, along with other "new value" to be contributed by Parent, the claims of Parent on account of the Funding will be will be converted into equity interests of the reorganized Glostation USA, Inc.

3.    <u>SVB Secured Loan</u>.  On January 3, 2019, the Debtors, Parent, and certain non-debtor affiliates entered into a loan agreement with SVB pursuant to which they obtained a $4 million loan, secured by a first priority security interest in substantially all of the Debtors' personal property and personal property of non-debtor affiliates.  On or about August 10, 2020, the parties to the SVB facility entered into an amendment pursuant to which SVB has agreed to, among other things, interest only payments under its loan through December 31, 2020.  Under the Plan, on the Effective Date of the Plan, interest only payments will be extended through April 30, 2021, on $2 Million of its claim and June 30, 2021, on the remaining $2 Million of its claim. Therefore, SVB's secured claim will be impaired, and SVB will be entitled to vote on the Plan.

4.    <u>TPC Secured Loan</u>.  On January 3, 2019, Glostation, Parent, Core, and Franchising also entered into a loan agreement with TPC, pursuant to which the Debtors have borrowed a total of $7,067,334.66 in funds, secured by a first priority security interest in substantially all of the Debtors' personal property and personal property of non-debtor affiliates, subject to the subordination agreement between SVB and TPC, as amended.  On or about August 10, 2020, the parties to the TPC facility entered into an amendment pursuant to which TPC has agreed to, among other things, divide the outstanding principal balance into two notes ("Note 1" and "Note 2"), with interest only payments under Notes 1 and 2 through December 31, 2020, and amendment fees in the aggregate amount of $1 million.  Under the Plan, on the Effective Date of the Plan, (i) interest only payments under Note 1 will be extended through April 1, 2021, to be

1    followed by 24 months of equally amortizing payments of principal and interest through April 1,

2    2023, (ii) interest only payments under Note 2 will be extended through June 1, 2021, to be

3    followed by 24 months of equally amortizing payments of principal and interest through June 1,

4    2023, and (iii) TPC will waive 50% of the amendment fees otherwise due and owing as of the

5    Petition Date.  Therefore, TPC's secured claim will be impaired, and TPC will be entitled to vote

6    on the Plan.

7            5.      Atel Secured Loan.  On June 16, 2019, Glostation and Parent entered into a

8    credit facility with Atel, pursuant to which Atel agreed to finance Glostation and Parent's purchase

9    of personal property necessary to operate their stores, secured by a first priority security interest in

10   such personal property and subordinated to SVB's and TPC's liens on personal property pursuant

11   to subordination agreements between Atel and SVB and TPC (the "Atel Collateral").  ATEL made

12   three loans to Glostation and Parent.  On July 31, 2020, the total outstanding principal balance of

13   the three loans is $1,567,244.34.  On or about August 6, 2020, the parties to the Atel facility

14   entered into an amendment pursuant to which Atel has agreed to, among other things, interest only

15   payments under its three loans from July 31, 2020 through December 31, 2020, to be followed by

16   18 months of equally amortizing payments of principal and interest on two of the loans and 20

17   months on the third loan.  Under the Plan, on the Effective Date of the Plan, interest only

18   payments will be extended through June 1, 2021 to be followed by 24 months of equally

19   amortizing payments of principal and interest through June 1, 2023 on all three loans. Therefore,

20   Atel's secured claim will be impaired, and Atel will be entitled to vote on the Plan.

21           6.      Priority Claims.  Allowed priority claims will be paid in full on the effective

22   date of the Plan or as soon thereafter as practicable, provided that each allowed claim entitled to

23   priority treatment pursuant to section 507(a)(8) of the Bankruptcy Code, to the extent such claim

24   has not already been paid during the Case (collectively, the "Priority Tax Claims") may, in full

25   and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each

26   Priority Tax Claim, be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.

27           7.      General Unsecured Clams.  In the context of a liquidation of the

28   Companies, collectively, or of any of the Companies, individually, under current circumstances,

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1  the Companies believe that unsecured creditors of the Companies would receive nothing. Under

2  the Plan, as a result of a "new value" contribution, an amount equal to $100,000 will be available

3  for distribution to unsecured creditors.

4          8.    <u>Intercompany Claims</u>.  Intercompany claims will be cancelled without any

5  payment or distribution under the Plan and such holders of intercompany claims will receive no

6  recovery.

7          9.    <u>Intercompany Equity Interests</u>.  Equity interests in the Debtors (other than

8  Glostation USA, Inc.) will be reinstated as of the Effective Date.

9          10.   <u>Equity Interests of Glostation USA, Inc.</u>  Equity interests in Glostation

10  USA, Inc. existing as of the Petition Date will be, at the election of Parent, (i) reinstated as of the

11  Effective Date or (ii) canceled without receiving any payment or distribution with new equity

12  interests in Glostation USA, Inc. issued to the Parent under the Plan, in each case, such treatment

13  shall be on account of the Parent's equity contribution in an amount not less than $700,000.

14  *See* PSA, Exhibit A, §C.

15          The PSA is the lynchpin of the Debtors' consensual restructuring, providing the roadmap to

16  the Debtors' successful emergence from chapter 11.  The PSA represents a comprehensive solution

17  to the Debtors' needs and is supported by all of the Debtors' secured creditors as well as Parent,

18  which will contribute the funds necessary for the Debtors to emerge from chapter 11.  The

19  collective goal of the Secured Creditors, Parent, and the Debtors is for the Debtors to emerge from

20  chapter 11 as quickly as feasible and in a manner that will facilitate the Debtors' ability to move

21  forward on a viable basis, even in the face of the ongoing impacts of the pandemic.  The Debtors

22  believe that Court approval of assumption of the PSA is a crucial step toward achieving that goal.

23          While the Debtors believe that the PSA represents the best restructuring terms available, in

24  the event that a better alternative to the proposed restructuring were to present itself, the PSA does

25  not purport to vitiate the Debtors' fiduciary duties in administering the bankruptcy cases.

26  Specifically, the PSA provides that the Debtors may terminate the PSA in the reasonable exercise

27  of their fiduciary duties, which would include agreeing to a different financial package that was

28  determined to be more beneficial for the Debtors and their estates, without any requirement to pay

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1    a break-up fee to the Secured Creditors or Parent.  See RSA, §11.

2         Importantly, the PSA will only continue to bind all the signatories thereto to support the

3    bargained-for restructuring if the Debtors file a motion to assume the PSA.  See PSA, §2.a.ii.  This

4    support will help the Debtors expeditiously emerge from chapter 11, reduce business disruption

5    and avoid an extended chapter 11 process with its significant associated costs, all of which will

6    benefit the Debtors' creditors and their estates.

7         The Debtors entered into the PSA only after several weeks of intensive negotiations with

8    the Secured Creditors and Parent and a robust process that included input and direction from the

9    Debtors' restructuring professionals.  Based upon extensive negotiations around the various

10   alternatives to the transactions embodied in the PSA, and taking into account both the heightened

11   sensitivity of a business such as the Debtors, in the context of an ongoing pandemic, to a non-

12   consensual chapter 11 process (including the cost, distraction, and delay that Secured Creditor

13   litigation could have caused in these cases), it is the Debtors' sound business judgment that the

14   final terms of the PSA, reached after significant , arm's-length negotiations, represent the best

15   restructuring path available.

16                                  **V.**

17                          **RELIEF REQUESTED**

18        By this motion, the Debtors request, pursuant to sections 105(a), 362, 363(b) and 365(a) of

19   the Bankruptcy Code and Bankruptcy Rules 6004 and 6006, entry of an order (i) authorizing the

20   Debtors to assume the PSA and perform their obligations thereunder, and (ii) granting such other

21   relief as is just and appropriate.

22                                  **VI.**

23                          **BASIS FOR RELIEF**

24   **A.       Assumption of the Plan Support Agreement**

25        Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the

26   court's approval, may assume or reject an executory contract or unexpired lease of the debtor."  11

27   U.S.C. § 365(a).  The PSA is an executory contract, with all parties thereto having significant

28   material, unperformed obligations.  Courts apply the "business judgment test" to determine

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

14

1  whether a debtor in possession's proposed assumption or rejection of an executory contract is

2  appropriate under Bankruptcy Code section 365.  *Agarwal v. Pomona Valley Medical Group, Inc.*

3  *(In re Pomona Valley Medical Group, Inc.)*, 476 F.3d 665, 670 (9th Cir. 2007); *Durkin v. Benedor*

4  *Corp. (In re G.I. Indust., Inc.)*, 204 F.3d 1276, 1282 (9th Cir. 2000); *See also Nat'l Labor Relations*

5  *Bd. v. Bildisco & Bildisco (In re Bildisco)*, 682 F.2d 72, 79 (3d Cir. 1982), *aff'd*, 465 U.S. 573

6  (1984).

7      Assumption of an executory contract is appropriate where such assumption would benefit a

8  debtor's estate.  *See In re Rickel Home Ctrs., Inc.*, 209 F.3d 291, 298 (3d Cir. 2000) ("Section 365

9  enables the [debtor] to maximize the value of the debtor's estate by assuming executory contracts

10  and unexpired leases that benefit the estate and rejecting those that do not."); *Burtch v. Masiz (In*

11  *re Vaso Active Pharms., Inc.)*, 500 B.R. 384, 397-98 (Bankr. D. Del. 2013) (same); *Show Grp. v.*

12  *Bechtel Jacobs Co. (In re IT Grp., Inc.)*, 350 B.R. 166, 177 (Bankr. D. Del. 2006) (same).

13      Once "the debtor articulates a reasonable basis for its business decisions (as distinct from a

14  decision made arbitrarily or capriciously), courts will generally not entertain objections to the

15  debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp.*

16  *(In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986); *see also Computer Sales*

17  *Int'l v. Fed. Mogul (In re Fed. Mogul Global, Inc.)*, 293 B.R. 124, 126 (Bankr. D. Del. 2003)

18  (explaining that under the business judgment standard, a court should defer to the debtor's contract

19  rejection, "unless that decision is the product of bad faith or a gross abuse of discretion").  Rather,

20  there is "a presumption that in making a business decision the directors of a corporation acted on

21  an informed basis, in good faith and in the honest belief that the action taken was in the best

22  interests of the company." *Gantler v. Stephens*, 965 A.2d 695, 705-06 (Del. 2009); *In re Cent.*

23  *Jersey Airport Servs., LLC*, 282 B.R. 176, 183 (Bankr. D.N.J. 2002) (holding that "the debtor can

24  reasonably take . . . a business risk if in its sound business judgment, it is worth the risk").

25      Indeed, the business judgment standard "embodies the deference that is accorded to

26  managerial decisions of a board of directors." *Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d

27  914, 928 (Del. 2003).  Accordingly, so long as a debtor exercises "reasonable" business judgment,

28  a court should approve the proposed assumption or rejection. *See, e.g.*, *NLRB v. Bildisco &*

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

15

1   *Bildisco*, 465 U.S. 513, 523 (1984); *Group of Inst. Investors v. Chicago, Milwaukee, St. Paul &*

2   *Pac. R.R. Co.*, 318 U.S. 523, 550 (1943); *In re Dendreon Corp.*, No. 14-12515 (PJW) (Bankr. D.

3   Del. Dec. 23, 2014) (finding that the debtors' assumption of a plan support agreement was "within

4   their sound business judgment").

5       In *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455 (Bankr. S.D.N.Y. 2014), the court

6   approved assumption of a restructuring support agreement (another name for a plan support

7   agreement) pursuant to section 365, stating that "[u]nder the 'business judgment' test, a debtor

8   must simply put forth a showing that assumption or rejection of the executory contract or

9   unexpired lease will benefit the Debtor's estate" and that "[t]he Debtors' decision to assume the

10  RSA clearly meets the "business judgment" standard." *Id.*, at 463 (citations omitted).

11      The Debtors' decision to assume the PSA is an exercise of their sound business judgment.

12  First, the PSA is the product of extensive, arms-length negotiations among the Debtors, Parent,

13  and the Secured Creditors.  Second, assumption of the PSA is necessary in order to ensure the

14  support of the Debtors' Secured Creditors during these chapter 11 cases – creditors who are

15  secured by substantially all property of the Debtors and who collectively hold senior claims

16  against the Debtors in the approximate amount of $13 million.  This represents the overwhelming

17  majority of outstanding debtor against the Debtors.  Total other debt is currently estimated at

18  $1,460,000 (assuming lease modification agreements are reached with a majority of the Debtors'

19  landlords).[3]  Approval of assumption of the PSA will help provide direction and structure for the

20  Debtors' reorganization, and allow the Debtors to expeditiously advance their chapter 11 cases,

21  avoid delay, minimize expense, eliminate potential litigation, focus on re-opening and operating

22  their business, and successfully emerge from chapter 11 on a viable, restructured basis, even with

23  the ongoing pandemic.  Assuming the PSA will also help the Debtors avoid the significant risks

24  associated with a "free fall" chapter 11 proceeding, which would be particularly acute given the

25  nature of the Debtors' operations and the ongoing Coronavirus pandemic.

26  _____

27  [3] In the event of a liquidation of the Debtors, the Debtors do not believe that any distribution
    would be available for general unsecured creditors.

28

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1    Finally, the obligations of the Debtors under the PSA are subject to a "fiduciary out"

2    allowing the Debtors to terminate the PSA in the reasonable exercise of their fiduciary duties.

3    While it is the Debtors' belief that the restructuring contemplated by the PSA is the best available

4    alternative in light of the facts and circumstances of these Bankruptcy Cases, the PSA explicitly

5    allows the Debtors to terminate their obligations thereunder if a superior alternative presents itself.

6    Thus, the PSA allows the Debtors to comply with their fiduciary duty to maximize the value of

7    their estates.

8                                        **VII.**

9                                  **<u>CONCLUSION</u>**

10    For the reasons set forth above, the Debtors respectfully request entry of an order,

11    substantially in the form of the Proposed Order, and such further relief as the Court finds

12    appropriate.

13    Dated:  August 14, 2020                    Respectfully submitted,

14                                                **Sulmeyer**Kupetz
                                                A Professional Corporation
15

16

17                                    By:      _/s/ David S. Kupetz_____

18                                            David S. Kupetz
                                            Steven F. Werth
19                                            Claire K. Wu
                                            Attorneys for Glostation USA, Inc. and related
20                                            debtors

21

22

23

24

25

26

27

28

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

**DECLARATION OF STEVEN ZHAO**

1. I am over the age of 18 years.

2. I have personal knowledge of the facts stated herein.  I can testify that these facts are true and correct.

3. I make this declaration in support of the attached "Motion For Order Assuming Plan Support Agreement" (the "Motion").  Capitalized terms have the meaning given them in the Motion.

4. I am the founder and CEO of Glostation.

5. The Debtors are part of a business enterprise established to develop, operate, and franchise facilities offering full-body tracking, free roaming, virtual reality experiences for private groups (meaning no strangers can play together), operating under the name "Sandbox VR ™" (the "Business").  The website for the Business is www.sandboxvr.com.

6. Immediately prior to the onset of the COVID-19 pandemic, the Business was starting to emerge from the initial, start-up phase of its existence.  It had seven operating locations, anticipated obtaining a "Series B" round of equity funding, and then opening at least another 20 stores within the next year.  Unfortunately, COVID-19 struck and, as a result, in mid-March, 2020, the Business was forced to shut down its operations, postpone the opening of any new stores, close all its existing stores, and furlough and lay-off employees.

7. The Business currently is in the process of reopening, re-hiring employees, and implementing a recovery process.  Despite the challenging and uncertain economic environment, the Debtors intend to move as quickly as feasible through this case and overall recovery process.  The PSA is the vehicle for driving a successful reorganization of the Debtors.  Even in the face of the pandemic, investors have provided funding to Parent that is available to the Debtors. subject to restructuring of the debt of Secured Creditors in accordance with the PSA and the plan term sheet attached thereto.

8. The virtual reality experience the Business provides includes placing customers in enclosed rooms--referred to as a holodeck or "deck"--after outfitting each customer with a virtual reality headset, or "HMD" (head-mounted display), and equipment which transmit

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1    information to, and can be read by, various electronic devices that surround the deck.  The

2    electronic system can read the customer's position on the deck, and also transmits to the customer

3    a virtual image of the other persons on the deck, as well as a virtual image of what that customer

4    can "see" as that customer moves about the deck.  There are no cords, so customers can move

5    around the deck freely.

6          9.    The Debtors' business model is that customers visit brick-and-mortar stores

7    which the Debtors lease from landlords.  Each such store has 2 to 4 enclosed decks, each of which

8    can hold between 2 to 6 customers.  The customers each pay for an approximately 40-minute

9    session on one of the decks.   Currently, customers can choose one of five different "experiences"-

10   -a digital gaming experience with a narrative centered around the group of customers.  These

11   experiences are either horror-themed, science fiction-themed, or pirate-themed.  Because virtual

12   reality technology is still at its inception, there is no limit to the type of experiences that customers

13   could potentially experience using the Debtors' system.

14         10.   Prior to the Coronavirus pandemic, the Debtors had seven operating stores

15   (the stores then very recently leased by Colony and Ridge Hill had not been built out and were not

16   yet operational, and will not be opened).  In mid-March, 2020, due to the Coronavirus, the Debtors

17   were forced to close all seven operating locations.

18         11.   On January 3, 2019, the Debtors, Sandbox VR, Inc., and certain non-debtor

19   affiliates entered into a loan agreement with SVB pursuant to which they obtained a $4 million

20   loan, secured by a first priority security interest in substantially all of the Debtors' personal

21   property and personal property of non-debtor affiliates.  On or about August 10, 2020, the parties

22   to the SVB facility entered into an amendment pursuant to which SVB has agreed to, among other

23   things, interest only payments under its loan through December 31, 2020.

24         12.   On January 3, 2019, Glostation, Parent, Core, and Franchising also entered

25   into a loan agreement with TPC, pursuant to which the Debtors have borrowed a total of

26   $7,067,334.66 in funds, secured by a first priority security interest in substantially all of the

27   Debtors' personal property and personal property of non-debtor affiliates, subject to the

28   subordination agreement between SVB and TPC, as amended.  On or about August 10, 2020, the

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1   parties to the TPC facility entered into an amendment pursuant to which TPC has agreed to,

2   among other things, divide the outstanding principal balance into two notes ("Note 1" and "Note

3   2"), with interest only payments under Notes 1 and 2 through December 31, 2020, and amendment

4   fees in the aggregate amount of $1 million.

5           13.     As a result of these loans, SVB and TPC both assert a security interest in

6   the Debtors' cash collateral.  No other entity asserts an interest in the Debtors' cash collateral.

7           14.     On June 16, 2019, Glostation and Parent entered into a credit facility with

8   Atel, pursuant to which Atel agreed to finance Glostation and Parent's purchase of personal

9   property necessary to operate their stores, secured by a first priority security interest in such

10  personal property and subordinated to SVB's and TPC's liens on personal property pursuant to

11  subordination agreements between Atel and SVB and TPC.  ATEL made three loans to Glostation

12  and Parent.  On July 31, 2020, the total outstanding principal balance of the three loans is

13  $1,567,244.34.  On or about August 10, 2020, the parties to the Atel facility entered into an

14  amendment pursuant to which Atel has agreed to, among other things, interest only payments

15  under its three loans from July 31, 2020 through December 31, 2020, to be followed by 18 months

16  of equally amortizing payments of principal and interest on two of the loans and 20 months on the

17  third loan.

18          15.     The Debtors' total debt not held by the Secured Creditors is currently

19  estimated at $1,460,000 (assuming lease modification agreements are reached with a majority of

20  the Debtors' landlords).  In the event of a liquidation of the Debtors, I do not believe that any

21  distribution would be available for general unsecured creditors.

22          16.     A business plan for the business enterprise including the Debtors has been

23  developed for re-opening stores, surviving the Coronavirus pandemic, and growing the Business

24  once Coronavirus-related restrictions have eased.  That plan includes: (i) Parent obtaining  funding

25  from its investors; (ii) the Secured Creditors agreeing to restructure secured debt obligations and

26  to support the chapter 11 process and the Debtors' reorganization; (iii) the Debtors moving for

27  immediate rejection of two leases (at locations where the Debtors never took possession and

28  operations never commenced prior to the pandemic--the leases to which Sandbox VR Ridge Hill,

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1  LLC and Sandbox VR Colony, LLC are a party), to the extent that lease termination agreements

2  are not entered prepetition; (iv) the Debtors negotiating with landlords as to the remaining seven

3  leases for locations that the Debtors were operating prior to the pandemic to obtain landlord

4  concessions and lease modifications necessary to allow viable ongoing operations and, if

5  negotiations are not successful, rejecting additional leases to avoid incurring potential

6  administrative expenses; (v) the Debtors proceeding with reopening stores to the extent allowed

7  under applicable government requirements; and (vi) the Debtors moving forward expeditiously

8  with the presentation of the Plan designed to allow them to survive as part of a viable ongoing

9  business enterprise.

10          17.    Prior to the Petition Date, the Debtors negotiated and entered the PSA and

11  Plan Term Sheet that will form the basis for the principal terms of the Debtors' restructuring under

12  a chapter 11 plan.   The Debtors believe that the Court's approval of assumption of the PSA is

13  imperative for the successful advancement of the Debtors' cases, provides clear direction for the

14  cases, minimizes litigation and expense, and charts the best available path forward toward a highly

15  beneficial reorganization of the Debtors.

16          18.    The PSA is the lynchpin of the Debtors' consensual restructuring, providing

17  the roadmap to the Debtors' successful emergence from chapter 11.  The PSA represents a

18  comprehensive solution to the Debtors' needs and is supported by all of the Debtors' secured

19  creditors as well as Parent, which will contributing the funds necessary for the Debtors to emerge

20  from chapter 11.  The collective goal of the Secured Creditors, Parent, and the Debtors is for the

21  Debtors to emerge from chapter 11 as quickly as feasible and in a manner that will facilitate the

22  Debtors' ability to move forward on a viable basis, even in the face of the ongoing impacts of the

23  pandemic.  The Debtors believe that Court approval of assumption of the PSA is a crucial step

24  toward achieving that goal.

25          19.    The Debtors entered into the PSA only after several weeks of intensive

26  negotiations with the Secured Creditors and Parent and a robust process that included input and

27  direction from the Debtors' restructuring professionals.  Based upon extensive negotiations around

28  the various alternatives to the transactions embodied in the PSA, and taking into account both the

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

21

1  heightened sensitivity of a business such as the Debtors, in the context of an ongoing pandemic, to

2  a non-consensual chapter 11 process (including the cost, distraction, and delay that Secured

3  Creditor litigation could have caused in these cases), it is my sound business judgment that the

4  final terms of the PSA, reached after significant, arm's-length negotiations, represent the best

5  restructuring path available.

6      I declare under penalty of perjury under the laws of the United States of America that the

7  foregoing is true and correct, and that this declaration was executed August 12, 2020, at Hong

8  Kong.

9

10  _____
    Steven Zhao

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

**EXHIBIT 1**

David S. Kupetz (CA Bar No. 125062)
 *dkupetz@sulmeyerlaw.com*
Steven F. Werth (CA Bar No. 205434)
 *swerth@sulmeyerlaw.com*
Claire K. Wu (CA Bar No. 295966)
 *ckwu@sulmeyerlaw.com*
**Sulmeyer**Kupetz
A Professional Corporation
333 South Grand Ave, Suite 3400
Los Angeles, California 90071
Telephone: 213.626.2311
Facsimile: 213.629.4520

Attorneys for Glostation USA, Inc. and
related debtors

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re | Case No.  1:20-bk-11435-MB |
| GLOSTATION USA, INC., a Delaware corporation, | Chapter 11 |
| Debtor. | **ORDER ON MOTION FOR ORDER APPROVING ASSUMPTION OF PLAN SUPPORT AGREEMENT** |
| Federal EIN:  37-1875688 | <u>Hearing</u>: |
| | Date:        September 22, 2020 |
| | Time:        1:30 p.m. |
| | Place:       U.S. Bankruptcy Court |
| |                     Courtroom 303 |
| |                     21041 Burbank Blvd. |
| |                     Woodland Hills, CA 90012 |

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA  90071-1406
TEL. 213.626.2311  •  FAX 213.629.4520

SFW 2704530v1

00023

1    The "Motion For Order Approving Assumption Of Plan Support Agreement" (the

2    "Motion"), filed by Glostation USA, Inc., a Delaware corporation, debtor and debtor in possession

3    in the above-captioned case, and its affiliated debtors and debtors in possession, came on for

4    hearing on an emergency basis on September 22, 2020, at 1:30 p.m., before the Honorable Martin

5    R. Barash, United States Bankruptcy Judge.   Appearances were as noted on the record of the

6    hearing.

7    This Court having considered the Motion, the declaration of Steven Zhao in support of the

8    Motion, all other papers filed in support of, in connection with, the Motion, the record in this case,

9    and all arguments, statements, and representations of counsel on the record at the hearing; and the

10   Motion and notice of the Motion having been timely and properly served on all necessary parties

11   in accordance with the directions of the Court and the Local Bankruptcy Rules; and good cause

12   appearing therefor, it is hereby **ORDERED** as follows:

13   1.    The Motion is granted;

14   2.    The Debtors (as that term is defined in the Motion) are authorized to assume the

15   PSA (as that term is defined in the Motion).

16                                     # # #

17

18

19

20

21

22

23

24

25

26

27

28

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

**EXHIBIT 2**

DocuSign Envelope ID: 6D25F649-8EB7-44C8-81B9-A4F9C0B628ED

**THIS PLAN SUPPORT AGREEMENT DOES NOT CONSTITUTE AN OFFER OF SECURITIES OR A SOLICITATION OF THE ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN FOR PURPOSES OF SECTIONS 1125 AND 1126 OF TITLE 11 OF THE UNITED STATES CODE (THE "<u>BANKRUPTCY CODE</u>"). ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

**THIS PLAN SUPPORT AGREEMENT CONTAINS A SERIES OF ASSUMPTIONS, COMPROMISES AND SETTLEMENTS OF ISSUES AND DISPUTES THAT WILL BE RESOLVED IN CONNECTION WITH CONFIRMATION OF A CHAPTER 11 PLAN. IN THE EVENT THE CHAPTER 11 PLAN CONTEMPLATED UNDER THIS PLAN SUPPORT AGREEMENT IS NOT CONFIRMED OR DOES NOT BECOME EFFECTIVE, NOTHING HEREIN SHALL BE CONSTRUED AS AN ADMISSION OF OR THE POSITIONS OF THE PARTIES WITH RESPECT TO THESE ISSUES OR DISPUTES. ACCORDINGLY, THIS PLAN SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROHIBITING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS. THIS PLAN SUPPORT AGREEMENT IS SUBJECT TO ALL EXISTING CONFIDENTIALITY AGREEMENTS.**

**GLOSTATION USA, INC., AND SUBSIDIARIES**

**PLAN SUPPORT AGREEMENT**

This Plan Support Agreement ("**Agreement**") dated as of August 5, 2020 (the "**Effective Date**") is made and entered into by and among (i) GloStation USA, Inc., and the following subsidiary, affiliated entities, Glostation Core USA, Inc., Sandbox VR Mission Valley, LLC, Sandbox VR San Mateo, LLC, Sandbox VR Cerritos, LLC, Sandbox VR Topanga, LLC, Sandbox VR Ridge Hill, LLC, Sandbox VR Austin, LLC, Sandbox VR Colony, LLC, Sandbox VR Oakbrook, LLC, and Sandbox VR Pop-Up, LLC (each, a "**Company**" and, collectively, the "**Companies**"), (ii) Sandbox VR, Inc. ("**Parent**" or "**Plan Sponsor**"), (iii) Silicon Valley Bank ("**SVB**"), (iv) TriplePoint Capital LLC ("**TPC**"), and (v) ATEL GROWTH CAPITAL, doing business as ATEL Ventures, as agent on behalf of its affiliates ("**ATEL**" and ATEL, SVB, and TPC are collectively referred to herein as "**Secured Creditors**"). The Companies, Parent, SVB, TPC, and ATEL are each referred to herein individually as a "**Party**," and collectively, as the "**Parties**."

**RECITALS**

**WHEREAS**:

A. The Companies are part of a business enterprise established to develop, operate and franchise facilities offering live-action, hyper reality experiences, including virtual reality and physical adventures with a full body tracking system, operating under the name "Sandbox VR ™" (the "**Business**");

B. Just as the Business was starting to emerge from the initial, start-up phase of its existence, it was severely impacted by the COVID-19 pandemic and forced to shut-down its operations in mid-March 2020, and is currently in the process of reopening;

C. SVB, TPC, and ATEL are secured creditors of the Companies, Parent, which is the ultimate parent of the Companies, and certain other affiliated entities.

D. The Parties have negotiated and agreed upon the principal terms of a consensual restructuring of the Secured Creditors' claims against the Companies through a plan of reorganization (the "**Plan**") on the terms set forth in the plan term sheet attached hereto as **Exhibit A** (the "**Plan Term Sheet**");

E. Each of the Companies intends to commence a chapter 11 case (collectively, the "**Cases**") by filing a petition for relief (the date of which such petition is filed, the "**Petition Date**") in the U.S. Bankruptcy Court for the Central District of California (the "**Bankruptcy Court**") and file certain "first day" motions, including, but not limited to, a motion requesting joint administration of the Cases.

F. The Companies intend to file the Plan in the Cases as quickly as feasible and, in any event, no later than 45 calendar days following the Petition Date.

00025

G. Pursuant to the terms of this Agreement, the Parties have agreed to support the reorganization of the Companies, including, to the extent consistent with applicable law, to vote to accept confirmation of the Plan;

H. In expressing such support and commitment, the Parties do not desire and do not intend in any way to derogate from or diminish the solicitation requirements of applicable securities and bankruptcy law, or the fiduciary duties of the Companies or any other Party having such duties.

## <u>AGREEMENT</u>

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1. <u>Plan Term Sheet</u>.  The Plan Term Sheet is expressly incorporated herein by reference and made part of this Agreement as if fully set forth herein. The Plan Term Sheet sets forth the material terms and conditions of the Plan; <u>provided</u>, <u>however</u>, the Plan Term Sheet is supplemented by the terms and conditions of this Agreement. In the event of any inconsistency between the Plan Term Sheet and this Agreement, the Plan Term Sheet shall govern. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan Term Sheet.

2. <u>Agreements of the Companies</u>. The Parties believe that prompt presentation and confirmation of the Plan will best facilitate the Companies' business and financial restructuring and is in the best interests of each of the Company's creditors, equity holders, and other parties in interest. Accordingly, from and after the Effective Date and until the earlier to occur of (x) the effective date of the Plan and (y) the date on which this Plan Support Agreement is terminated in accordance with its terms (such period, the "**Plan Support Period**"), and subject to Section 25 below, each Company hereby expresses its intention and agrees as follows:

a. *Affirmative Covenants*.  Except as otherwise permitted or required by this Agreement or the Plan Term Sheet, or otherwise consented to in writing by the Secured Creditors and Plan Sponsor, each Company shall, in accordance with the terms of the Plan Term Sheet:

i.      file a voluntary petition pursuant title 11 of the Bankruptcy Code and commence its Case on or before August 14, 2020;

ii.     file a motion to assume this Agreement within one (1) business day of the Petition Date;

iii.    file a motion to reject (A) that certain lease agreement between Sandbox VR Ridge Hill, LLC and  Yonkers Associates, LLC, and (B) that certain lease agreement between Sandbox VR Colony, LLC and LMG Ventures, LLC, in each case, *nunc pro tunc* to the Petition Date, within one (1) business day of the Petition Date, in the event that a lease termination agreement is not signed by the respective landlord prior to the Petition Date (the "**Lease Rejection Motion**");

iv.     file a motion for consensual use of cash collateral during the pendency of the Cases within one (1) business day of the Petition Date requesting a hearing on interim relief requested therein within three (3) business days of the Petition Date;

v.      file the Plan, a disclosure statement relating to the Plan (the "**Disclosure Statement**") containing all of the information required under the Bankruptcy Code, and a motion to approve the Disclosure Statement on or before September 15, 2020;

vi.     provide draft copies of all documents, motions, orders, procedures, agreements and other papers any Company intends to file with the Bankruptcy Court within five (5) business days prior to the date such Company intends to file any such document, motion, order, procedure, agreement or other paper and use commercially reasonable efforts to consult in advance in good

faith with the Plan Sponsor and the Secured Creditors regarding the form and substance of any such proposed filing with the Bankruptcy Court;

       vii.     timely file a formal objection and otherwise object to any motion filed with the Bankruptcy Court by any party seeking the entry of an order (A) directing the appointment of an examiner with expanded powers or a trustee, (B) converting any Case to case under chapter 7 of the Bankruptcy Code or (C) dismissing any Case;

       viii.     timely file a formal objection and otherwise object to any motion filed with the Bankruptcy Court by any party seeking the entry of an order modifying or terminating any Company's exclusive right to file and/or solicit acceptances of a plan of reorganization;

       ix.     provide to each Secured Creditor reasonable access to (A) the advisors of the Companies, and (B) any other information reasonably requested by such Secured Creditor;

       x.     to the extent permitted by the Bankruptcy Court and not otherwise paid in connection with the Cases, indefeasibly pay in full in cash, all reasonable and documented fees and expenses of each Secured Creditor's professionals from the commencement of the Cases, pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise, which fees and expenses the Companies acknowledge shall be entitled to treatment as administrative expense claims pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code;

       xi.     use commercially reasonable efforts to obtain any and all governmental, regulatory, licensing or other approvals necessary to the implementation or consummation of the Plan or the approval by the Bankruptcy Court of the transactions contemplated herein and therein;

       xii.     otherwise use its best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and rules to obtain an order authorizing the Companies to assume this Agreement at the earliest practicable date;

       xiii.     as soon as reasonably practicable, notify the Secured Creditors of any breach of this Agreement or any other event or communication that could reasonably be expected to prevent, hinder, delay, or have a material impact on the consummation of the transactions contemplated in this Agreement or the Plan;

       xiv.     otherwise use its best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and rules to present and obtain confirmation of the Plan, and consummate and make effective the transactions contemplated by the Plan at the earliest practicable date; and

       xv.     take such actions as may be necessary or appropriate to effectuate this Agreement;

b. *Negative Covenants*.  Except as otherwise permitted or required by this Agreement or the Plan Term Sheet, or otherwise consented to in writing by the Secured Creditors and Plan Sponsor, each Company shall not do or permit to occur any of the following:

       i.     pursue, propose or support, or encourage the pursuit, proposal or support of, any plan of reorganization for the Companies that is inconsistent with the Plan;

       ii.     file a motion seeking to obtain post-petition financing or nonconsensual use of cash collateral;

       iii.     grant or permit any liens or claims with priority equal or senior to the liens and claims of the Secured Creditors having recourse to the assets to be encumbered or affected thereby;

iv.    materially amend or modify the Plan, in whole or in part, in a manner that is not consistent in any material respect with this Agreement or the Plan Term Sheet;

v.    withdraw or revoke the Plan or publicly announce its intention not to pursue the Plan;

vi.    take any action in connection with the Cases that is not consistent in any material respect with this Agreement or the Plan Term Sheet;

vii.    move for an order authorizing or directing the assumption or rejection of any executory contract or unexpired lease other than with the consent of the Plan Sponsor and any Secured Creditor for which such contract or lease constitutes such Secured Creditor's collateral;

viii.    commence any avoidance action or other legal proceeding that challenges the validity, enforceability or priority of any Secured Creditor's claim;

ix.    acquire or divest (by merger, exchange, consolidation, acquisition of stock or assets or otherwise) (A) any corporation, partnership, limited liability company, joint venture or other business organization or division or (B) assets of the Companies, other than in the ordinary course of business; or

x.    enter into any commitment or agreement with respect to exit financing without the consent of the Plan Sponsor and each Secured Creditor affected thereby.

c. *Waiver of Automatic Stay*.  From and after the Petition Date, the Companies acknowledge and agree and shall not dispute that the giving of notice of termination by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Companies hereby waive, to the greatest extent possible, the applicability of the automatic stay to the giving of such notice).

3. <u>Agreements by the Secured Creditors</u>. During the Plan Support Period, and subject to the Parties hereto fulfilling their respective obligations as provided herein, each of the Secured Creditors shall:

a. support, and take all reasonable actions necessary to facilitate the implementation or consummation of, the Plan in accordance with the terms of this Agreement;

b. subject to the Plan containing terms consistent with the Plan Term Sheet and being in form and substance otherwise reasonably acceptable to such Secured Creditor, (A) timely vote, or cause to be voted, all of its claims to accept the Plan, and (B) not change, withdraw or revoke such vote(s) (or cause or direct such vote(s) to be changed, withdrawn or revoked);

c. except in connection with the Plan, not (A) directly or indirectly seek, solicit or vote such Secured Lender's claims for, support or encourage the termination or modification of the exclusive period for the filing of any plan of reorganization, proposal or offer of dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or restructuring of any Company, (B) take any other action, including, but not limited to, initiating or joining in any legal proceedings or enforcing rights as a holder of a secured claim (as applicable), that is inconsistent with the Plan Term Sheet or the Plan, or is reasonably likely to prevent, interfere with, delay or impede the implementation or consummation of the Plan, or (C) encourage any person or entity to take any of the actions described in the preceding clauses (A) and (B) herein; <u>provided</u>, <u>however</u>, that nothing in this Agreement or the Plan Term Sheet (x) shall prohibit any Secured Creditor from appearing in or commencing any proceeding for the purpose of contesting whether any material fact is or results in a breach of, or is inconsistent with, this Agreement or (y) prohibit any Secured Creditor from pursuing a claim against Parent for any breach by the Companies and/or Parent of an obligation under the loan arrangements with Secured Creditor..

DocuSign Envelope ID: 6D25F649-8EB7-44C8-8189-A4F9C0B623ED

00028

DocuSign Envelope ID: 6D25F649-8EB7-44C8-8189-A4F9C0B628ED

4. <u>Agreements by the Plan Sponsor</u>.  Upon the terms and subject to the conditions hereof and the terms and conditions set forth in the Plan Term Sheet, the Plan Sponsor agrees that, for the duration of the Plan Support Period, it shall:

a. support, and take all reasonable actions necessary to facilitate the confirmation, implementation or consummation of the Plan and the approval by the Bankruptcy Court of the Disclosure Statement;

b. fund the operations of the Company in the following amounts:

i.       on or before August 14, 2020 and prior to the Petition Date, Parent shall make a capital contribution to the Company in the amount of $260,000, and

c. after the Petition Date, provide the Companies with financial liquidity on an as-needed basis consistent with the budget agreed to by the Companies, SVB and TPC in connection with the order approving consensual use of cash collateral of the Companies which shall be consistent in all material respects with Annex I to the Plan Term Sheet; <u>provided</u>, that Parent shall be obligated to fund any amounts incurred by the Company that are in excess of such budget;

d. not file, pursue, propose or support, or encourage the filing, pursuit, proposal or support of, any motion or pleading or other document (including a plan of reorganization) that is inconsistent with this Agreement or the Plan;

e. perform in accordance with, and subject to the terms and conditions of its loan arrangements with each of the Secured Creditors;

f. promptly pay all prepetition and postpetition reasonable and documented fees and expenses of (i) Morrison & Foerster LLP and any other advisors retained by SVB, (ii) McDermott Will & Emery LLP and any other advisors retained by TPC, (iii) ATEL and any other advisors retained by ATEL, and (iv) counsel and any other advisors retained by the other Secured Creditors;

g. otherwise use its best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and rules to present and obtain confirmation of the Plan, and consummate and make effective the transactions contemplated by the Plan at the earliest practicable date;

h. not pursue, propose, support, or encourage the pursuit, proposal or support of, any chapter 11 plan or other restructuring or reorganization for, or the liquidation of, the Companies (directly or indirectly) that is inconsistent with the Plan; and

i. except in connection with the Plan, not (A) directly or indirectly seek, solicit, support or encourage the termination or modification of the exclusive period for the filing of any plan of reorganization, proposal or offer of dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or restructuring of any Company, (B) take any other action, including but not limited to, initiating or joining in any legal proceedings, that is inconsistent with the Plan Term Sheet or the Plan, or is reasonably likely to prevent, interfere with, delay or impede the implementation or consummation of the Plan, or (C) encourage any person or entity to take any of the actions described in the preceding clauses (A) and (B) herein; <u>provided</u>, <u>however</u>, that nothing in this Agreement or the Plan Term Sheet shall prohibit the Plan Sponsor from appearing in or commencing any proceeding for the purpose of contesting whether any material fact is or results in a breach of, or is inconsistent with, this Agreement.

5. <u>Good Faith Cooperation; Further Assurances</u>. During the Plan Support Period, the Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent practicable and subject to the terms hereof) in respect of (a) all matters relating to their rights hereunder in respect of the Companies or otherwise in connection with their relationship with the Companies, (b) all matters concerning the implementation of the Plan Term Sheet, and (c) the pursuit and support of the Plan and other transactions contemplated herein.  Furthermore, subject

00029

to the terms hereof, each of the Parties shall take such action as may be reasonably necessary to carry out the purposes and intent of this Agreement, including making and filing any required governmental, regulatory, or licensing filings, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement.

6. <u>Acknowledgment of the Parties</u>.  Each Party acknowledges and agrees as follows:

a. While the Parties agree herein to support approval of the Plan, this Agreement is not and shall not be deemed to be a solicitation for consent to the Plan in contravention of Section 1125(b) of the Bankruptcy Code, but is intended to fall within the safe harbor provisions in Section 1125(g) of the Bankruptcy Code.  The acceptances of the Plan will not be solicited until the Disclosure Statement and related ballot(s) have been approved by the Bankruptcy Court.  Notwithstanding anything to the contrary contained herein, any obligation as set forth above is expressly conditioned on the receipt of definitive documentation that is consistent in all material respects with this Agreement and the Term Sheet and is otherwise reasonably acceptable to the Parties.

b. Each Party acknowledges that no securities of any Company are being offered or sold hereby and that this Agreement neither constitutes an offer to sell nor a solicitation to buy any securities of any Company.

7. <u>Limitations on Transfer of Secured Debt</u>. During the Plan Support Period, each of the Secured Creditors shall not (i) sell, transfer, assign, pledge, grant a participation interest in or otherwise dispose of, directly or indirectly, its right, title or interest in respect of any of its secured claims against the Companies, in whole or in part, or any interest therein, or (ii) grant any proxies with respect to its secured claims against the Companies, or (iii) enter into a voting agreement with respect to any of such secured claim (collectively, "**Transfer**"), unless, as a condition precedent to such Transfer, the transferee executes an assumption agreement providing for the assumption of all obligations of the subject transferor Party under this Agreement.  Any Transfer made in violation of this Section 7 shall be deemed null and void and of no force or effect.

8. <u>Condition to Each Party's Obligations</u>. Each Party's obligations under this Agreement shall become effective as of the first date on which each of the following conditions have been satisfied:

a.    this Agreement has been executed by the Company, Parent, and each of the Secured Creditors;

b.    the Parent and the Company, among others, shall have entered into amendments to the existing loan arrangements with the Secured Creditors, each in a form and substances acceptable to the applicable Secured Creditor; and

c.    the Parent shall have received at least $4.65 million in unrestricted cash proceeds of subordinated debt from its existing investors.

9. <u>Termination of this Agreement</u>.  The Agreement shall terminate as follows:

a. automatically and without further notice or action by any Party following entry of a final order by the Bankruptcy Court denying confirmation of the Plan;

b. upon receipt of written notice by the Companies delivered to each Party in accordance with this Agreement that the governing board of any Company has determined in good faith, after consultation with outside legal counsel, to exercise its fiduciary out pursuant to Section 25 of this Agreement;

c. if any Secured Creditor shall have breached any of its material obligations under this Agreement, on the third (3rd) business day following receipt of a written notice by the Companies or Plan Sponsor seeking to terminate this Agreement on account of such breach so long as the Party seeking to terminate this Agreement is not in material breach as of such date; *provided that* the written notice must reasonably detail

DocuSign Envelope ID: 6925F649-8EB7-44C8-81B9-A4F9C0B623ED

the material breach giving rise to such notice; *provided further* that this Agreement shall not terminate if the breaching Party remedies the breach prior to expiration of the three (3) business day notice period;

d. if any Party shall have breached any of its material obligations under this Agreement, on the third (3rd) business day following receipt of a written notice by any Secured Creditor seeking to terminate this Agreement on account of such breach so long as the Party seeking to terminate this Agreement is not in material breach as of such date; *provided that* the written notice must reasonably detail the material breach giving rise to such notice; *provided further* that this Agreement shall not terminate if the breaching Party remedies the breach prior to expiration of the three (3) business day notice period;

e. upon receipt of written notice by any Secured Creditor delivered to each Party in accordance with this Agreement following the occurrence of any of the following:

    i.    the Cases shall have not been commenced by August 14, 2020;

    ii.    an order by the Bankruptcy Court authorizing the use of cash collateral by the Companies on an interim basis, in form and substance acceptable the Secured Creditors, is not entered within seven (7) business days of the Petition Date;

    iii.    an order by the Bankruptcy Court approving the relief requested in each of the Companies' "first day" motions on an interim basis, in form and substance acceptable the Secured Creditors, is not entered within seven (7) business days of the Petition Date;

    iv.    an order by the Bankruptcy Court authorizing the use of cash collateral by the Companies on a final basis, in form and substance acceptable the Secured Creditors, is not entered within forty-five (45) calendar days of the Petition Date;

    v.    an order by the Bankruptcy Court authorizing the Companies to assume this Agreement, in form and substance acceptable the Secured Creditors, is not entered within forty-five (45) calendar days of the Petition Date;

    vi.    an order by the Bankruptcy Court approving the relief requested in the Lease Rejection Motion, in form and substance acceptable the Secured Creditors, is not entered within thirty-five (35) calendar days of the Petition Date, in the event that a lease termination agreement is not signed by the respective landlord prior to the Petition Date;

    vii.    an order by the Bankruptcy Court approving the relief requested each of the Companies' "first day" motions on an final basis, in form and substance acceptable the Secured Creditors, is not entered within forty-five (45) calendar days of the Petition Date;

    viii.    the Plan and Disclosure Statement have not been filed by September 15, 2020;

    ix.    an order by the Bankruptcy Court approving the Disclosure Statement, in form and substance acceptable the Secured Creditors, is not entered by October 30, 2020;

    x.    an order by the Bankruptcy Court confirming the Plan, in form and substance acceptable the Secured Creditors, is not entered by November 30, 2020;

    xi.    the effective date of the Plan has not occurred by December 15, 2020;

    xii.    the occurrence and continuation of an event of default under any order authorizing the Companies' use of cash collateral;

    xiii.    conversion of the Cases to cases under chapter 7 of the Bankruptcy Code, appointment of a chapter 11 trustee, a responsible officer or an examiner with enlarged powers

00031

DocuSign Envelope ID: 6D25F649-8EB7-4498-81R9-A4F9C0B928ED

(beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of any of the Companies, or dismissal of the Cases;

xiv.    the Bankruptcy Court grants relief that is materially inconsistent with this Agreement or the Plan Term Sheet or would reasonably be expected to materially frustrate the purpose of this Agreement or the Plan Term Sheet;

xv.    Parent files a voluntary petition for relief under the Bankruptcy Code or an involuntary petition for relief under the Bankruptcy Code is filed against the Parent and not otherwise dismissed within thirty (30) calendar days;

xvi.    the allowance of any administrative claims with priority to the adequate protection claims granted to such Secured Creditor, if any;

xvii.    the granting of any lien with priority equal or senior to the liens of such Secured Creditor;

xviii.    the commencement of any avoidance action or other legal proceeding that challenges the validity, enforceability or priority of such Secured Creditor's claim; or

xix.    a plan is filed that is inconsistent with the Plan Term Sheet in any material respect.

Notwithstanding the foregoing, nothing in this Section 7 shall preclude any non-breaching Party from seeking specific performance or any other remedy available under applicable law for breach of this Agreement.

10. Specific Performance; Damages. This Agreement, including without limitation, the Parties' agreement herein to support confirmation of the Plan, is intended as a binding commitment enforceable in accordance with its terms. Each Party acknowledges and agrees that the exact nature and extent of damages resulting from a breach of this Agreement are uncertain at the time of entering into this Agreement and that breach of this Agreement would result in damages that would be difficult to determine with certainty. It is understood and agreed that money damages would not be a sufficient remedy for any breach of this Agreement and that the Parties shall each be entitled to specific performance and injunctive relief as remedies for any such breach, and further agree to waive, and to use their best efforts to cause each of their representatives to waive, any requirement for the securing or posting of any bond in connection with such remedy. Such remedies shall not be deemed to be the exclusive remedies for the breach of this Agreement by any Party or its representatives.

11. Effect of Termination. Upon termination of this Agreement, all obligations hereunder shall terminate and shall be of no further force and effect; provided, however, that any claim for breach of this Agreement shall survive termination and all rights and remedies with respect to such claims shall not be prejudiced in any way; provided, further, that the breach of this Agreement by one or more Parties shall not create any rights or remedies against any non-breaching Party unless such non-breaching Party has participated in or aided and abetted the breach by a breaching Party or Parties. Except as set forth above in this Section 11, upon such termination, any obligations of the non-breaching Parties set forth in this Agreement shall be null and void ab initio and all claims, causes of actions, remedies, defenses, setoffs, rights or other benefits of such non-breaching Parties shall be fully preserved without any estoppel, evidentiary or other effect of any kind or nature whatsoever.

12. Representations and Warranties. The Companies, the Plan Sponsor and each Secured Creditor represents and warrants to each other Party, severally but not jointly, that the following statements are true, correct and complete as of the date hereof or as of the date of the execution of this Agreement:

a. Corporate Power and Authority. It is duly organized, validly existing, and in good standing under the laws of the state of its organization, and has all requisite corporate, partnership or other power and authority to enter into this Agreement and to carry out the transactions contemplated by, and to perform its respective obligations under, this Agreement.

Page 8 of 10

00032

b. <u>Authorization</u>. The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part.

c. <u>Binding Obligation</u>. This Agreement has been duly executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable in accordance with the terms hereof.

13. <u>Amendment or Waiver</u>. Except as otherwise specifically provided herein, this Agreement may not be modified, waived, amended or supplemented unless such modification, waiver, amendment or supplement is in writing and has been signed by each Party. No waiver of any of the provisions of this Agreement shall be deemed or constitute a waiver of any other provision of this Agreement, whether or not similar, nor shall any waiver be deemed a continuing waiver (unless such waiver expressly provides otherwise).

14. <u>Notices</u>. Any notice required or desired to be served, given or delivered under this Agreement shall be in writing, and shall be deemed to have been validly served, given or delivered if provided by email, as follows:

a. if to the Companies, to:  SulmeyerKupetz, David Kupetz, dkupetz@sulmeyerlaw.com

b. if to the Plan Sponsor, to:  Silicon Legal Strategy, Natasha Hsieh, natasha@siliconlegal.com

c. if to SVB, to:  Morrison & Foerster LLP, c/o Alexander Rheaume (arheaume@mofo.com), Todd Goren (tgoren@mofo.com), and Benjamin Butterfield (bbutterfield@mofo.com)

d. if to TPC, to:  2755 Sand Hill Rd., Ste. 150, Menlo Park, CA 94025, Attention: Mr. Sajal Srivastava, President, email:  legal@triplepointcapital.com, with a copy to McDermott Will & Emery LLP, 2049 Century Park East, Suite 3200, Los Angeles, CA 90067, Attention: Gary B. Rosenbaum, email: grosenbaum@mwe.com

e. if to ATEL,to:  The Transamerica Pyramid, 600 Montgomery Street, 9th Floor, San Francisco, CA 94111, Attention: Mr. Russell H. Wilder, Executive Vice President, Chief Credit Officer, email: rwilder@atel.com, with a copy to Johanna Johannesson, Associate General Counsel and Vice President, The Transamerica Pyramid, 600 Montgomery Street, 9th Floor, San Francisco, CA  94111, email: jjohannesson@atel.com

15. <u>Governing Law; Jurisdiction</u>. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE CALIFORNIA, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISION WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. By its execution and delivery of this Agreement, each of the Parties hereto irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought in the federal or state courts located in the State of California.

16. <u>Headings</u>. The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

17. <u>Interpretation</u>. This Agreement is the product of negotiations of the Parties, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.

18. <u>Successors and Assigns</u>. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, transferees, executors, administrators and representatives.

19. <u>No Third-Party Beneficiaries</u>. Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties hereto and no other person or entity shall be a third-party beneficiary hereof.

20. <u>No Waiver of Participation and Reservation of Rights</u>. Except as expressly provided in this Agreement and in any amendment among the Parties, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each of the Parties to protect and preserve its rights, remedies and interests, including without limitation, its claims against any of the other Parties (or their respective affiliates or subsidiaries) or its full participation in the Cases. If the transactions contemplated by this Agreement or in the Plan are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.

21. <u>No Admissions</u>. This Agreement shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever. Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert. No Party shall have, by reason of this Agreement, a fiduciary relationship in respect of any other Party or any person or entity, or any Company, and nothing in this Agreement, expressed or implied, is intended to or shall be so construed as to impose upon any Party any obligations in respect of this Agreement, except as expressly set forth herein.

22. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement. Delivery of an executed signature page of this Agreement by email shall be effective as delivery of a manually executed signature page of this Agreement.

23. <u>Representation by Counsel</u>. Each Party acknowledges that it has been represented by counsel in connection with this Agreement and the transactions contemplated herein (or had the opportunity to be represented by outside counsel). Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

24. <u>Several Not Joint</u>. The agreements, representations and obligations of the Parties under this Agreement are, in all respects, several and not joint. Any breach of this Agreement by any Party shall not result in liability for any other non-breaching Party.

25. <u>Company Fiduciary Duties</u>.  Notwithstanding anything to the contrary herein, nothing in this Agreement shall require any Company or any directors or officers of any Company (in such person's capacity as a director or officer of such Company) to take any action, or to refrain from taking any action, to the extent required, in the opinion of counsel, to comply with its or their fiduciary obligations under applicable law.

26. <u>Reservation of Rights; No Admission</u>.  Except as expressly provided in this Agreement and in any amendment among the Parties, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each of the Parties to protect and preserve its rights, remedies and interests, including without limitation, its claims against any of the other Parties (or their respective affiliates or subsidiaries) or its full participation in the Cases.  Except as expressly provided in this Agreement and in any amendment among the Parties, if the Plan and other transactions contemplated herein are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights, remedies, and interest.

[Signature Pages to Follow]

00034

IN WITNESS HEREOF, the Parties have executed this Plan Support Agreement as of the Effective Date.

GloStation USA, Inc., GloStation Core, USA, Inc., Sandbox VR Mission Valley, LLC, Sandbox VR San Mateo, LLC, Sandbox VR Cerritos, LLC, Sandbox VR Topanga, LLC, Sandbox VR Ridge Hill, LLC, Sandbox VR Austin, LLC, Sandbox VR Colony, LLC, Sandbox VR Oakbrook, LLC, and Sandbox VR Pop-Up, LLC

By: *Steven Zhao*
     F52FAAC2BBAA4AB... _____

Steven Zhao, authorized representative


Sandbox VR, Inc.

By: *Steven Zhao*
     F52FAAC2BBAA4AB... _____

Steven Zhao, authorized representative

*[Signature Page to Plan Support Agreement]*

00035

Silicon Valley Bank

By: _Sean Thompson_____

Name:  Sean Thompson

Title:   Director

TriplePoint Capital LLC

By: _____ *Christopher M. Mathieu* _____
DocuSigned by:
7D6564E45CF94BD...

Name:   Christopher M. Mathieu

Title:   Chief Financial officer

*[Signature Page to Plan Support Agreement]*

ATEL GROWTH CAPITAL, doing business as ATEL Ventures, as agent on behalf of its affiliates

By: _____

Name:  Vasco Morais

Title:    General Counsel

**EXHIBIT A**

<u>Plan Term Sheet</u>

[See attached.]

**SUBJECT TO FRE 408**

**THIS PLAN OF REORGANIZATION TERM SHEET DOES NOT CONSTITUTE AN OFFER OF SECURITIES OR A SOLICITATION OF THE ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN FOR PURPOSES OF SECTIONS 1125 AND 1126 OF TITLE 11 OF THE UNITED STATES CODE (THE "BANKRUPTCY CODE").   ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

**THIS PLAN OF REORGANIZATION TERM SHEET CONTAINS A SERIES OF ASSUMPTIONS, COMPROMISES AND SETTLEMENTS OF ISSUES AND DISPUTES THAT WILL BE RESOLVED IN CONNECTION WITH CONFIRMATION OF A CHAPTER 11 PLAN.  IN THE EVENT THE CHAPTER 11 PLAN CONTEMPLATED UNDER THIS PLAN OF REORGANIZATION TERM SHEET IS NOT CONFIRMED OR DOES NOT BECOME EFFECTIVE, NOTHING HEREIN SHALL BE CONSTRUED AS AN ADMISSION OF OR THE POSITIONS OF THE PARTIES WITH RESPECT TO THESE ISSUES OR DISPUTES.  ACCORDINGLY, THIS PLAN OF REORGANIZATION TERM SHEET IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROHIBITING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.  THIS PLAN OF REORGANIZATION TERM SHEET IS SUBJECT TO ALL EXISTING CONFIDENTIALITY AGREEMENTS.**

## PLAN OF REORGANIZATION TERM SHEET

This Plan of Reorganization Term Sheet ("**Plan Term Sheet**") does not attempt to describe all of the terms, conditions, requirements and provisions of the Plan.  Rather, it summarizes material terms and provisions thereof.  Capitalized terms used and not otherwise defined herein shall have the meanings given to them in that certain Plan Support Agreement dated as of July [--], 2020 ("**PSA**") by and among (i) GloStation USA, Inc., and the following subsidiary, affiliated entities, Glostation Core USA, Inc., Sandbox VR Mission Valley, LLC, Sandbox VR San Mateo, LLC, Sandbox VR Cerritos, LLC, Sandbox VR Topanga, LLC, Sandbox VR Ridge Hill, LLC, Sandbox VR Austin, LLC, Sandbox VR Colony, LLC, Sandbox VR Oakbrook, LLC, and Sandbox VR Pop-Up, LLC (each, a "**Company**" and, collectively, the "**Companies**"), (ii) Sandbox VR, Inc. ("**Parent**" or "**Plan Sponsor**"), (iii) Silicon Valley Bank ("**SVB**"), (iv) TriplePoint Capital LLC ("**TPC**"), and (v) ATEL GROWTH CAPITAL, a California corporation, doing business as ATEL Ventures, as agent on behalf of its affiliates ("**ATEL**" and ATEL, SVB, and TPC are collectively referred to herein as "**Secured Creditors**").

### A.    Financing.

SVB and TPC hold duly perfected security interests in, among other things, all available cash of Parent and the Companies (the "**Cash Collateral**").  SVB and TPC will permit the Companies to use the Cash Collateral during the chapter 11 cases in accordance with, and subject to, the terms of the proposed cash collateral order attached hereto as **Annex I**, including the provisions therein relating to adequate protection.  ATEL holds a duly perfected security interest in, among other things, the Collateral described on Annex III attached hereto and made a part hereof (the "ATEL Collateral).

Under current circumstances, the only realistic source of additional funding for the Companies during the Cases is Parent.  Parent will provide funding (the "**Funding**") to the extent necessary to meet reopening and/or operating expenses, secured debt service payments, and administrative expenses during the Cases, and to fund the Companies' emergence from chapter 11, in accordance with the budget attached hereto as **Annex II** the ("**Chapter 11 Budget**").

The Funding shall be subordinated to the claims and liens, respectively, of the Secured Creditors (including the adequate protection claims and liens, respectively, of the Secured Creditors).

### B.    Plan Overview.

The Plan shall provide for the reorganization of the Companies as a going concern.   The Companies are commencing the Cases to restructure their operations and debt.  The Companies believe

that a successful overall reorganization will maximize the value of the bankruptcy estates and allow the Companies to emerge from chapter 11 as a reorganized and viable ongoing business.

A business plan for the business enterprise including the Companies has been developed for re-opening stores, surviving the Coronavirus pandemic, and growing the Business once Coronavirus-related restrictions have eased.  That plan includes: (i) Parent obtaining  funding from investors; (ii) SVB, TPC and ATEL agreeing to restructure secured debt obligations and to support the chapter 11 process and the Companies' reorganization; (iii) the Companies moving for rejection of two leases (at locations where the Companies never took possession and operations never commenced prior to the pandemic) immediately (the leases to which Ridge Hill and Colony are a party), to the extent that lease termination agreements are not entered prepetition; (iv) the Companies negotiating with landlords as to the remaining seven (7) leases for locations that the Companies were operating prior to the pandemic to obtain landlord concessions and lease modifications necessary to allow viable ongoing operations in the different economic environment resulting from the pandemic and, if negotiations are not successful, rejecting additional leases to avoid incurring potential administrative expenses; (v) the Companies proceeding with reopening stores to the extent allowed under applicable government requirements; and (vi) the Companies moving forward expeditiously with the presentation of the Plan designed to allow them to survive as part of a viable ongoing business enterprise, despite the severe impact of COVID-19, with a necessary restructuring of debt and lease obligations

The Plan will provide for the treatment of claims against and equity interests in the Companies. This includes administrative, priority, secured, and unsecured claims.  Intercompany claims will not receive any payment or other recovery under the Plan.

The Companies contemplate a "new value" plan pursuant to which Parent, as Plan Sponsor, will make an equity contribution to the Companies' estates under the Plan, in an amount not less than $700,000, in exchange for 100% of the outstanding equity interests of the reorganized GloStation USA, Inc.

C.      **Treatment of Claims and Equity Interests.**

Treatment of claims and interests under the Plan are contemplated as follows:

1.      Administrative Claims.  In accordance with the requirements of the Bankruptcy Code, allowed administrative claims (to the extent not paid prior thereto) will be paid in full on the effective date of the Plan or as soon thereafter as practicable or pursuant to such other terms as may be agreed to by the holder of such claim and the Companies; provided, that the foregoing treatment shall not apply to the claims of Parent on account of the Funding.

2.      Funding Claims.  Under the Plan, along with other "new value" to be contributed by Parent, the claims of Parent on account of the Funding will be will be converted into equity interests of the reorganized GloStation USA, Inc..

3.      SVB Secured Loan.  On January 3, 2019, the Companies, Parent, and certain non-debtor affiliates entered into a loan agreement with SVB pursuant to which they obtained a $4 million loan, secured by a first priority security interest in substantially all of the Companies' personal property and personal property of non-debtor affiliates.  On July [--], 2020, the parties to the SVB facility entered into an amendment pursuant to which SVB has agreed to, among other things, interest only payments under its loan through December 31, 2020.  Under the Plan, on the Effective Date of the Plan, interest only payments will be extended through April 30, 2021 on $2 Million of its claim and June 30, 2021 on the remaining $2 Million of its claim.  Therefore, SVB's secured claim will be impaired, and SVB will be entitled to vote on the Plan.

4.      TPC Secured Loan.  On January 3, 2019, Glostation, Parent, Core, and Franchising also entered into a loan agreement with TPC, pursuant to which the Companies have borrowed a total of [$7,067,334.66] in funds, secured by a first priority security interest in substantially all of the

Companies' personal property and personal property of non-debtor affiliates, subject to the subordination agreement between SVB and TPC, as amended. On July [--], 2020, the parties to the TPC facility entered into an amendment pursuant to which TPC has agreed to, among other things, divide the outstanding principal balance into two notes ("Note 1" and "Note 2"), with interest only payments under Notes 1 and 2 through December 31, 2020 and amendment fees in the aggregate amount of $1 million. Under the Plan, on the Effective Date of the Plan, (i) interest only payments under Note 1 will be extended through April 1, 2021, to be followed by 24 months of equally amortizing payments of principal and interest through April 1, 2023, (ii) interest only payments under Note 2 will be extended through June 1, 2021, to be followed by 24 months of equally amortizing payments of principal and interest through June 1, 2023, and (iii) TPC will waive 50% of the amendment fees otherwise due and owing as of the Petition Date. Therefore, TPC's secured claim will be impaired, and TPC will be entitled to vote on the Plan.

5.    ATEL Secured Loan.    On June 16, 2019, Glostation and Parent entered into a credit facility with ATEL, pursuant to which ATEL agreed to finance Glostation and Parent's purchase of personal property necessary to operate their stores, secured by a first priority security interest in such personal property and subordinated to SVB's and TPC's liens on personal property pursuant to subordination agreements between ATEL and SVB and TPC (the "ATEL Collateral"). ATEL made three loans to Glostation and Parent. On July 31, 2020, the total outstanding principal balance of the three loans is $1,567,244.34. On August 6, 2020, the parties to the ATEL facility entered into an amendment pursuant to which ATEL has agreed to, among other things, interest only payments under its three loans from July 31, 2020 through December 31, 2020, to be followed by 18 months of equally amortizing payments of principal and interest on two of the loans and 20 months on the third loan. Under the Plan, on the Effective Date of the Plan, interest only payments will be extended through June 1, 2021 to be followed by 24 months of equally amortizing payments of principal and interest through June 1, 2023 on all three loans. Therefore, ATEL's secured claim will be impaired, and ATEL will be entitled to vote on the Plan.

6.    Priority Claims.    Allowed priority claims will be paid in full on the effective date of the Plan or as soon thereafter as practicable, provided that each allowed claim entitled to priority treatment pursuant to section 507(a)(8) of the Bankruptcy Code, to the extent such claim has not already been paid during the Case (collectively, the "**Priority Tax Claims**") may, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Priority Tax Claim, be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.

7.    General Unsecured Claims.    In the context of a liquidation of the Companies, collectively, or of any of the Companies, individually, under current circumstances, the Companies believe that unsecured creditors of the Companies would receive nothing. Under the Plan, as a result of the "new value" contribution by Plan Sponsor, an amount equal to $100,000 will be available for distribution to unsecured creditors.

8.    Intercompany Claims.    Intercompany claims will be cancelled without any payment or distribution under the Plan and such holders of intercompany claims will receive no recovery.

9.    Intercompany Equity Interests.    Equity interests in the Companies (other than GloStation USA, Inc.) will be reinstated as of the Effective Date.

10.    Equity Interests of GloStation USA, Inc.    Equity interests in GloStation USA, Inc. existing as of the Petition Date will be, at the election of Plan Sponsor, (i) reinstated as of the Effective Date or (ii) canceled without receiving any payment or distribution with new equity interests in GloStation USA, Inc. issued to the Plan Sponsor under the Plan, in each case, such treatment shall be on account of the Plan Sponsor's equity contribution in an amount not less than $700,000.

**D.    Leases.** the Companies engaged in discussions with their landlords prior to the Petition Date regarding a renegotiation of the Companies' lease terms. Those negotiations are ongoing. In virtually all cases, the Companies' landlords informed the Companies that the landlords believed that lease modification agreements could be achieved, but that the landlord would not reach such an agreement prior to the Companies commencing their Chapter 11 bankruptcy cases. The Companies will continue to attempt

00042

to promptly reach agreement with their landlords on necessary lease modifications in order for the Companies to be able to move forward on a viable basis, restore their operations, and ultimately emerge as a sustainable company despite the ongoing harm caused and challenges imposed by the pandemic.

The Companies' goal is to reopen stores and to reach lease modification agreements with landlords for all of its remaining leases. The Companies are actively pursuing lease modification discussions with the landlords relating to those leases. Because the impact of the pandemic is changing, this situation is highly fluid and the Companies cannot anticipate with precision whether and when additional stores will reopen.

### E.     Liquidation Alternative.

The Companies believe that liquidation of the Companies, collectively, or of any of the Companies, individually, under current circumstances, would result in insufficient proceeds to pay secured creditors in full and would leave unsecured creditors with no recovery on their claims.

### F.     Conduct of the Business.

Prior to confirmation of the Plan, the Companies shall operate in the ordinary course as that term is applied to the current COVID-19 pandemic reality (including re-opening stores to the extent allowable under government requirements and to the extent of agreements with landlords).

### G.     Discharge.

Except as otherwise provided in section 1141(d)(1) of the Bankruptcy Code, in the Plan, or in the order confirming the Plan, the confirmation of the Plan shall discharge the Companies from any debt that arose before the date of such confirmation, and any debt of a kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (i) a proof of the claim based on such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (ii) such claim is allowed under section 502 of the Bankruptcy Code, or (iii) the holder of such claim has accepted the Plan, provided that the debts owed to SVB, TPC, and ATEL shall not be discharged and shall be reaffirmed by the reorganized Companies as of the effective date.

### H.     Revesting of Property in Reorganized Companies.

Except as otherwise provided in the Plan, on the effective date of the Plan, all property and rights of the estates of the Companies will revest in, or be transferred to, the reorganized Companies, free and clear of all claims, liens, and rights of creditors and interests or interest holders other than claims, liens, and rights in favor of SVB, TPC, and ATEL, which shall be reaffirmed by the reorganized Companies as of the effective date.

### I.     Conditions Precedent to Plan Effective Date; Documentation

The occurrence of the Plan effective date will be subject to conditions precedent that are acceptable to the Secured Creditors, including (a) the PSA shall not have been terminated, and (b) the Plan, all schedules documents, and supplements thereto, and the order confirming the Plan shall be, in form and substances, in accordance with the terms of the PSA and reasonably acceptable to the Secured Creditors. The parties shall negotiate the definitive documents necessary to complete the restructuring in good faith. Any and all documentation necessary to effectuate the restructuring, including the definitive documents,

shall be in form and substance consistent with the PSA and this Plan Term Sheet and shall be reasonably acceptable to the Secured Creditors.

**J.**　　**Releases, Exculpation, and Injunction**

The Plan will include release, exculpation, and injunction provisions in form and substance reasonably acceptable to the Secured Creditors.

**ANNEX I**

<u>Cash Collateral Order</u>

1  David S. Kupetz (CA Bar No. 125062)
    *dkupetz@sulmeyerlaw.com*
2  Steven F. Werth (CA Bar No. 205434)
    *swerth@sulmeyerlaw.com*
3  Asa S. Hami (CA Bar No. 210728)
    *ahami@sulmeyerlaw.com*
4  **Sulmeyer**Kupetz
   A Professional Corporation
5  333 South Grand Ave, Suite 3400
   Los Angeles, California 90071
6  Telephone: 213.626.2311
   Facsimile: 213.629.4520
7
   Attorneys for Glostation USA, Inc., and
8  related debtors

9

10              **UNITED STATES BANKRUPTCY COURT**

                **CENTRAL DISTRICT OF CALIFORNIA**

                **SAN FERNANDO VALLEY DIVISION**

In re                                    |  Case No.  1:20-bk-

GLOSTATION   USA,   INC.,   a  Delaware  |  Chapter 11
corporation,
                                         |  **INTERIM ORDER (I) AUTHORIZING
                                         |  THE USE OF CASH COLLATERAL,
                Debtor.                  |  (II) GRANTING ADEQUATE
                                         |  PROTECTION, (III) SCHEDULING A
                                         |  FINAL HEARING, AND (IV) GRANTING
   Federal EIN:  37-1875688              |  RELATED RELIEF**

                                         |  Date:
                                         |  Time:
                                         |  Place:    Courtroom
                                         |            21041 Burbank Blvd.
                                         |            Woodland Hills, CA 91367

25      Upon the motion (the "**Motion**") filed August ___, 2020], of Glostation USA, Inc., and its

26  affiliated debtors, each as a debtor and debtor in possession (collectively, the "**Debtors**") in the

27  above-referenced chapter 11 cases (the "**Chapter 11 Cases**"), pursuant to sections 105, 361, 362,

28

ASH 2704294v12

363, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and the corresponding local rules (the "**Local Rules**") for the United States Bankruptcy Court for the Central District of California (the "**Court**"), for entry of an interim order (this "**Interim Order**"):

(i)   Authorizing the Debtors to use of all property constituting "cash collateral" as defined in section 363(a) of the Bankruptcy Code (the "**Cash Collateral**"), effective as of the Petition Date (as defined herein), subject to the terms set forth herein;

(ii)  Granting adequate protection to the Prepetition Lenders (as defined herein);

(iii) Vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of this Interim Order;

(iv)  Scheduling a final hearing (the "**Final Hearing**") to consider entry of an order (the "**Final Order**") granting the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing;

(v)   Waiving, to the extent applicable, any stay of the immediate effectiveness of this Interim Order imposed by the Bankruptcy Code, the Bankruptcy Rules or the Local Rules, such that this Interim Order shall be immediately effective upon its entry on the docket of the Court; and

(vi)  Granting related relief.

The Court having considered the Motion, the *Declaration of Steven Zhao* (the "**First Day Declaration**"), the exhibits attached thereto, and the evidence submitted or adduced and the arguments of counsel made at the hearing on this Interim Order (as defined below) (the "**Interim Hearing**"); and notice of the Motion and the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and 9014; and the Interim Hearing having been held and concluded; and it appearing that granting the relief requested in the Motion on an interim basis is necessary to avoid immediate and irreparable harm to the Debtors pending the Final Hearing, and is otherwise fair and reasonable and in the best interests of the Debtors, their estates and their creditors, and is essential for the preservation of the value of the Debtors' assets; and all objections, if any, to the entry of this Interim Order having been withdrawn, resolved or overruled

1  by the Court; and after due deliberation and consideration, and good and sufficient cause appearing

2  therefor:

3      **IT IS FOUND AND DETERMINED THAT:[3]**

4      A.      <u>**Commencement of Chapter 11 Case**</u>.  On August ___, 2020 (the "**Petition**

5  **Date**"), the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code with this

6  Court.  The Debtors are continuing to operate their business as debtors and debtors in possession

7  under sections 1107 and 1108 of the Bankruptcy Code.

8      B.      <u>**Jurisdiction and Venue**</u>.  This Court has jurisdiction over these proceedings,

9  pursuant to 28 U.S.C. §§ 157(b) and 1334 and General Order No. 13-05 from the United States

10  District Court for the Central District of California, and over the persons and property affected

11  hereby.  Venue for the Chapter 11 Cases and proceedings on the Motion is proper in this District

12  pursuant to 28 U.S.C. §§ 1408 and 1409.  Consideration of the Motion constitutes a core

13  proceeding under 28 U.S.C. § 157(b)(2).  This Court may enter a final order consistent with Article

14  III of the United States Constitution.

15      C.      <u>**Notice**</u>.  Notice of the Interim Hearing and the Motion has been provided by the

16  Debtors to (i) the U.S. Trustee for the Central District of California (the "**U.S. Trustee**"), (ii) the

17  Internal Revenue Service, (iii) the Debtors' thirty (30) largest unsecured creditors (excluding

18  insiders), (iv) counsel to the Prepetition Lenders, and (v) all other known holders of prepetition

19  liens, encumbrances or security interests against the Debtors' property, and (vi) any party that has

20  requested notice pursuant to Bankruptcy Rule 2002.  Under the circumstances, such notice of the

21  Interim Hearing and the Motion constitutes adequate and sufficient notice and complies with

22

23

24
---

25  [3] The findings and conclusions set forth herein constitute the court's findings of fact and
26  conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant
    to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute
27  conclusions of law, they are adopted as such.  To the extent any of the following conclusions of
    law constitute findings of fact, they are adopted as such.

28

Sulmeyer Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311   FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311    FAX 213.629.4520

1    section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001(b), (c), and (d), and the

2    Local Rules.

3          D.      **Debtors' Stipulations.**  After consultation with their attorneys, and without

4    prejudice to the rights of parties-in-interest as set forth in paragraph 18 herein, each of the Debtors,

5    on its behalf and on behalf of its estate, admits, stipulates, acknowledges, and agrees as follows:

6            (i)      **SVB Secured Loan**.  As of the Petition Date, pursuant to that certain Loan

7    and Security Agreement dated as of January 3, 2019 between Sandbox VR, Inc. ("**Parent**"), certain

8    of the Debtors and Silicon Valley Bank (the "**SVB**") (as amended, supplemented, or otherwise

9    modified, the "**SVB Loan Agreement**" and, together with all other agreements, documents and

10    instruments executed and/or delivered in connection therewith, as all of the same have been

11    amended, supplemented, or otherwise modified at any time prior to the Petition Date, the "**SVB**

12    **Loan Documents**"), the Debtors were indebted and liable, without defense, counterclaim, or offset

13    of any kind, to SVB in the aggregate principal amount of not less than $4,000,000.00 (the "**SVB**

14    **Facility**").  All obligations of the Debtors arising under the SVB Loan Agreement or any other

15    SVB Loan Documents, including under the SVB Facility, shall hereinafter be referred to

16    collectively as the "**SVB Loan Obligations**".

17            (ii)      **SVB Liens**.  As set forth more fully in the SVB Loan Agreement and the

18    Motion, prior to the Petition Date, to secure the SVB Loan Obligations, the Debtors granted to

19    SVB first priority liens (the "**SVB Liens**") on substantially all of the Debtors' assets, including,

20    but not limited to, all goods, accounts, equipment, inventory, intellectual property, contract

21    rights, leases, general intangibles, commercial tort claims, cash, deposit accounts and letters of

22    credit (collectively, the "**SVB Collateral**").

23            (iii)      **SVB Additional Stipulations**.  The Debtors acknowledge that as of the

24    Petition Date, (a) the SVB Liens on the SVB Collateral were valid, binding, enforceable, non-

25    avoidable, and properly perfected and were granted to, or for the benefit of, SVB for fair

26    consideration and reasonably equivalent value, (b) the SVB Liens were senior in priority over any

27    and all other liens on the SVB Collateral, subject only to liens in favor of ATEL Growth Capital,

28

doing business as ATEL Ventures, to the extent set forth in that certain Subordination Agreement and Consent dated June 14, 2019 between ATEL Growth Capital and SVB,  certain liens senior by operation of law (including any that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code), or otherwise permitted by the SVB Loan Agreement (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the SVB Liens as of the Petition Date),(c) the SVB Loan Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the SVB Loan Agreement, (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the SVB Liens or SVB Loan Obligations exist, and no portion of the SVB Liens or SVB Loan Obligations is subject to any challenge or defense including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law, (e) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against SVB or any of its affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon or related to the SVB Facility, (f) the Debtors have waived, discharged, and released any right to challenge any of the SVB Loan Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the liens securing the SVB Loan Obligations, and (g) the SVB Loan Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(iv)    **TPC Secured Loan.**  As of the Petition Date, pursuant to that certain Plain English Growth Capital Loan and Security Agreement dated as of January 3, 2019 among Parent, certain of the Debtors and TriplePoint Capital LLC ("**TPC**") (as amended, supplemented, or otherwise modified, the "**TPC Loan Agreement**" and, together with all other agreements, documents and instruments executed and/or delivered in connection therewith, as all of the same have been amended, supplemented, or otherwise modified at any time prior to the Petition Date,

the "**TPC Loan Documents**"), the Debtors were indebted and liable, without defense, counterclaim, or offset of any kind, to SVB in the aggregate amount of not less than [$8,067,334.66] (the "**TPC Facility**"). All obligations of the Debtors arising under the TPC Loan Agreement or any other TPC Loan Documents, including under the TPC Facility, shall hereinafter be referred to collectively as the "**TPC Loan Obligations**".

(v)    **TPC Liens**. As set forth more fully in the TPC Loan Agreement and the Motion, prior to the Petition Date, to secure the TPC Loan Obligations, the Debtors granted to TPC first priority liens (the "**TPC Liens**"), subject to the SVB Liens and liens in favor of ATEL Growth Capital, doing business as ATEL Ventures, and its successors and assigns ("**ATEL**"), pursuant to that certain Intercreditor Agreement by and between ATEL and TPC dated June 14, 2019, on substantially all of the Debtors' assets, including, but not limited to, all goods, accounts, equipment, inventory, intellectual property, contract rights, leases, general intangibles, commercial tort claims, cash, deposit accounts and letters of credit (collectively, the "**TPC Collateral**").

(vi)    **TPC Additional Stipulations**. The Debtors acknowledge that as of the Petition Date, (a) the TPC Liens on the TPC Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, TPC for fair consideration and reasonably equivalent value, (b) the TPC Liens were senior in priority over any and all other liens on the TPC Collateral, subject only to the SVB Liens and certain other liens senior by operation of law (including any that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) or otherwise permitted by the TPC Loan Agreement (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the TPC Liens as of the Petition Date), (c) the TPC Loan Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the TPC Loan Agreement, (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the TPC Liens or TPC Loan Obligations exist, and no portion of the TPC Liens or TPC Loan Obligations

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 FAX 213.629.4520

ASH 2704294v12                    6                    00051

is subject to any challenge or defense including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law, (e) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of TPC or any of its affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon or related to the TPC Facility, (f) the Debtors have waived, discharged, and released any right to challenge any of the TPC Loan Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the liens securing the TPC Loan Obligations, and (g) the TPC Loan Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(vii)    **Subordination Agreement**.  That certain Subordination Agreement dated as of January 3, 2019 between SVB and TPC (as amended, modified, and in effect from time to time, the "**Subordination Agreement**"), which governs, among other things, the relative priorities of the SVB Liens and the TPC Liens (the "**Prepetition Liens**") in respect of the SVB Collateral and the TPC Collateral (the "**Prepetition Collateral**") is binding and enforceable against the Debtors and SVB and TPC (together, the "**Prepetition Lenders**") in accordance with its terms, and the Debtors and the Prepetition Lenders are not entitled to take any action that would be contrary to the provisions thereof.  Notwithstanding anything to the contrary contained herein, any right that may be exercised, or action taken, by a Prepetition Lender under the terms of this Order shall be expressly subject to the terms of the Subordination Agreement and shall not be taken by the Prepetition Lender if such exercise or action would violate the terms of the Subordination Agreement.

(viii)    **No Claims**.  The Debtors have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code) or causes of action against the Prepetition Lenders with respect to the SVB Loan Documents or the TPC Loan Documents (together, the "**Prepetition**

**Loan Documents**"), the SVB Loan Obligations or the TPC Loan Obligations (together, the

"**Prepetition Loan Obligations**"), the SVB Facility or the TPC Facility (together, the

"**Prepetition Facilities**"), the Prepetition Liens, any prior financing transactions, or otherwise,

whether arising at law or at equity, including, without limitation, any challenge, recharacterization,

subordination, avoidance, or other claims arising under or pursuant to sections 105, 510, 541, or

542 through 553, inclusive, of the Bankruptcy Code.

(ix)    **Release**. Each Debtor, individually and on behalf of its successors, assigns,

agents, attorneys, officers, directors, partners, relatives, executors, administrators, shareholders,

subsidiaries, other affiliates and representatives (in their representative capacities, the foregoing

individuals and entities herein referred to as the "**Releasors**"), hereby stipulates and agree that they

forever, unconditionally and irrevocably release, discharge and acquit the Prepetition Lenders and

each of their respective successors, assigns, affiliates, subsidiaries, parents, officers, shareholders,

directors, employees, attorneys, and agents, past, present, and future, and their respective heirs,

predecessors, successors, and assigns (collectively, the "**Releasees**") of and from any and all

claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including,

without limitation, reasonable attorneys' fees), debts, liens, actions, and causes of action of any

and every kind whatsoever, whether arising in law or otherwise, and whether or not known or

matured, arising out of or relating to, as applicable, the Prepetition Facilities, the Prepetition Loan

Documents, and/or the transactions contemplated hereunder or thereunder including, without

limitation, (x) any so-called "lender liability" or equitable subordination claims or defenses,

(y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all

claims and causes of action with respect to the validity, priority, perfection or avoidability of the

liens or claims of the Prepetition Lenders; provided that the forgoing shall not release any claims

against a Releasee that a court of competent jurisdiction determines results primarily from the bad

faith, gross negligence, or willful misconduct of such Releasee.  Each Debtor, on behalf of itself

and the Releasors, further waive and release any defense, right of counterclaim, right of set-off, or

deduction to the payment of the Prepetition Loan Obligations which the Debtors now have or may

**SulmeyerKupetz,** A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 FAX 213.629.4520

1    claim to have, directly or indirectly against the Releasees, arising out of, connected with or relating

2    to any and all acts, omissions, or events occurring prior to the Court entering this Interim Order.

3    Each Debtor acknowledges that it is its intention, on behalf of itself and the Releasors, to effect a

4    general release as provided in California Civil Code§ 1542, and each Debtor specifically waives

5    the protections of California Civil Code § 1542, which reads as follows:

6    **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS**
**THAT THE CREDITOR OR RELEASING PARTY DOES**
7    **NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER**
**FAVOR AT THE TIME OF EXECUTING THE RELEASE,**
8    **AND THAT, IF KNOWN BY HIM OR HER WOULD HAVE**
**MATERIALLY AFFECTED HIS OR HER SETTLEMENT**
9    **WITH THE DEBTOR OR RELEASED PARTY.**

10    Each Debtor, on behalf of itself and the Releasors, expressly waives and releases any right

11    or benefit which it or they might now or in the future have under California Civil Code

12    Section 1542 (or any other laws of similar effect) to the fullest extent that such rights or benefits

13    may be lawfully waived and released. Each Debtor, on behalf of itself and the Releasors,

14    acknowledges that it may hereafter discover facts different from the facts now known or believed

15    by such Debtor and/or the Releasors to be true with respect to the matters covered by this release,

16    and agrees that this release nevertheless will be binding on such Debtor and the Releasors and

17    remain in full force and effect.

18    (x)    **No Control**.  The Prepetition Lenders do not control the Debtors or their

19    properties or operations, do not have authority to determine the manner in which any of the

20    Debtors' operations are conducted, are not control persons or insiders of the Debtors or any of

21    their affiliates by virtue of any of the actions taken with respect to, in connection with, related to,

22    or arising from this Interim Order, the Prepetition Facilities, and/or the Prepetition Loan

23    Documents.

24    E.    **Findings Regarding the Cash Collateral**.

25    (i)    **Cash Collateral**.  Any and all of the Debtors' cash including cash and other

26    amounts on deposit or maintained in any account or accounts by the Debtors, whether subject to

27    control agreements or otherwise, and any amount generated by the collection of accounts

28

ASH 2704294v12    9    00054

1    receivable or other disposition of the Prepetition Collateral, and the proceeds of any of the

2    foregoing, whether existing on the Petition Date or thereafter, constitute the Cash Collateral of the

3    Prepetition Lenders.

4            (ii)    **Need for Use Cash Collateral**. An immediate need exists for the Debtors

5    to obtain access to the Cash Collateral in order to continue operations, fund payroll and operating

6    expenses, and to administer and preserve the value of their estates pending the Final Hearing.  The

7    ability of the Debtors to operate through the use of Cash Collateral on an interim basis is vital to

8    the preservation and maintenance of the going concern value of the Debtors' estates, to maximize

9    the value of the Debtors' assets for the benefit of their creditors, and to avoid immediate and

10    irreparable harm to the Debtors, their estates and their creditors.

     F.    <u>**Good Cause for Immediate Entry**</u>.  Good cause has been shown for immediate

entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2).  In particular, the

authorization granted herein for the Debtors to continue using Cash Collateral is necessary to avoid

immediate and irreparable harm to the Debtors and their estates.  Entry of this Interim Order is in

the best interest of the Debtors, their estates, and creditors.  The terms of the Debtors' use of Cash

Collateral as set forth in this Interim Order are fair and reasonable under the circumstances, reflect

the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are

18    supported by reasonably equivalent value and fair consideration.

19         G.    <u>**Arm's Length Negotiation; Good Faith**</u>.  The Debtors and the Prepetition Lenders

20    have negotiated the terms and conditions of this Interim Order in good faith and at arm's length.

21    The terms of the use of the Cash Collateral pursuant to this Interim Order shall be, and hereby are,

22    deemed to have been extended and made, as the case may be, in "good faith" and at arm's length

23    among the Debtors and the Prepetition Lenders and, pursuant to sections 105, 361 and 363 of the

24    Bankruptcy Code, the Prepetition Lenders are hereby found to be entities that have acted in "good

25    faith" in connection with the negotiation and entry of this Interim Order, and each is entitled to the

26    protection provided under Bankruptcy Code section 363(m).

27

28

H.      **Good Cause**.  The ability of the Debtors to continue to use Cash Collateral is vital to the Debtors, their estates, creditors, and other parties in interest.  The liquidity to be provided through the use of the Cash Collateral will enable the Debtors to continue to operate their businesses in the ordinary course and preserve the value of their businesses.  The Court concludes that entry of this Interim Order is in the best interests of the Debtors' respective estates and creditors as its implementation will, among other things, allow for the sustained operation of the Debtors' existing businesses and further enhance the Debtors' prospects for a successful restructuring.

I.      **Adequate Protection**.  The Prepetition Lenders are entitled to adequate protection provided in this Interim Order as and to the extent set forth herein pursuant to Bankruptcy Code sections 361, 363 and 364.  Based on the Motion, the First Day Declaration and the record presented to the Court at the Interim Hearing, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of Cash Collateral; *provided*, that nothing in this Interim Order shall prejudice, limit, or otherwise impair the rights of the Prepetition Lenders to seek new, different, or additional adequate protection.

**NOW, THEREFORE,** based upon the foregoing findings, and upon consideration of the Motion and the record made before this Court with respect to the Motion, including the First Day Declaration and the record created during the Interim Hearing, and with the consent of the Debtors and the Prepetition Lenders to the form and entry of this Interim Order, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED AND DECREED:**

1.      **Motion Granted**.  The Motion is granted on an interim basis in accordance with the terms and conditions set forth in this Interim Order.  Any objections to the Motion with respect to entry of this Interim Order to the extent not withdrawn, waived or otherwise resolved, and all reservations of rights included therein, are hereby denied and overruled on the merits.

2.      **Authorization to Use Cash Collateral**.  Subject to the terms of this Interim Order, the Debtors are hereby authorized to continue to use Cash Collateral from and after the Petition Date until the earlier to occur of (a) [September 17, 2020] and (b) the Termination Date (as defined herein), only for the purposes specifically set forth in the Prepetition Loan Documents and this Interim Order and in strict compliance with the Budget (as defined herein), subject to any variances thereto permitted by this Interim Order.  Except as expressly provided herein, the Debtors shall be immediately prohibited from using the Cash Collateral from and after the Termination Date. Notwithstanding anything to the contrary herein, nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or the Debtors' use of any Cash Collateral or other proceeds resulting therefrom, except as permitted in this Interim Order and in accordance with the Budget (as defined herein).

3.      **Adequate Protection**.  In addition to all the existing security interests and liens previously granted to the Prepetition Lenders, as adequate protection for, and to secure the payment of an amount equal to the diminution of the value of the Prepetition Collateral to the fullest extent authorized under the Bankruptcy Code and applicable case law interpreting the same, and as an inducement for the Prepetition Lenders to permit the Debtors' use of the Cash Collateral as provided for in this Interim Order, the Prepetition Lenders are hereby granted the following adequate protection (the "**Adequate Protection Obligations**"), pursuant to sections 361, 362, 363, and 507 of the Bankruptcy Code:

(i)      continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on (collectively, the "**Adequate Protection Liens**") all prepetition and postpetition tangible and intangible property and assets, whether real or personal of the Debtors, including, without limitation, all assets and property pledged under the Prepetition Loan Documents, and all cash, any investment of such cash, inventory, accounts receivable, including intercompany accounts (and all rights associated therewith), other rights to payment whether arising before or after the Petition Date, contracts, contract rights, chattel paper, goods, investment property, inventory, deposit accounts, and all

DocuSign Envelope ID: 6D25F549-8EB7-44C8-81B9-A4F9C0B623ED

amounts on deposit therein from time to time, equity interests, securities accounts, securities entitlements, securities, shares, commercial tort claims and claims that may constitute commercial tort claims (known and unknown), books, records, plants, equipment, general intangibles, documents, instruments, interests in leases and leaseholds, interests in real property, fixtures, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, letter of credit rights, supporting obligations, machinery and equipment, patents, copyrights, trademarks, tradenames, other intellectual property, all licenses therefor, and all proceeds, rents, profits, products, and substitutions, if any, of any of the foregoing, and subject to entry of the Final Order, the Adequate Protection Collateral shall include the proceeds of any recoveries by the Debtors, by settlement or otherwise, in respect of claims or causes of action to which the Debtors may be entitled to assert by reason of any avoidance or other power vested in or on behalf of a debtor or the estate of a debtor under chapter 5 of the Bankruptcy Code (the "**Adequate Protection Collateral**"). Notwithstanding the foregoing, the Adequate Protection Collateral shall not include any contract or license under which the granting of the Adequate Protection Liens thereon would constitute a breach or termination thereof other than to the extent such breach or termination would be rendered ineffective pursuant to applicable law (including applicable state law or the Bankruptcy Code) but shall, in any event, include the proceeds of such contracts and licenses; *provided*, *further*, that Adequate Protection Collateral shall include the economic value of the proceeds of any sale or other disposition of, and any other proceeds or products of Adequate Protection Collateral;

(ii)    allowed superpriority administrative expense claims in the Chapter 11 Cases and any successor cases (the "**Adequate Protection Superpriority Claim**") with priority over all other administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 506(c), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code;

1      (iii)     payment of interest on the Prepetition Loan Obligations at the contractual,

2  non-default rate that would otherwise be applicable under the Prepetition Loan Documents, which

3  interest shall be payable monthly in cash and otherwise in accordance with the terms of the

4  Prepetition Loan Documents; and

5      (iv)     payment in cash within five (5) business days of receipt all reasonable and

6  documented legal fees and out-of-pocket expenses incurred in connection with the Chapter 11

7  Cases, whether arising before or after the Petition Date; *provided*, that the Prepetition Lenders (and

8  each of their professionals) shall not be required to comply with U.S. Trustee fee guideline or file

9  applications or motions with, or obtain approval of, the Court for the payment of any of their out-

10  of-pocket costs, fees, expenses, disbursements and other charges.

    4.    **Priority of Adequate Protection Liens**.  The Adequate Protection Liens shall be

first priority perfected security interests, liens, and mortgages on all Adequate Protection Collateral

not subject to valid, perfected, enforceable, and non-avoidable security interests, liens or

mortgages in existence on Petition Date (the "**Prior Permitted Liens**").  The Adequate Protection

Liens shall be junior security interests, liens and mortgages on all Adequate Protection Collateral

that was subject to a Prior Permitted Lien in existence on the Petition Date.  Other than as set forth

herein, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or

18  security interest heretofore or hereinafter in the Chapter 11 Cases or any successor cases, and shall

19  be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any successor

20  cases, or upon the dismissal of any of the Chapter 11 Cases or any successor case.  The Adequate

21  Protection Liens shall not be subject to sections 510, 549, or 550 of the Bankruptcy Code.  No lien

22  or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the

23  Bankruptcy Code shall be *pari passu* with or senior to the Prepetition Liens or the Adequate

24  Protection Liens.

25    5.    **Validity of Adequate Protection Obligations**.  The Adequate Protection

26  Obligations shall constitute valid and binding obligations of the Debtors, enforceable against the

27  Debtors in accordance with the terms thereof.  The Adequate Protection Liens as approved under

28

**Sulmeyer** Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 ᴧ FAX 213.629.4520

this Interim Order shall become effective on an interim basis upon entry of this Interim Order and on a final basis upon entry of the Final Order.  No obligation, payment, transfer or grant of security interest or lien under this Interim Order or the Final Order shall be voided, voidable, or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment, or counterclaim.  The Debtors shall not consent to relief from the automatic stay by any person or entity other than the Prepetition Lenders to proceed against any Adequate Protection Collateral without the express written consent of Prepetition Lenders.

6.    **Postpetition Lien Perfection**.    This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the Adequate Protection Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect the Adequate Protection Liens or to entitle the Adequate Protection Liens to the priorities granted herein.  Notwithstanding the foregoing, the Prepetition Lenders may, in their sole discretion, file such financing statements, mortgages, notices of liens and other similar documents, and are hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded at the time and on the date of the commencement of the Chapter 11 Cases.  The Debtors shall execute and deliver to the Prepetition Lenders all such financing statements, mortgages, notices and other documents as the Prepetition Lenders may reasonably request to evidence, confirm, validate or perfect, or to insure the contemplated priority of, the Adequate Protection Liens granted pursuant hereto.  The Prepetition Lenders, in their sole discretion, may file a photocopy of this Interim Order as a financing statement with any recording officer designated to file or record financing statements or with any registry of deeds or similar office in any jurisdiction in which the Debtors have real or personal property, and in such event, the recording officer shall be authorized to file or record such

1   copy of this Interim Order.  To the extent required, the automatic stay imposed under section 362(a)

2   of the Bankruptcy Code is hereby vacated and modified to permit the Debtors to grant the liens

3   and security interests to the Prepetition Lenders contemplated by this Interim Order.

4        7.    **Budget**.   The budget annexed hereto as **Exhibit A** (as it may be updated

5   periodically in accordance with this Interim Order, the "**Budget**"), is hereby approved.  Beginning

6   on the first Friday following the Petition Date, and then no later than the Friday of each subsequent

7   calendar week, the Debtors shall deliver to the Parent and the Prepetition Lenders an updated,

8   proposed Budget (each, a "**Proposed Budget**") for the following 13-week period, which shall be

9   in form and substance satisfactory to Parent and the Prepetition Lenders. A Proposed Budget shall

10  become the new Budget upon approval by the Parent and the Prepetition Lenders (which must be

11  in writing, including via email).  If Parent or the Prepetition Lenders reject or fail to approve a

12  Proposed Budget, the prior approved budget shall continue in place and shall govern and the parties

13  shall negotiate in good faith regarding the terms of the Proposed Budget.  The Debtors shall not

14  permit the percentage variance with respect to (a) projected receipts in each then-current Budget

15  to exceed (i) 12.5% on an individual basis of actual receipts for a specific line item and (ii) 7.5%

16  on an aggregate basis of total actual receipts, in each case, on a cumulative four-week rolling basis,

17  and (b) projected disbursements in each then-current Budget to exceed (i) 12.5% on an individual

18  basis of actual disbursements for a specific line item and (ii) 7.5% on an aggregate basis of total

19  actual disbursements, in each case, on a cumulative four-week rolling basis (collectively, the

20  "**Budget Variances**"; all references in this Interim Order to "Budget" shall mean the Budget as it

21  is subject to the Budget Variances).  The Debtors shall also deliver with each updated Budget a

22  variance report reflecting on a line item and an aggregate basis, the Debtors' actual unrestricted

23  cash receipts and cash disbursements compared to the Budget for such immediately preceding

24  week and for the period commencing on the Petition Date through and including the end of the

25  week immediately preceding the date of the variance report; and such variance report shall be in

26  form and substance satisfactory to the Prepetition Lenders and certified as complete and accurate

27  by a responsible officer to the responsible officer's reasonable belief.  For the avoidance of doubt,

28

1  for purposes of calculating the Budget Variances, any unused amounts set forth in the Budget for

2  any period of determination may be carried forward and used during subsequent periods.

3         8.      **Cash Management**.  The Debtors shall maintain their cash management

4  arrangements in a manner consistent with that described in the motion seeking entry of an order

5  authorizing the Debtors to maintain their existing cash management system, which order shall be

6  in form and substance acceptable to the Prepetition Lenders, unless directed otherwise by the Court

7  or the United States Trustee.

8         9.      **[Reserved]**.

9        10.      **[Reserved]**.

10        11.      **Protection of Prepetition Lenders' Rights**.  A "**Termination Event**" means:

(i) the Debtors shall violate the terms of this Interim Order; (ii) a breach by the Debtors or Parent

of that certain plan support agreement by, among others, the Debtors, Parent, SVB, and TPC, dated

as of July 31, 2020 (the "**PSA**") or a termination of the PSA in accordance with the terms thereof,

(iii) the effective date of the Debtors' chapter 11 plan has not occurred on or before December 15,

2020 (provided, however, that this date may be extended in writing by the Prepetition Lenders

(acting in their sole and absolute discretion), which writing may be via e-mail through counsel),

(iv) this Interim Order ceasing to be in full force and effect for any reason (except to the extent

18  superseded by the Final Order in form and substance acceptable to the Prepetition Lenders in their

19  sole and absolute discretion), (v) Debtors shall file, propose, or support confirmation of a chapter

20  11 plan that is not consistent with the PSA or reasonably acceptable to SVB, (vi) the Debtors shall

21  file, propose, or support any sale process for, or sell, a material portion of their assets without the

22  prior written consent of SVB, (vi) the Debtors investigate, assert, or prosecute (a) any claims or

23  causes of action against any of the Prepetition Lenders arising under or related to the Prepetition

24  Loan Documents, or (b) any Challenge (as defined herein) or raise any defenses to the Prepetition

25  Loan Obligations, or (vii) the Debtors fail to meet any Milestone (as defined in the PSA).

26        12.      **[Reserved]**.

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311  FAX 213.629.4520

13.     **Additional Rights Upon Termination Event**.  Upon the occurrence and during the continuance of a Termination Event, unless such Termination Event is waived by the Prepetition Lenders, either Prepetition Lender may declare (a) all Adequate Protection Obligations and Prepetition Loan Obligations immediately due and owing, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Debtors, whereupon all Adequate Protection Obligations and Prepetition Loan Obligations shall be immediately due and payable; and (b) that the Debtors shall have no right to use any Cash Collateral, other than towards the satisfaction of the Adequate Protection Obligations and Prepetition Loan Obligations.

14.     **Notice of Termination Event; Exercise of Remedies**.  Five (5) business after the delivery by a Prepetition Lender to the Debtors or their counsel of a written notice (the "**Remedies Notice**"), which may be via email or otherwise, of the occurrence of a Termination Event (such date, the "**Termination Date**"), the Prepetition Lenders may seek relief from the automatic stay from the Court on an expedited basis to exercise all rights and remedies available under applicable non-bankruptcy law or the Prepetition Loan Documents with respect to the Adequate Protection Collateral (to the extent of the Adequate Protection Obligations) and the Prepetition Collateral; *provided*, *however*, that after the delivery of the Remedies Notice and prior to the Termination Date, without further Court authority, the Debtors may use Cash Collateral solely to pay expenses that the Prepetition Lenders approve in their sole discretion.  Within two business days upon the delivery of the Remedies Notice, to the extent not previously provided, the Debtors shall provide a line-by-line itemization of the Budget to the Prepetition Lenders.

15.     **Modifications of Prepetition Loan Documents**. The Debtors and the Prepetition Lenders are hereby authorized to implement, in accordance with the terms of the Prepetition Loan Documents, any modifications to the Prepetition Loan Documents (other than to this Interim Order) that are not materially adverse to the Debtors' estates or creditors without further notice, motion, or application to, order of or hearing before, this Court.  Any material modification or amendment to the Prepetition Loan Documents shall only be permitted pursuant to an order of this

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311  FAX 213.629.4520

DocuSign Envelope ID: 6D25F649-8EB7-44C8-8129-A4F9C0B623ED

Court (which may be sought within (3) Business Days), *provided*, *however*, that any forbearance from, or waiver of, (a) a breach by the Debtors of a covenant, representation or any other agreement or (b) a Termination Event shall not require an order of this Court.

16.        **Waiver of Requirement to File Proofs of Claim**. The Prepetition Lenders shall not be required to file proofs of claim in the Chapter 11 Cases or any successor cases in order to maintain their respective claims for payment of the obligations under their respective Prepetition Loan Documents.

17.        **Payment of Compensation**. Nothing herein shall be construed to obligate the Prepetition Lenders to pay any professional fees or to assure that the Debtors have sufficient funds on hand to pay any professional fees. Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors or shall affect the right of the Prepetition Lenders to object to the allowance and payment of such fees and expenses or to permit the Debtors to pay any such amounts not set forth in the Budget.

18.        **Effect of Stipulations**.

(i)        **Generally**.  The admissions, stipulations, agreements, releases, and waivers set forth in Paragraph D of this Interim Order (collectively, the "**Prepetition Lien and Claim Stipulations**") are and shall be binding on the Debtors.  In addition, the Prepetition Lien and Claim Stipulations shall be binding on any subsequent trustee, responsible person, examiner with expanded powers, any other estate representative, and all creditors and parties in interest and all of their successors in interest and assigns, including any statutory committee, unless, and solely to the extent that, a party in interest with standing and requisite authority (other than the Debtors, as to which any Challenge (as defined below) is irrevocably waived and relinquished) (a) has timely filed the appropriate pleadings, and timely commenced the appropriate proceeding required under the Bankruptcy Code and Bankruptcy Rules, including as required pursuant to Part VII of the Bankruptcy Rules (in each case subject to the limitations set forth in this paragraph) challenging the Prepetition Lien and Claim Stipulations (each such proceeding or appropriate pleading commencing a proceeding or other contested matter, a "**Challenge**") by no later than the date that

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 FAX 213.629.4520

is seventy five (75) days after the date of entry of this Interim Order (the "**Challenge Deadline**"),

as such applicable date may be extended in writing from time to time with the consent of the

Debtors and the affected Prepetition Lender (which written consent may be via email), and (b) this

Court enters judgment in favor of the plaintiff or movant in any such timely and properly

commenced Challenge proceeding and any such judgment has become a final judgment that is not

subject to any further review or appeal.  Notwithstanding the foregoing, if a chapter 11 trustee is

appointed or the Chapter 11 Cases are converted to chapter 7 prior to the expiration of the

Challenge Deadline, (1) the chapter 11 trustee or chapter 7 trustee, as applicable, shall have until

the later of the Challenge Deadline or the tenth (10th) day after the appointment of the chapter 11

trustee or the conversion of the Chapter 11 Cases to chapter 7, as applicable, to commence a

Challenge, subject to any further extension by order of the Court for cause and (2) if a statutory

committee has asserted a Challenge prior to the Challenge Deadline, the chapter 11 trustee or

chapter 7 trustee will stand in the shoes of such committee in such Challenge.

(ii)    **Binding Effect**.  To the extent no Challenge is timely and properly

commenced by the Challenge Deadline, or to the extent such proceeding does not result in a final

and non-appealable judgment or order of this Court that is inconsistent with the Prepetition Lien

and Claim Stipulations, then, without further notice, motion, or application to, order of, or hearing

before, this Court and without the need or requirement to file any proof of claim, the Prepetition

Lien and Claim Stipulations shall, pursuant to this Interim Order, become binding, conclusive, and

final on any person, entity, or party in interest in the Chapter 11 Cases, and their successors and

assigns, and in any successor cases for all purposes and shall not be subject to challenge or

objection by any party in interest, including a trustee, responsible individual, examiner with

expanded powers, or other representative of the Debtors' estates.  Notwithstanding anything to the

contrary herein, if any such proceeding is properly and timely commenced, the Prepetition Lien

and Claim Stipulations shall nonetheless remain binding on all other parties in interest and

preclusive as provided in subparagraph (i) above except to the extent that any of such Prepetition

Lien and Claim Stipulations is expressly the subject of a timely and properly filed Challenge,

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311  FAX 213.629.4520

1  which Challenge is successful as set forth in a final judgment as provided in subparagraph (i)

2  above.  To the extent any such Challenge proceeding is timely and properly commenced, the

3  Prepetition Lenders shall be entitled to payment of the related costs and expenses, including, but

4  not limited to, reasonable attorneys' fees, incurred under the Prepetition Loan Documents in

5  defending themselves in any such proceeding as adequate protection.  If any such Challenge is

6  timely commenced and/or sustained, the stipulations contained in Paragraph D shall nonetheless

7  remain binding on the Debtors' estates and all parties in interest, except to the extent that such

8  stipulations were expressly challenged in such Challenge.  Nothing in this Interim Order vests or

9  confers on any person (as defined in the Bankruptcy Code), including any statutory committee,

10  standing or authority to pursue any cause of action belonging to the Debtors or their estates,

11  including, without limitation, any Challenges, without prior express Court approval.

12       19.    **Limitation on Charging Expenses Against Collateral**.  Subject to entry of the

13  Final Order, (i) no costs or expenses of administration of these Chapter 11 Cases, any successor

14  cases or any other future proceeding that may result therefrom, including liquidation in bankruptcy

15  or other proceedings under the Bankruptcy Code shall be charged against or recovered from the

16  Adequate Protection Collateral or the Prepetition Collateral pursuant to section 506(c) of the

17  Bankruptcy Code or any similar principle of law or equity and (ii) the Debtors (and any successor

18  thereto, including any representatives thereof, including any trustee appointed in these Chapter 11

19  Cases or any successor cases) shall be deemed to have waived any rights, benefits or causes of

20  action under section 506(c) of the Bankruptcy Code as they may related to or be asserted against

21  the Prepetition Lenders, the Adequate Protection Collateral or the Prepetition Collateral.  Nothing

22  contained in this Interim Order shall be deemed a consent by the Prepetition Lenders to any charge,

23  lien, assessment or claim against, or in respect of, the Adequate Protection Collateral or the

24  Prepetition Collateral under 506(c) of the Bankruptcy Code or otherwise.

25       20.    **Limitations on the Use of Prepetition Collateral, Cash Collateral, and Carve-**

26  **Out**.  Prepetition Collateral, Cash Collateral, and Carve-Out may not be used: (a) in connection

27  with or to finance in any way any action, suit, arbitration, proceeding, application, motion or other

28

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1  litigation of any type (i) adverse to the interests of the Prepetition Lenders, or their rights and

2  remedies under the Prepetition Loan Documents, as applicable, including, without limitation, for

3  the payment of any services rendered by the professionals retained by the Debtors or any official

4  committee of unsecured creditors appointed in the Chapter 11 Cases in connection with the

5  assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion,

6  objection, defense or other contested matter, the purpose of which is to seek, or the result of which

7  would be to obtain, any order, judgment, determination, declaration or similar relief invalidating,

8  setting aside, avoiding or subordinating, in whole or in part, the Prepetition Obligations or

9  Adequate Protection Obligations, (ii) for monetary, injunctive or other affirmative relief against

10  the Prepetition Lenders, or (iii) preventing, hindering or otherwise delaying the exercise by the

11  Prepetition Lenders of any rights and remedies under this Interim Order, the Prepetition Loan

12  Documents, or applicable law, or the enforcement or realization (whether by foreclosure, credit

13  bid, further order of the Court or otherwise) by the Prepetition Lenders upon any of the Prepetition

14  Collateral; (b) to make any distribution under a plan of reorganization in the Chapter 11 Cases; (c)

15  to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator

16  or other governmental body without the prior written consent of the Prepetition Lenders, except as

17  contemplated by the Budget and approved by the Court; (d) to object to, contest, or interfere with

18  in any way the Prepetition Lenders' enforcement or realization upon any of the Prepetition

19  Collateral, as applicable, once an Event of Default has occurred; (e) to use or seek to use any

20  insurance proceeds constituting Prepetition Collateral without the prior written consent of the

21  Prepetition Lenders; (f) to incur indebtedness outside the ordinary course of business without the

22  prior written consent of the Prepetition Lenders; (g) to object to or challenge in any way the claims,

23  security interests, liens, or other interests (including interests in the Prepetition Collateral) held by

24  or on behalf of the Prepetition Lenders; (h) to assert, commence or prosecute any claims or causes

25  of action whatsoever, including, without limitation, any actions under chapter 5 of the Bankruptcy

26  Code, against the Prepetition Lenders; (i) to prosecute an objection to, contest in any manner, or

27  raise any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of

28

Sulmeyer Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311  FAX 213.629.4520

the Prepetition Obligations, the Adequate Protection Obligations, or any other rights or interests of the Prepetition Lenders; or (j) to prevent (or attempt to prevent), hinder or otherwise delay the exercise by the Prepetition Lenders of any rights and remedies granted under this Interim Order; *provided*, that any official committee of unsecured creditors appointed in the Chapter 11 Cases may use up to $15,000 (in the aggregate) in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Prepetition Lenders.

21.    **Payments Free and Clear**.  Any and all payments or proceeds remitted to the Prepetition Lenders pursuant to the provisions of this Interim Order or any subsequent order of the Court shall be irrevocable, received free and clear of any claim, charge, assessment or other liability, including without limitation, subject to the entry of the Final Order, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) (whether asserted or assessed by, through or on behalf of the Debtors) or 552(b) of the Bankruptcy Code.  No payments authorized by this Interim Order shall be subject to recharacterization, avoidance, subordination or disgorgement.

22.    **No Marshaling / Applications of Proceeds**. Subject to entry of the Final Order, the Prepetition Lenders shall not be subject to the equitable doctrine of 'marshaling' or any other similar doctrine with respect to any of the Adequate Protection Collateral or the Prepetition Collateral, as the case may be, and proceeds shall be received and applied pursuant to this Interim Order and the Prepetition Loan Documents notwithstanding any other agreement or provision to the contrary.

23.    **Section 552(b)**.  The Prepetition Lenders shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to the entry of the Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Lenders in any respect.

24.    **Limitation of Liability**. Nothing in this Interim Order or the Prepetition Loan Documents shall in any way be construed or interpreted to impose or allow the imposition upon

ASH 2704294v12                                    23                                    00068

the Prepetition Lenders, or any of their successors or predecessors, of any liability for any claims arising from the prepetition or postpetition activities of the Debtors or any affiliate of the Debtors.

25. **Indemnification**. The Debtors shall indemnify and hold harmless the Prepetition Lenders and their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders and employees, past, present and future, and their respective heirs, predecessors, successors and assigns in accordance with the Prepetition Loan Documents, which indemnification is hereby authorized and approved.

26. **Credit Bidding**. Subject to entry of the Final Order, each Prepetition Lender shall have the unqualified right to credit bid (a) up to the full amount of its Adequate Protection Obligations and Prepetition Loan Obligations in any sale of the Prepetition Collateral (or any part thereof), and (b) any unpaid amounts due and owing to such Prepetition Lender under this Interim Order, without the need for further Court order authorizing the same, and whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise; *provided that* with respect to a credit bid submitted by TPC, TPC's right to credit bid is subject to the repayment in full of all obligations owed to SVB in accordance with the Subordination Agreement.

27. **Monitoring of Collateral**. During normal business hours and after advanced written notice to the Debtors' counsel (email shall suffice), the Prepetition Lenders, and their representatives, consultants and advisors, shall be given reasonable access to the Debtors' books, records, assets and properties for purposes of monitoring the Debtors' business and the value of the Adequate Protection Collateral.

28. **No Third Party Rights**. This Interim Order does not create any rights for the benefit of any party, creditor, equity holder or other entity other than the Prepetition Lenders and the Debtors, and their respective successors and assigns.

29. **Rights Preserved**. Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or

ASH 2704294v12    24    00069

implicitly the Prepetition Lenders' right to seek any other or supplemental relief in respect of the Debtors, including the right to seek new, different or additional adequate protection, as applicable. Nothing contained in this Interim Order shall be deemed a finding by the Court or an acknowledgement by the Prepetition Lenders that the adequate protection granted in this Interim Order does in fact adequately protect the Prepetition Lenders against any diminution in value of the Prepetition Collateral.

30.    **Reversal or Modification on Appeal**.  The reversal or modification on appeal of a grant of priority or a lien under this Interim Order shall not affect the validity of any priority or lien so granted to the Prepetition Lenders under this Interim Order.

31.    **Binding Nature of Order**.  The provision**s** of this Interim Order shall be binding upon the Debtors and their successors and assigns (including, without limitation, any trustee or other fiduciary hereafter elected or appointed for or on behalf of the Debtors' estates or with respect to their property).

32.    **Survival of Order**.  Solely with respect to the Prepetition Lenders, the provisions of this Interim Order and any actions taken pursuant hereto (a) shall survive the entry of any order: (i) confirming any plan of restructuring in the Chapter 11 Cases; (ii) converting the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code; or (iii) dismissing the Chapter 11 Cases; and (b) shall continue in full force and effect notwithstanding the entry of any such order, and the claims, liens, and security interests granted pursuant to this Interim Order shall maintain their priority as provided by this Interim Order until (x) all of the Adequate Protection Obligations are indefeasibly paid or otherwise satisfied in full and discharged in accordance with this Interim Order and (y) the obligations owed to the Prepetition Lenders are indefeasibly paid or otherwise satisfied in full.  The Adequate Protection Obligations shall not be discharged by the entry of any order confirming any plan in the Chapter 11 Cases that does not provide for payment in full of the Adequate Protection Obligations or such other treatment of the Adequate Protection Obligations as may be agreed to by the Prepetition Lenders.

33.     **Priority of Terms**.  To the extent of any conflict between or among the Motion,

the terms of any "first day" orders (including any provisions contained in such orders authorizing

the Debtors to make any payments), and this Interim Order, the terms and provisions of this Interim

Order (including the provisions hereof relating to the Budget) shall govern.

34.     **Disposition of Collateral**.  The Debtors shall not sell, transfer, lease, encumber or

otherwise dispose of any portion of the Adequate Protection Collateral without the prior written

consent of the Prepetition Lenders (and no such consent shall be implied, from any other action,

inaction or acquiescence by the Prepetition Lenders or an order of this Court), except as provided

in this Interim Order and approved by the Court to the extent required under applicable bankruptcy

law.

35.     **No Waivers or Modification of Interim Order**.  The Debtors irrevocably waive

any right to seek any modification or extension of this Interim Order without the prior written

consent of the Prepetition Lenders and no such consent shall be implied by any other action,

inaction or acquiescence of the Prepetition Lenders.

36.     **Final Hearing**.  The Final Hearing to consider entry of the Final Order is scheduled

for _____, 2020 at __:__ _.m. prevailing Pacific time at the United States Bankruptcy

Court for the Central District of California.  If no objections to the relief sought in the Final Hearing

are filed and served in accordance with this Interim Order, no Final Hearing may be held, and a

separate Final Order may be presented by the Debtor and entered by this Court.  Within two (2)

business days following entry of this Interim Order, the Debtors shall serve, by e-mail or United

States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final

Hearing (the "**Final Hearing Notice**"), together with copies of this Interim Order, the proposed

Final Order, on: (i) the parties having been given notice of the Interim Hearing, (ii) any party which

has filed prior to such date a request for notices with this Court, (iii) counsel for any statutory

committee, if any, (iv) the U.S. Trustee, (v) the Internal Revenue Service, (vi) counsel to the

Prepetition Lenders, and (vii) the Securities and Exchange Commission.  The Final Hearing Notice

shall state that any party in interest objecting to the entry of the proposed Final Order shall file

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311  FAX 213.629.4520

DocuSign Envelope ID: 6D25F549-8EB7-44C8-8189-A4F9C0B623ED

1  written objections with the Clerk of the Court no later than _____, 2020 at 4:00 p.m.

2  prevailing Pacific time which objections shall be served so that the same are received on or before

3  such date by: (i) bankruptcy counsel for the Debtors, (ii) counsel for SVB, Morrison & Foerster

4  LLP, 200 Clarendon St., Boston, MA 02116, Attn: Alexander Rheaume, Esq., (iii) counsel to TPC,

5  McDermott Will & Emery LLP, 2049 Century Park East, Suite 3200, Los Angeles, CA 90067,

6  Attention: Gary B. Rosenbaum, (iv) counsel to any statutory committee, and (v) the U.S. Trustee,

7  Attn: [_], Esq., and shall be filed with the Clerk of the Court, in each case to allow actual receipt

8  of the foregoing no later than _____, 2020, at 4:00 p.m. prevailing Pacific time.

9  Notwithstanding the terms of this Interim Order, this Court is not precluded from entering a Final

10  Order containing provisions that are inconsistent with, or contrary to any of the terms in this

   Interim Order; *provided*, that the Prepetition Lenders shall have the right to terminate the use of

   Cash Collateral if such Final Order is not acceptable to them.  In the event this Court modifies any

   of the provisions of this Interim Order following such further hearing, such modifications shall not

   affect the rights and priorities of Prepetition Lenders pursuant to this Interim Order with respect to

   the Adequate Protection Collateral, and this Interim Order shall remain in full force and effect

   except as specifically amended or modified at such Final Hearing.

   37.    **Nunc Pro Tunc Effect**.  This Interim Order shall constitute findings of fact and

18  conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable

19  nunc pro tunc to the Petition Date immediately upon execution thereof.

20  38.    **Carve-Out**.  Notwithstanding anything to the contrary in this Interim Order, any

21  Prepetition Lien, Adequate Protection Lien, Prepetition Loan Obligations, Adequate Protection

22  Superpriority Claim, or Adequate Protection Obligations are subject and subordinate to a carve

23  out for the payment of (A) all fees required to be paid pursuant to the Clerk of the Court and to the

24  U.S. Trustee under section 1930(a) of title 28 of the United States Code prior to or after delivery

25  by SVB of a Remedies Notice plus interest at the statutory rate, plus (B) all reasonable fees and

26  expenses of the Debtors' bankruptcy counsel incurred prior to a Termination Event and allowed

27  under section 330 of the Bankruptcy Code, but not to exceed the line-item for such fees and

28

ASH 2704294v12                 27                        00072

expenses in the Budget, plus (C) all reasonable fees and expenses up to $40,000 of the Debtors'

bankruptcy counsel incurred after a Termination Event and allowed under section 330 of the

Bankruptcy Code, plus (D) all reasonable fees and expenses of bankruptcy counsel for any official

committee of unsecured creditors appointed in this case incurred prior to a Termination Event and

allowed under section 330 of the Bankruptcy Code but not to exceed $50,000, plus (E) all

reasonable fees and expenses up to $20,000 incurred by a trustee under section 726(b) of the

Bankruptcy Code.

39.     **Waiver of Stay of Effectiveness of the Interim Order**.    Notwithstanding

Bankruptcy Rules 6003 and 6004 or any other Bankruptcy Rule, this Interim Order shall be

immediately effective and enforceable upon its entry and there shall be no stay of execution or

effectiveness of this Interim Order.

40.     **Retention of Jurisdiction**.    This Court has and will retain exclusive jurisdiction to

enforce this Interim Order and over all matters, including, without limitation, disputes, relating

hereto.

# # #

**SUBJECT TO FRE 408**

**ANNEX II**

<u>Chapter 11 Budget</u>

[To be provided.]

Assumptions for all models:
1
2
3

| | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|
| USD | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| | 7/20/2020 | 7/27/2020 | 8/3/2020 | 8/10/2020 | 8/17/2020 | 8/24/2020 | 8/31/2020 | 9/7/2020 | 9/14/2020 | 9/21/2020 |
| Corporate Reduction factor (Covid impact) | 100% | 100% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% |
| **Revenues** | | | | | | | | | | |
| Corporate Store Revenue | 0 | 0 | 10,387 | 9,877 | 25,298 | 22,390 | 18,710 | 20,563 | 38,419 | 38,034 |
| Other Revenue | | | | | | | | | | |
| **Total Sandbox Revenue** | *0* | *0* | *10,387* | *9,877* | *25,298* | *22,390* | *18,710* | *20,563* | *38,419* | *38,034* |
| **Sandbox Operating Costs** | | | | | | | | | | |
| COGS Expense - Corporate stores | 0 | 0 | (406) | (386) | (990) | (876) | (732) | (804) | (1,503) | (1,488) |
| **Total COGS Expense** | **0** | **0** | **(406)** | **(386)** | **(990)** | **(876)** | **(732)** | **(804)** | **(1,503)** | **(1,488)** |
| **Gross Profit** | **0** | **0** | **9,981** | **9,490** | **24,308** | **21,514** | **17,978** | **19,759** | **36,916** | **36,546** |
| **SG&A Expense** | | | | | | | | | | |
| **Store SG&A Expense** | | | | | | | | | | |
| Salary Expense | (8,500) | (8,500) | (10,633) | (10,528) | (14,338) | (13,667) | (12,817) | (13,245) | (17,972) | (17,877) |
| Rent & Related Expense | 0 | 0 | (893) | (849) | (2,176) | (1,926) | (1,609) | (1,768) | (3,304) | (3,271) |
| Advertising & Marketing Expense | 0 | 0 | (3,084) | (2,932) | (7,511) | (6,648) | (5,555) | (6,105) | (11,803) | (11,685) |
| Store Expenses | 0 | 0 | (424) | (403) | (1,033) | (914) | (764) | (839) | (1,568) | (1,552) |
| Other SG&A Expense | 0 | 0 | (385) | (366) | (937) | (829) | (696) | (765) | (1,430) | (1,415) |
| **Total Store SG&A Expense** | **(8,500)** | **(8,500)** | **(15,419)** | **(15,078)** | **(25,994)** | **(23,983)** | **(21,441)** | **(22,723)** | **(36,077)** | **(35,801)** |
| Total Operating Income | (8,500) | (8,500) | (5,438) | (5,588) | (1,686) | (2,469) | (3,463) | (2,964) | 838 | 746 |
| Total Operating Profit Margin | n/a | n/a | -52.35% | -56.58% | -6.66% | -11.03% | -18.51% | -14.41% | 2.18% | 1.96% |
| Salary Expense - Experience | | | | | | | | | | |
| Salary Expense - Product | | | | | | | | | | |
| Salary Expense - Franchise | | | | | | | | | | |
| Salary Expense - Retail | (9,575) | (9,575) | (9,575) | (9,575) | (9,575) | (9,575) | (9,575) | (9,575) | (9,575) | (9,575) |
| Salary Expense - G&A | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) |
| Other staff related | | | | | | | | | | |
| T&E | 0 | (608) | (852) | (852) | (852) | (852) | (332) | (245) | (245) | (245) |
| Rent & Related | (225) | (225) | (225) | (225) | (225) | (225) | (225) | (225) | (225) | (225) |
| Marketing/Brand | (467) | (467) | (467) | (467) | (467) | (467) | (467) | (467) | (467) | (467) |
| Experience contractors | | | | | | | | | | |
| Consulting | | | | | | | | | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| R&D Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Office expense | | | | | | | | | | |
| Franchise Marketing | | | | | | | | | | |
| Franchise Expenses | | | | | | | | | | |
| SulmeyerKupetz BK counsel | | 0 | (63,333) | (18,667) | (18,667) | (18,667) | (18,667) | (18,667) | (18,667) | (18,667) |
| Others | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Central Expenses** | **(13,767)** | **(14,375)** | **(77,952)** | **(33,285)** | **(33,285)** | **(33,285)** | **(32,765)** | **(32,678)** | **(32,678)** | **(32,678)** |
| | | | | | | | | | | |
| **Total Sandbox Income** | **(22,267)** | **(22,875)** | **(83,389)** | **(38,873)** | **(34,970)** | **(35,754)** | **(36,228)** | **(35,642)** | **(31,840)** | **(31,932)** |
| Profit Margin | n/a | n/a | -802.79% | -393.59% | -138.23% | -159.69% | -193.63% | -173.33% | -82.88% | -83.96% |
| | | | | | | | | | | |
| **Financing** | | | | | | | | | | |
| Parent contribution | | | 260,000 | | | | 100,000 | | | |
| New Value Contribution | | | | | | | | | | |
| ***Financing*** | ***0*** | ***0*** | ***260,000*** | ***0*** | ***0*** | ***0*** | ***100,000*** | ***0*** | ***0*** | ***0*** |
| | | | | | | | | | | |
| **Others** | | | | | | | | | | |
| Unsecured creditor settlement (Ch.11) | | | | | | | | | | |
| | | | | | | | | | | |
| **Net Cash Flow** | **(22,267)** | **(22,875)** | **176,611** | **(38,873)** | **(34,970)** | **(35,754)** | **63,772** | **(35,642)** | **(31,840)** | **(31,932)** |
| | | | | | | | | | | |
| **Cash Balance** | **32,773** | **9,899** | **186,509** | **147,636** | **112,666** | **76,912** | **140,684** | **105,042** | **73,202** | **41,269** |

00076

| | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| | 9/28/2020 | 10/5/2020 | 10/12/2020 | 10/19/2020 | 10/26/2020 | 11/2/2020 | 11/9/2020 | 11/16/2020 | 11/23/2020 | 11/30/2020 | 12/7/2020 | 12/14/2020 | 12/21/2020 | 12/28/2020 | 1/4/2021 |
| | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% |
| | 39,882 | 27,383 | 71,429 | 86,251 | 72,105 | 66,689 | 106,479 | 128,712 | 102,479 | 122,160 | 116,185 | 133,938 | 142,310 | 141,923 | 126,969 |
| | *39,882* | *27,383* | *71,429* | *86,251* | *72,105* | *66,689* | *106,479* | *128,712* | *102,479* | *122,160* | *116,185* | *133,938* | *142,310* | *141,923* | *126,969* |
| | (1,560) | (1,071) | (2,794) | (3,374) | (2,821) | (2,609) | (4,165) | (5,035) | (4,009) | (4,779) | (4,545) | (5,240) | (5,567) | (5,552) | (4,967) |
| | *(1,560)* | *(1,071)* | *(2,794)* | *(3,374)* | *(2,821)* | *(2,609)* | *(4,165)* | *(5,035)* | *(4,009)* | *(4,779)* | *(4,545)* | *(5,240)* | *(5,567)* | *(5,552)* | *(4,967)* |
| | **38,322** | **26,312** | **68,635** | **82,877** | **69,284** | **64,080** | **102,314** | **123,677** | **98,470** | **117,381** | **111,639** | **128,698** | **136,743** | **136,371** | **122,002** |
| | (18,333) | (15,251) | (26,451) | (30,175) | (26,620) | (25,259) | (35,851) | (41,562) | (34,824) | (39,879) | (38,344) | (42,904) | (45,055) | (44,955) | (41,114) |
| | (3,430) | (2,355) | (6,143) | (7,418) | (6,201) | (5,736) | (9,158) | (11,070) | (8,814) | (10,506) | (9,992) | (11,519) | (12,239) | (12,206) | (10,920) |
| | (12,252) | (8,412) | (22,009) | (26,576) | (22,218) | (20,549) | (33,554) | (40,559) | (32,293) | (38,495) | (36,612) | (42,206) | (44,844) | (44,722) | (40,010) |
| | (1,628) | (1,118) | (2,916) | (3,521) | (2,943) | (2,722) | (4,346) | (5,254) | (4,183) | (4,986) | (4,742) | (5,467) | (5,809) | (5,793) | (5,183) |
| | (1,483) | (1,020) | (2,657) | (3,206) | (2,682) | (2,478) | (3,965) | (4,793) | (3,817) | (4,544) | (4,335) | (4,999) | (5,301) | (5,293) | (4,738) |
| | **(37,125)** | **(28,157)** | **(60,176)** | **(70,896)** | **(60,665)** | **(56,744)** | **(86,873)** | **(103,238)** | **(83,930)** | **(98,410)** | **(94,026)** | **(107,096)** | **(113,249)** | **(112,970)** | **(101,965)** |
| | 1,196 | (1,845) | 8,459 | 11,981 | 8,619 | 7,337 | 15,440 | 20,439 | 14,540 | 18,970 | 17,613 | 21,602 | 23,494 | 23,401 | 20,037 |
| | 3.00% | -6.74% | 11.84% | 13.89% | 11.95% | 11.00% | 14.50% | 15.88% | 14.19% | 15.53% | 15.16% | 16.13% | 16.51% | 16.49% | 15.78% |
| | (9,575) | (9,575) | (9,575) | (9,575) | (9,575) | (9,575) | (9,575) | (9,575) | (9,575) | (9,310) | (9,266) | (9,266) | (9,266) | (9,266) | (9,575) |
| | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) |
| | (592) | (852) | (852) | (852) | (852) | (852) | (852) | (852) | (852) | (828) | (824) | (824) | (824) | (824) | (852) |
| | (225) | (225) | (225) | (225) | (225) | (225) | (225) | (225) | (225) | (225) | (225) | (225) | (225) | (225) | (225) |
| | (467) | (467) | (467) | (467) | (467) | (467) | (467) | (467) | (467) | (454) | (452) | (452) | (452) | (452) | (467) |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| (18,667) | (18,667) | (18,667) | (18,667) | (18,667) | (18,667) | (18,667) | (18,667) | (18,667) | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| (33,025) | (33,285) | (33,285) | (33,285) | (33,285) | (33,285) | (33,285) | (33,285) | (33,285) | (14,317) | (14,267) | (14,267) | (14,267) | (14,267) | (14,618) |
| (31,829) | (35,130) | (24,826) | (21,304) | (24,665) | (25,948) | (17,845) | (12,846) | (18,745) | 4,653 | 3,347 | 7,335 | 9,227 | 9,134 | 5,419 |
| -79.81% | -128.29% | -34.76% | -24.70% | -34.21% | -38.91% | -16.76% | -9.98% | -18.29% | 3.81% | 2.88% | 5.48% | 6.48% | 6.44% | 4.27% |
| 100,000 | | | | | 700,000 | | | | | | | | | |
| 100,000 | 0 | 0 | 0 | 0 | 700,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | (100,000) | | | | | | | | | |
| 68,171 | (35,130) | (24,826) | (21,304) | (24,665) | 574,052 | (17,845) | (12,846) | (18,745) | 4,653 | 3,347 | 7,335 | 9,227 | 9,134 | 5,419 |
| 109,441 | 74,311 | 49,486 | 28,182 | 3,516 | 577,568 | 559,723 | 546,877 | 528,132 | 532,786 | 536,132 | 543,467 | 552,694 | 561,828 | 567,248 |

## EXHIBIT A TO ANNEX III

## ATEL COLLATERAL LIST

| LOAN SCHEDULE | VENDOR |
| --- | --- |
| Schedule No. 1 | VICON |

| EQUIPMENT DESCRIPTION | QUANTITY | SERIAL NUMBER | | | |
| --- | --- | --- | --- | --- | --- |
| VICON VERO 2.2 CAMERA | 228 | VE22-S-6108 | VE22-S-6187 | VE22-S-6227 | VE22-S-6324 |
| Commodity Code HTC 9031 80 8000 | | VE22-S-6111 | VE22-S-6188 | VE22-S-6228 | VE22-S-6310 |
| | | VE22-S-6112 | VE22-S-6189 | VE22-S-6228 | VE22-S-6284 |
| | | VE22-S-6116 | VE22-S-6190 | VE22-S-6230 | VE22-S-6314 |
| | | VE22-S-6117 | VE22-S-6192 | VE22-S-6231 | VE22-S-6282 |
| | | VE22-S-6118 | VE22-S-6195 | VE22-S-6232 | VE22-S-6319 |
| | | VE22-S-6120 | VE22-S-6194 | VE22-S-6197 | VE22-S-6295 |
| | | VE22-S-6123 | VE22-S-6194 | VE22-S-6200 | VE22-S-6280 |
| | | VE22-S-6126 | VE22-S-6157 | VE22-S-6201 | VE22-S-6279 |
| | | VE22-S-6129 | VE22-S-6158 | VE22-S-6205 | VE22-S-6209 |
| | | VE22-S-6133 | VE22-S-6159 | VE22-S-6241 | VE22-S-5191 |
| | | VE22-S-6114 | VE22-S-6160 | VE22-S-6242 | VE22-S-5195 |
| | | VE22-S-6115 | VE22-S-6161 | VE22-S-6243 | VE22-S-6276 |
| | | VE22-S-6121 | VE22-S-6162 | VE22-S-6244 | VE22-S-6278 |
| | | VE22-S-6124 | VE22-S-6163 | VE22-S-6245 | VE22-S-6285 |
| | | VE22-S-6130 | VE22-S-6164 | VE22-S-6246 | VE22-S-6275 |
| | | VE22-S-6131 | VE22-S-6165 | VE22-S-6247 | VE22-S-6211 |
| | | VE22-S-6132 | VE22-S-6166 | VE22-S-6248 | VE22-S-6213 |
| | | VE22-S-6135 | VE22-S-6173 | VE22-S-6249 | VE22-S-6214 |
| | | VE22-S-6113 | VE22-S-6177 | VE22-S-6251 | VE22-S-6216 |
| | | VE22-S-6119 | VE22-S-6167 | VE22-S-6252 | VE22-S-6217 |
| | | VE22-S-6122 | VE22-S-6168 | VE22-S-6253 | VE22-S-6292 |
| | | VE22-S-6125 | VE22-S-6170 | VE22-S-6254 | VE22-S-6277 |
| | | VE22-S-6127 | VE22-S-6174 | VE22-S-6255 | VE22-S-6272 |
| | | VE22-S-6128 | VE22-S-6175 | VE22-S-6256 | VE22-S-6307 |
| | | VE22-S-6134 | VE22-S-6176 | VE22-S-5933 | VE22-S-6296 |
| | | VE22-S-6109 | VE22-S-6178 | VE22-S-6250 | VE22-S-6291 |
| | | VE22-S-6137 | VE22-S-6180 | VE22-S-6039 | VE22-S-6313 |
| | | VE22-S-6141 | VE22-S-6169 | VE22-S-6257 | VE22-S-6312 |
| | | VE22-S-6142 | VE22-S-6171 | VE22-S-6255 | VE22-S-6322 |
| | | VE22-S-6143 | VE22-S-6172 | VE22-S-6266 | VE22-S-6323 |
| | | VE22-S-6144 | VE22-S-6179 | VE22-S-6267 | VE22-S-6315 |
| | | VE22-S-6149 | VE22-S-6181 | VE22-S-6268 | VE22-S-6328 |
| | | VE22-S-6152 | VE22-S-6182 | VE22-S-6259 | VE22-S-6309 |
| | | VE22-S-6152 | VE22-S-6183 | VE22-S-6270 | VE22-S-6289 |
| | | VE22-S-6154 | VE22-S-6184 | VE22-S-6258 | VE22-S-6329 |
| | | VE22-S-6138 | VE22-S-6223 | VE22-S-6259 | VE22-S-6281 |
| | | VE22-S-6139 | VE22-S-6234 | VE22-S-6260 | VE22-S-6326 |
| | | VE22-S-6140 | VE22-S-6235 | VE22-S-6261 | VE22-S-6325 |
| | | VE22-S-6145 | VE22-S-6236 | VE22-S-6263 | VE22-S-6306 |
| | | VE22-S-6146 | VE22-S-6237 | VE22-S-6264 | VE22-S-6321 |
| | | VE22-S-6147 | VE22-S-6238 | VE22-S-6265 | VE22-S-6316 |
| | | VE22-S-6148 | VE22-S-6239 | VE22-S-6271 | VE22-S-6327 |
| | | VE22-S-6150 | VE22-S-6240 | VE22-S-6283 | VE22-S-6331 |
| | | VE22-S-6151 | VE22-S-6198 | VE22-S-6286 | VE22-S-6332 |
| | | VE22-S-6153 | VE22-S-6199 | VE22-S-6287 | VE22-S-6333 |
| | | VE22-S-6155 | VE22-S-6202 | VE22-S-6288 | VE22-S-6339 |
| | | VE22-S-6136 | VE22-S-6203 | VE22-S-6290 | VE22-S-6340 |
| | | VE22-S-6210 | VE22-S-6108 | VE22-S-6293 | VE22-S-6341 |
| | | VE22-S-6212 | VE22-S-6204 | VE22-S-6294 | VE22-S-6334 |
| | | VE22-S-6215 | VE22-S-6206 | VE22-S-6297 | VE22-S-6342 |
| | | VE22-S-6218 | VE22-S-6207 | VE22-S-6273 | VE22-S-6335 |

00079

**EXHIBIT TO ANNEX II**

## ATEL COLLATERAL LIST

| | | **SERIAL NUMBER (Cont.)** | | |
|---|---|---|---|---|
| | VE22-S-6219 | VE22-S-6208 | VE22-S-6311 | VE22-S-6343 |
| | VE22-S-6220 | VE22-S-6223 | VE22-S-6274 | VE22-S-6299 |
| | VE22-S-6222 | VE22-S-6224 | VE22-S-6308 | VE22-S-6336 |
| | VE22-S-6185 | VE22-S-6225 | VE22-S-6318 | VE22-S-6337 |
| | VE22-S-6186 | VE22-S-6226 | VE22-S-6317 | VE22-S-6338 |

| **EQUIPMENT DESCRIPTION** | **QUANTITY** | **SERIAL NUMBER** | | |
|---|---|---|---|---|
| **ACTIVE WAND I** | **19** | AWIR-1274 | AWIR-1255 | AWIR-1266 | AWIR-1271 |
| **Commodity Code HTC 9031 80 8000** | | AWIR-1276 | AWIR-1262 | AWIR-1267 | AWIR-1272 |
| | | AWIR-1279 | AWIR-1263 | AWIR-1268 | AWIR-1285 |
| | | AWIR-1280 | AWIR-1264 | AWIR-1269 | AWIR-1286 |
| | | AWIR-1273 | AWIR-1265 | AWIR-1270 | |

| **EQUIPMENT DESCRIPTION** | **QUANTITY** | **SERIAL NUMBER** | | |
|---|---|---|---|---|
| **SW- EVOKE** | **19** | UB2107 | UB2112 | UB2118 | UB2122 |
| **Commodity Code HTC 9031.80.8000** | | UB2108 | UB2113 | UB2119 | UB2123 |
| | | UB2109 | UB2114 | UB2120 | UB2124 |
| | | UB2110 | UB2115 | UB2121 | UB2125 |
| | | UB2111 | UB2117 | | |

## LOAN SCHEDULE
### Schedule No. 2

**VENDOR**

**CDW**

| **EQUIPMENT DESCRIPTION** | **QUANTITY** | **SERIAL NUMBERS** |
|---|---|---|
| **LOGI KB Mouse MK270**<br>**Mfg Part # 920-004536** | 46 | *ARE DETAILED IN THE CDW INVOICES ATTACHED HEREIN AS EXHIBIT B* |
| **Trednet USB 3.0 GBIT Adapter**<br>**Mfg Part #3199448** | 15 | *AND WITHIN THE FOLLOWING CDW INVOICE NUMBERS:* |
| **TRIPP 1 OFT USB Extension Cable**<br>**Mfg Part #415051** | 114 | *TJF5141, TKD0161, TQD0652, TRF8515, TRF8613, VCT6591* |
| **Trednet 8P Giga Full Pwr Poe & Switch**<br>**Mfg Part #5426013** | 114 | |
| **MSI VR One Battery 2 Pack**<br>**Mfg Part #5540862** | 600 | |
| **MSI VR One Charger - ITL**<br>**Mfg Part #5521503** | 300 | |
| **MSI AC Adapter + Pwr Cord 230W**<br>**Mfg Part # 5521504** | 300 | |
| **TRIPP 6 Ft Power Cord 10A 5-15P C13**<br>**Mfg Part #P006-006** | 260 | |
| **TRIPP Surge Strip 6 Outlet 6 Ft Cord**<br>**Mfg Part #1269577** | 290 | |
| **Kinsgston Hyperx Cloud Alpha Headset**<br>**Mfg Part #5077302** | 290 | |

00080

## EXHIBIT A TO ANNEX II
### ATEL COLLATERAL LIST

| | |
|---|---|
| **TRIPP 6 Ft USB Cable A- Micro**<br>**Mfg Part #1630101** | 433 |
| **TRIPP 6 Ft USB 3.1 Typec/Type A**<br>**Mfg Part # U428-006** | 433 |
| **CISCO CS3 MX68-HW-Dup**<br>**Mfg Part #5526537** | 222 |
| **CISCO CS3 MS120-8FP - HWDUP**<br>**Mfg Part #5526540** | 76 |
| **CISCO CS3 MR52-HW-DUP**<br>**Mfg Part # MR52-HW-849152393** | 46 |
| **STARTECH 6 Ft High Speed HDMI Cab**<br>**Mfg Part #HDMM6** | 46 |
| **APPLE 10.5 IPAD Air Wi-FI 64GB Sil**<br>**Mfg Part #MUUK2LL/A** | 57 |
| **APPLE 2M Lightening USB Cable**<br>**Mfg Part #MD819AM/A** | 57 |
| **MACKICKS Universal Tabet Lock - ITL**<br>**Mfg Part #CL37UTL** | 57 |
| **STARTECH Soft Hook & Loop**<br>**HKLP50** | 38 |
| **C2G 11 SIN BLK Cab Ties**<br>**Mfg Part #43039** | 112 |
| **HP SB 14 G5 N3350 16GB**<br>**Mfg Part #3NU63UT#ABA** | 8 |
| **IPAD Mini 5 WI -FI Outlet 1URM**<br>**Mfg Part #RS-1215-RA** | 8 |
| **APPLE iPAD Mini Wi-FI 5th Gen 64 GB**<br>**Mfg Part # MUQW2LL/A** | 63 |
| **TRIPP 16PT AC Charging Sync Cart**<br>**Mfg Part # CSC16AC** | 8 |
| **DYMO LabelManager 280 Handheld**<br>**Mfg Part #1815990** | 8 |
| **TRIPP Rack Standard Sliding Shelf**<br>**Mfg Part # SRSHELF2P** | 38 |

00081

# EXHIBIT TO ANNEX III

## ATEL COLLATERAL LIST

| EQUIPMENT DESCRIPTION | QUANTITY | SERIAL NUMBERS |
|---|---|---|
| CANTILEVER Shelf 2U<br>Mfg Part #SRSHELF2P | 76 | *ARE DETAILED IN THE CDW* |
| | | *INVOICES ATTACHED HEREIN* |
| | | *AS EXHIBIT B* |
| TRIPP Power Strip 12 | 46 | *AND WITHIN THE FOLLOWING* |
| | | *CDW INVOICE NUMBERS:* |
| TRIPP RACK Cable Finger 1URM<br>Mfg Part #SRCABLEDUC | 92 | *TJF5141, TKD0161, TQD0652,* |
| | | *TRF8515, TRF8613, VCT6591* |
| ZOTAC GEFORCE RTX<br>Mfg Part #ZT-T20810DPS | 46 | |
| DELL 20" 1600X900 TN 60HZ Monitor<br>Mfg Part# E2016H | 46 | |
| TRIPP 1500VA UPS Smart 120V 2U RM<br>Mfg Part #SMART T1500RM2U | 38 | |
| MSI VR One 7RE 17 7820HK<br>Mfg Part#VRONE065 | 300 | |
| RACK DRS & S-ITL<br>Mfg Part#SRW15US | 8 | |
| TRIPP 42U Rack Enclosure 32" DEP - ITL<br>Mfg Part # SR42UBSD | 38 | |
| CISCO WS- C2960+48TC-S Wallmount<br>Mfg Part #WSS851263881 | 8 | |
| CDW WDC Staging-Pe Month Pallet<br>Mfg Part #EDC Staging | 186 | |
| CDW WDC Staging Labor<br>Mfg Part : Staging | 8 | |
| CIS CS3 SNET<br>Mfg Part #CON-851263881 | 8 | |
| TRIPP 550VA UPS AVR 120V 5-15R<br>Mfg Part # AVR55OU | 8 | |
| TRIPP 1000VA UPS Smart 120V 2URM<br>Mfg Part #SM1000RM2UTAA | 1 | |
| SUPERMICRO MBX11SCA-O ATX<br>Mfg Part #8600291654 | 114 | |
| HUBS  (7 Ports)<br>Mfg Part # 3708710 | 38 | |
| KVM SWITCH SERVERS<br>Mfg Part #5448938 | 46 | |

00082

## EXHIBIT TO ANNEX II

## ATEL COLLATERAL LIST

| EQUIPMENT DESCRIPTION | QUANTITY | SERIAL NUMBERS |
|---|---|---|
| **STORAGE RACK FIX SHELF**<br>Mfg Part # 3614412 | 54 | *ARE DETAILED IN THE CDW*<br>*INVOICES ATTACHED HEREIN*<br>*AS EXHIBIT B* |
| **TRIP LITE SERVER RACK 42U**<br>Mfg Part # 5757785 | 30 | *AND WITHIN THE FOLLOWING*<br>*CDW INVOICE NUMBERS:*<br>*TJF5141, TKD0161, TQD0652,*<br>*TRF8515, TRF8613, VCT6591* |

## LOAN SCHEDULE

## Schedule No. 3

**VENDOR**

**VICON**

| EQUIPMENT DESCRIPTION | QUANTITY | SERIAL NUMBER | | | |
|---|---|---|---|---|---|
| **VICON VERO  2.2 CAMERA**<br>Commodity Code HTC 9031 80 8000 | 108 | VE22-S-6734 | VE22-S-6866 | VE22-S-6862 | VE22-S-6781 |
| | | VE22-S-6738 | VE22-S-6808 | VE22-S-6811 | VE22-S-6865 |
| | | VE22-S-6731 | VE22-S-6848 | VE22-S-6859 | VE22-S-6805 |
| | | VE22-S-6730 | VE22-S-6864 | VE22-S-6840 | VE22-S-6772 |
| | | VE22-S-6755 | VE22-S-6873 | VE22-S-6812 | VE22-S-6783 |
| | | VE22-S-6722 | VE22-S-6791 | VE22-S-6861 | VE22-S-6779 |
| | | VE22-S-6724 | VE22-S-6849 | VE22-S-6842 | VE22-S-6810 |
| | | VE22-S-6725 | VE22-S-6847 | VE22-S-6727 | VE22-S-6799 |
| | | VE22-S-6747 | VE22-S-6858 | VE22-S-6726 | VE22-S-6845 |
| | | VE22-S-6720 | VE22-S-6797 | VE22-S-6813 | VE22-S-6814 |
| | | VE22-S-6743 | VE22-S-6719 | VE22-S-6816 | VE22-S-6844 |
| | | VE22-S-6721 | VE22-S-6760 | VE22-S-6850 | VE22-S-6571 |
| | | VE22-S-6732 | VE22-S-6750 | VE22-S-6807 | VE22-S-6737 |
| | | VE22-S-6756 | VE22-S-6803 | VE22-S-6735 | VE22-S-6794 |
| | | VE22-S-6729 | VE22-S-6763 | VE22-S-6761 | VE22-S-6746 |
| | | VE22-S-6757 | VE22-S-6798 | VE22-S-6739 | VE22-S-6801 |
| | | VE22-S-6728 | VE22-S-6795 | VE22-S-6723 | VE22-S-6804 |
| | | VE22-S-6752 | VE22-S-6792 | VE22-S-6736 | VE22-S-6764 |
| | | VE22-S-6766 | VE22-S-6753 | VE22-S-6742 | VE22-S-6765 |
| | | VE22-S-6754 | VE22-S-6767 | VE22-S-6734 | VE22-S-6796 |
| | | VE22-S-6748 | VE22-S-6802 | VE22-S-6773 | VE22-S-6740 |
| | | VE22-S-6806 | VE22-S-6809 | VE22-S-6768 | VE22-S-6867 |
| | | VE22-S-6745 | VE22-S-6762 | VE22-S-6780 | VE22-S-6789 |
| | | VE22-S-6718 | VE22-S-6843 | VE22-S-6741 | VE22-S-6872 |
| | | VE22-S-6733 | VE22-S-6851 | VE22-S-6749 | VE22-S-6786 |
| | | VE22-S-6871 | VE22-S-6863 | VE22-S-6774 | VE22-S-6787 |
| | | VE22-S-6841 | VE22-S-6846 | VE22-S-6770 | VE22-S-6790 |
| **ACTIVE WAND I**<br>Commodity Code HTC 9031 80. 8000 | 9 | AWIR-1387<br>AWIR-1395<br>AWIR-1400 | AWIR-1397<br>AWIR-1391 | AWIR-1393<br>AWIR-1384 | AWIR-1386<br>AWIR-1383 |
| **SW- EVOKE**<br>Commodity  Code  HTC 9031.80.8000 | 9 | UB2178<br>UB2179<br>UB2180 | UB2181<br>UB2182 | UB2183<br>UB2184 | UB2185<br>UB2186 |

00083

EXHIBIT B TO ANNEX III TO SANDBOX PLAN TERM SHEET (25 PAGES)

00084

| | |
|---|---|
| **From:** | CDW |
| **To:** | sandboxvr |
| **Subject:** | CDW Credit Memo #TMM2836 Detail |
| **Date:** | Tuesday, October 8, 2019 3:44:51 PM |

The copy of the invoice # you requested is now available. | View in browser



CDW

HARDWARE | SOFTWARE | SOLUTIONS | CLOUD | BRANDS | BLOG | DEALS

# CDW Credit Memo #TMM2836

Dick Lau,

Thank you for choosing CDW. The Credit Memo #TMM2836 from 08/15/2019 you requested is detailed below.

| Order # | Order Date | PO # | Customer # |
|---|---|---|---|
| KSFM795 | 08/15/2019 | HW ONLY | 12844249 |

### Order Details

| Item | Order Qty | Ship Qty | Open Qty | Unit Price | Ext. Price |
|---|---|---|---|---|---|
| **TRIPP 550VA UPS AVR 120V 5-15R 8 OUT**<br>Mfg. Part#: AVR550U<br>CDW #: 856572 | 0 | -8 | 0 | $63.61 | ($508.88) |

| | |
|---|---|
| **Subtotal** | ($508.88) |
| **Sales Tax** | ($41.98) |
| **CREDIT AMOUNT** | **($550.86)** |

| Purchaser Billing Info | Deliver To |
|---|---|
| **Billing Address:**<br>SANDBOX VR<br>AP<br>4695 CHARBOT DR STE 200<br>PLEASANTON, CA 94588-2756<br>**Payment Terms:** Prepay / Wire Transfer | **Shipping Address:**<br>SANDBOX VR<br>ATTN: AP<br>3201 E ALEXANDER RD<br>NORTH LAS VEGAS, NV 89030-7557<br>**Shipping Method:** Best Way Custom Freight |

**2 ways to GO GREEN with CDW! Paperless billing and electronic payment transmission**

☐ **TRANSMIT PAYMENTS ELECTRONICALLY** — Eliminate the hassle of paper checks by utilizing ACH for electronic bill pay.
**EMAIL REMITTANCE TO:** achremittance@cdw.com

**ACH INFORMATION:** The Northern Trust, 50 South LaSalle St., Chicago, IL 60675

**ROUTING NO.:** 071000152  |  **ACCOUNT NAME:** CDW Direct  |  **ACCOUNT NO.:** 47910

**PAPERLESS BILLING NOW AVAILABLE** — If you would like to start receiving your invoices as an emailed PDF, please contact us at paperlessbilling@cdw.com. Please include your customer number or an invoice number in your request for faster processing.



**Sales Contact Info**

**Anthony Capon**  |  (480) 270-7347  |  anthcap@cdw.com

| Need Help? | | |
| --- | --- | --- |
| My Account | Support | Call 800.800.4239 |

About Us | Privacy Policy | Terms and Condition

This email was sent to sandboxvr@cdw.com. Please add cdwsales@cdwemail.com to your address book.

© 2019 200 N. Milwaukee Avenue, Vernon Hills, IL 60061
AS-I:001 | iSeries 004 | Customer#: 12844249 | AD63600B-6CAE1A37-844C0004-AC1D9492

00086

| | |
|---|---|
| **From:** | CDW |
| **To:** | sandboxvr |
| **Subject:** | CDW Invoice #TJF5141 Detail |
| **Date:** | Tuesday, October 8, 2019 3:45:50 PM |

---

The copy of the invoice # you requested is now available.  |  View in browser



CDW

**HARDWARE** | **SOFTWARE** | **SOLUTIONS** | **CLOUD** | **BRANDS** | **BLOG** | **DEALS**

# CDW Invoice #TJF5141

Dick Lau,

Thank you for choosing CDW. The Invoice #TJF5141 from 08/02/2019 you requested is detailed below.
The total amount of **$1,266,385.62** is due by **09/01/2019**.

**Please remit payment to:**
CDW Direct - P.O. Box 75723 Chicago, IL 60675-5723

| Order # | Order Date | PO # | Customer # |
|---|---|---|---|
| KSFM795 | 06/28/2019 | HW ONLY | 12844249 |

| Due Date | Amount Due |
|---|---|
| 09/1/2019 | $1,266,385.62 |

| Item | Order Qty | Ship Qty | Open Qty | Unit Price | Ext. Price |
|---|---|---|---|---|---|
| **Order Details** | | | | | |
| **LOGI KB MOUSE MK270 WIRELESS COMBO**<br>Mfg. Part#: 920-004536<br>CDW #: 3006282 | 46 | 46 | 0 | $20.65 | $949.90 |
| **TRENDNET USB 3.0 GBIT ENET ADAPTER**<br>Mfg. Part#: TU3-ETG<br>CDW #: 3199448 | 16 | 16 | 0 | $18.07 | $289.12 |
| **TRIPP 10FT USB EXTENSION CABLE A M/F**<br>Mfg. Part#: U024-010<br>CDW #: 415051 | 114 | 114 | 0 | $3.66 | $417.24 |
| **TRENDNET 8P GIGA FULL PWR POE+ SWITC**<br>Mfg. Part#: TPE-TG80F<br>CDW #: 5426013 | 114 | 114 | 0 | $246.53 | $28,104.42 |
| **MSI VR ONE BATTERY 2PACK-ITL**<br>Mfg. Part#: 1T211T002-SANDBOX<br>CDW #: 5540862 | 600 | 600 | 0 | $199.23 | $119,538.00 |

00087

| | | | | | |
|---|---|---|---|---|---|
| **MSI VR ONE CHARGER-ITL**<br>Mfg. Part#: 1T2111E004-SANDBOX<br>CDW #: 5521503 | 300 | 300 | 0 | $61.99 | $18,597.00 |
| **MSI AC ADAPT+PWR CORD 230W-ITL**<br>Mfg. Part#: 957-17811P-104-SANDBOX<br>CDW #: 5521504 | 300 | 300 | 0 | $105.15 | $31,545.00 |
| **TRIPP 6FT POWER CORD 10A 5-15P C13**<br>Mfg. Part#: P006-006<br>CDW #: 326378 | 260 | 260 | 0 | $5.27 | $1,370.20 |
| **TRIPP SURGE STRIP 6 OUTLET 6FT CORD**<br>Mfg. Part#: TLP606B<br>CDW #: 1269577 | 290 | 290 | 0 | $11.99 | $3,477.10 |
| **KINGSTON HYPERX CLOUD ALPHA HEADSET**<br>Mfg. Part#: HX-HSCA-RD/AM<br>CDW #: 5077302 | 290 | 290 | 0 | $90.22 | $26,163.80 |
| **TRIPP 6FT USB CABLE A/MICRO-B M/M**<br>Mfg. Part#: U050-006<br>CDW #: 1630102 | 433 | 433 | 0 | $3.56 | $1,541.48 |
| **TRIPP 6FT USB 3.1 TYPE-C/TYPE-A M/M**<br>Mfg. Part#: U428-006<br>CDW #: 5177669 | 222 | 222 | 0 | $14.71 | $3,265.62 |
| **CISCO CS3 MX68-HW-DUP**<br>Mfg. Part#: MX68-HW-DUP<br>CDW #: 5526537 | 8 | 8 | 0 | $481.47 | $3,851.76 |
| **CISCO CS3 MS120-8FP-HW-DUP-DUP**<br>Mfg. Part#: MS120-8FP-HW-849152392<br>CDW #: 5526540 | 76 | 76 | 0 | $556.48 | $42,292.48 |

**Serial Numbers:** Q2CX-WMER-CWTH, Q2CX-WMFQ-4V8S, Q2CX-WNW6-VNNH, Q2CX-WN57-H8NQ, Q2CX-WP5A-3Q6F, Q2CX-WQZB-N8UE, Q2CX-WQ42-A3MW, Q2CX-WQ5J-GSD2, Q2CX-WQ5M-SZ5H, Q2CX-WREN-M484, Q2CX-WRKJ-3MJC, Q2CX-WSVY-7R86, Q2CX-WT53-42GC, Q2CX-WWNF-2VTC, Q2CX-WW5P-ZFQU, Q2CX-WXFX-FSNT, Q2CX-WXM3-HHM5, Q2CX-WX3H-ACEC, Q2CX-WYUS-QAUZ, Q2CX-WYWC-FH6W, Q2CX-WZKK-CF44, Q2CX-WZR9-UAN7, Q2CX-XBNP-DPAG, Q2CX-XBWA-HHDT, Q2CX-XBY8-MDRT, Q2CX-XCLX-RB6S, Q2CX-XHMW-Z4ZY, Q2CX-XHPC-DD6T, Q2CX-XJTG-DRE4, Q2CX-XJ2D-FUTG, Q2CX-XJ52-YKLP, Q2CX-XJ53-ER3N, Q2CX-XJ7W-Z48H, Q2CX-XKB9-HRHB, Q2CX-XKJD-LLL7, Q2CX-XKPW-Z8G7, Q2CX-XLHN-X6QW, Q2CX-XLLN-8TAE, Q2CX-XMA4-ZHAH, Q2CX-XMFY-2YGK, Q2CX-XMMX-H9MH, Q2CX-XMPN-ENJD, Q2CX-XMWU-HKDR, Q2CX-XMX7-J95F, Q2CX-XM25-FCZ7, Q2CX-XM6W-DMHC, Q2CX-XNA6-7WVK, Q2CX-XNCS-7YT9, Q2CX-XNCZ-D4JE, Q2CX-XNGH-FZVV, Q2CX-XNGM-EY8K, Q2CX-XNNL-6LKS, Q2CX-XNVC-UZP2, Q2CX-XNX5-M4DX, Q2CX-XN8Y-ZH98, Q2CX-XPJB-SFMJ, Q2CX-XPPJ-ZCLC, Q2CX-XPYH-P4DJ, Q2CX-XPZF-UVFR, Q2CX-XP2Y-ESFB, Q2CX-XP79-8JSZ, Q2CX-XQ62-XH5U, Q2CX-XRDB-HM4R, Q2CX-XRGD-2Y5G, Q2CX-XRJQ-TEP6, Q2CX-XRNJ-BGFQ, Q2CX-XR87-

| | | | | | |
|---|---|---|---|---|---|
| **CISCO CS3 MR52-HW-DUP-DUP-DUP** | 46 | 46 | 0 | $676.97 | $31,140.62 |

Mfg. Part#: MR52-HW-849152393
CDW #: 5526541

**Serial Numbers:** MR52-HW, Q2LD-CR4Z-C8N3, Q2LD-E93D-T3XD, Q2LD-GWGN-3HQQ, Q2LD-G7J7-3VJP, Q2LD-HEVD-GQHE, Q2LD-JUCF-ZPNB, Q2LD-J6DJ-9TJ5, Q2LD-LAMQ-7ES3, Q2LD-LTP5-VQW4, Q2LD-L3KF-MV3C, Q2LD-L7AR-5XLB, Q2LD-MPGW-PDWM, Q2LD-NA54-UW2U, Q2LD-NFTT-NWUE, Q2LD-NJCP-DWBQ, Q2LD-PNY2-NMW3, Q2LD-QYZ3-6QSC, Q2LD-Q64G-PVWL, Q2LD-RTNA-XPEK, Q2LD-SRW7-ZPV3, Q2LD-S757-WDA7, Q2LD-TC6T-ZZ5L, Q2LD-TGSW-YC8K, Q2LD-TJ7Q-4WR4, Q2LD-TRPN-ZLQR, Q2LD-TRWW-AP82, Q2LD-T3FY-Y744, Q2LD-T547-FR9G, Q2LD-U7NH-4K2R, Q2LD-VPL4-XJ3J, Q2LD-WXBS-NU7X, Q2LD-W4EQ-UBTC, Q2LD-X8QR-X4B6, Q2LD-YGVF-GT4S, Q2LD-ZWJB-K5ZU, Q2LD-2BJM-VL96, Q2LD-2EF2-SGWG, Q2LD-3ADM-3N99, Q2LD-5PXB-363R, Q2LD-5U7W-LCQL, Q2LD-69LJ-EJCJ, Q2LD-7G5H-TSF4, Q2LD-8VAK-FBAD, Q2LD-99DH-2TLA, Q2LD-99JF-8TLX

| | | | | | |
|---|---|---|---|---|---|
| **STARTECH 6FT HIGH SPEED HDMI CAB**<br>Mfg. Part#: HDMM6<br>CDW #: 3036583 | 46 | 46 | 0 | $8.63 | $396.98 |
| **APPLE 10.5 IPAD AIR WI-FI 64GB SIL**<br>Mfg. Part#: MUUK2LL/A<br>CDW #: 5497009 | 57 | 57 | 0 | $482.52 | $27,503.64 |

**Serial Numbers:** SF9FYC2JRLMPF, SF9FYD1KFLMPF, SF9FYD2HSLMPF, SF9FYD3HMLMPF, SF9FYD3KMLMPF, SF9FYD3V5LMPF, SF9FYD32QLMPF, SF9FYD4BNLMPF, SF9FYD4BYLMPF, SF9FYD4CJLMPF, SF9FYD4C5LMPF, SF9FYD4C8LMPF, SF9FYD4H8LMPF, SF9FYD4N2LMPF, SF9FYD4Q3LMPF, SF9FYD44RLMPF, SF9FYD48QLMPF, SF9FYD489LMPF, SF9FYD497LMPF, SF9FYD5CZLMPF, SF9FYD5DXLMPF, SF9FYD59ELMPF, SF9FYLFJ3LMPF, SF9FYQB6LLMPF, SF9FYQ1GWLMPF, SF9FYQ1Q7LMPF, SF9FYQ376LMPF, SF9FYQ9GFLMPF, SF9FYR2ATLMPF, SF9FYR2Y1LMPF, SF9FYR2ZQLMPF, SF9FYR300LMPF, SF9FYT1B6LMPF, SF9FYT1N9LMPF, SF9FYT2TGLMPF, SF9FYT4NSLMPF, SF9FYT5FNLMPF, SF9FYT6F5LMPF, SF9FYT7F9LMPF, SF9FYT7UMLMPF, SF9FYV0EJLMPF, SF9FYV0FKLMPF, SF9FYV0PSLMPF, SF9FYV0YQLMPF, SF9FYV08WLMPF, SF9FYW0XHLMPF, SF9FYW2UALMPF, SF9FYW38SLMPF, SF9FYW4D8LMPF, SF9FYW532LMPF, SF9FY50B6LMPF, SF9FY50J8LMPF, SF9FY82X0LMPF, SF9FY829ZLMPF, SF9FY8320LMPF, SF9FY93UXLMPF, SF9FY95SBLMPF

| | | | | | |
|---|---|---|---|---|---|
| **APPLE 2M LIGHTNING TO USB CABLE**<br>Mfg. Part#: MD819AM/A<br>CDW #: 3802914 | 57 | 57 | 0 | $33.15 | $1,889.55 |
| **MACLOCKS UNIVERSAL TABLET LOCK-ITL**<br>Mfg. Part#: CL37UTL-SANDBOX<br>CDW #: 5541191 | 57 | 57 | 0 | $41.37 | $2,358.09 |
| **STARTECH 50FT HOOK & LOOP CABLE TIE**<br>Mfg. Part#: HKLP50<br>CDW #: 4478186 | 38 | 38 | 0 | $12.67 | $481.46 |
| **C2G 11.5IN BLK CAB TIES 100PK**<br>Mfg. Part#: 43039<br>CDW #: 1262323 | 112 | 112 | 0 | $14.99 | $1,678.88 |
| **HP SB 14 G5 N3350 16GB 4GB CHROME**<br>Mfg. Part#: 3NU63UT#ABA | 8 | 8 | 0 | $256.99 | $2,055.92 |

CDW #: 4946642

**Serial Numbers:** 5CD9045ZBC, 5CD9045ZBN, 5CD9045Z4K, 5CD9045Z4O, 5CD9045Z8D, 5CD90462F5, 5CD90462P2, 5CD90462SK

| | | | | | |
|---|---|---|---|---|---|
| **APPLE IPAD MINI 5 WI-FI 64GB GRAY**<br>Mfg. Part#: MUQW2LL/A<br>CDW #: 5497005 | 76 | 76 | 0 | $398.43 | $30,280.68 |

**Serial Numbers:** SDMPYX3JXLM93, SDMPYX4F5LM93, SDMPYX4HSLM93, SDMPYX4SJLM93, SDMPYX5BQLM93, SDMPYX5F4LM93, SDMPYX5KFLM93, SDMPYX5MJLM93, SDMPYX5X1LM93, SDMPYX5ZELM93, SDMPYX5ZVLM93, SDMPYX5ZZLM93, SDMPYX6A3LM93, SDMPYX6CLLM93, SDMPYX6GPLM93, SDMPYX6G9LM93, SDMPYX6J4LM93, SDMPYX6RRLM93, SDMPYX6R3LM93, SDMPYX6WKLM93, SDMPYX6WZLM93, SDMPYX6XXLM93, SDMPYX602LM93, SDMPYX61KLM93, SDMPYX61VLM93, SDMPYX61YLM93, SDMPYX610LM93, SDMPYX62YLM93, SDMPYX64ELM93, SDMPYX651LM93, SDMPYX66ELM93, SDMPYX66GLM93, SDMPYX66KLM93, SDMPYX7CYLM93, SDMPYX7DRLM93, SDMPYX7FSLM93, SDMPYX7GYLM93, SDMPYX7HJLM93, SDMPYX7J2LM93, SDMPYX7J3LM93, SDMPYX7LFLM93, SDMPYX7LVLM93, SDMPYX7MMLM93, SDMPYX7NQLM93, SDMPYX7QALM93, SDMPYX7RJLM93, SDMPYX7SULM93, SDMPYX7W5LM93, SDMPYX7YULM93, SDMPYX7ZPLM93, SDMPYX706LM93, SDMPYX71HLM93, SDMPYX72PLM93, SDMPYX74RLM93, SDMPYX74ZLM93, SDMPYX76FLM93, SDMPYX763LM93, SDMPYX8ADLM93, SDMPYX8AHLM93, SDMPYX8BBLM93, SDMPYX8BXLM93, SDMPYX8GGLM93, SDMPYX8J0LM93, SDMPYX8MHLM93, SDMPYX8NZLM93, SDMPYX8Q3LM93, SDMPYX8SDLM93, SDMPYX8S3LM93, SDMPYX8S6LM93, SDMPYX812LM93, SDMPYX820LM93, SDMPYX

| | | | | | |
|---|---|---|---|---|---|
| **TRIPP 16PT AC CHARGING SYNC CART**<br>Mfg. Part#: CSC16AC<br>CDW #: 4077910 | 8 | 8 | 0 | $684.99 | $5,479.92 |

**Serial Numbers:** CR0022, 2850AY0CR002200050, 2850AY0CR002200127, 2850AY0CR002200128, 2850AY0CR002200129, 2850AY0CR002200130, 2850AY0CR002200131, 2850AY0CR002200132

| | | | | | |
|---|---|---|---|---|---|
| **DYMO LABELMANAGER 280 HANDHELD**<br>Mfg. Part#: 1815990<br>CDW #: 2896132 | 8 | 8 | 0 | $55.99 | $447.92 |
| **TRIPP RACK STANDARD SLIDING SHELF**<br>Mfg. Part#: SRSHELF4PSL<br>CDW #: 1538204 | 38 | 38 | 0 | $162.00 | $6,156.00 |
| **TRIPP RACK FIXED CANTILEVER SHELF 2U**<br>Mfg. Part#: SRSHELF2P<br>CDW #: 1539282 | 76 | 76 | 0 | $52.02 | $3,953.52 |
| **TRIPP POWER STRIP 12 OUTLET 1URM**<br>Mfg. Part#: RS-1215-RA<br>CDW #: 382531 | 46 | 46 | 0 | $65.99 | $3,035.54 |
| **TRIPP RACK CABLE FINGER DUCT 1URM**<br>Mfg. Part#: SRCABLEDUCT1U | 92 | 92 | 0 | $53.37 | $4,910.04 |

CDW #: 1539350

**ZOTAC GEFORCE RTX 2080TI AMP 11G-ITL** | 114 | 114 | 0 | $1,301.11 | $148,326.54
Mfg. Part#: ZT-T20810D-10P-SANDBOX
CDW #: 5518547

**DELL 20" 1600X900 TN 60HZ MONITOR** | 46 | 46 | 0 | $93.25 | $4,289.50
Mfg. Part#: E2016H
CDW #: 3851763

**Serial Numbers:** BBVGVQ2, BJ9FVQ2, B3CFVQ2, B4CFVQ2, CM9FVQ2, CX9FVQ2, C1SGVQ2, DD9FVQ2, DNXSVQ2, D7CFVQ2, D8CFVQ2, F8CFVQ2, G1SGVQ2, G4CFVQ2, HD9FVQ2, HV9FVQ2, H5CFVQ2, JJ9FVQ2, JV9FVQ2, J1SGVQ2, J2CFVQ2, J3CFVQ2, J6CFVQ2, 2G9FVQ2, 35SGVQ2, 4CVGVQ2, 4V9FVQ2, 45CFVQ2, 54CFVQ2, 6H9FVQ2, 63CFVQ2, 63SGVQ2, 64CFVQ2, 7F9FVQ2, 7H9FVQ2, 7MPGVQ2, 7NXSVQ2, 7V9FVQ2, 8BVGVQ2, 8M9FVQ2, 84CFVQ2, 87CFVQ2, 9V9FVQ2, 92CFVQ2, 95CFVQ2, 97CFVQ2

**TRIPP 1500VA UPS SMART 120V 2U RM** | 38 | 38 | 0 | $557.57 | $21,187.66
Mfg. Part#: SMART1500RM2U
CDW #: 582532

**Serial Numbers:** 2850DY0SM820600104, 2850DY0SM820600105, 2850DY0SM820600107, 2850DY0SM820600108, 2850DY0SM820600109, 2850DY0SM820600110, 2850DY0SM820600111, 2850DY0SM820600112, 2850DY0SM820600114, 2850DY0SM820600115, 2850DY0SM820600117, 2850DY0SM820600489, 2850DY0SM820600490, 2850DY0SM820600491, 2850DY0SM820600492, 2850DY0SM820600493, 2850DY0SM820600494, 2850DY0SM820600495, 2850DY0SM820600496, 2850DY0SM820600497, 2850DY0SM820600498, 2850DY0SM820600499, 2850DY0SM820600500, 2850DY0SM820600503, 2850DY0SM820600504, 2850DY0SM820600507, 2850DY0SM820600775, 2850DY0SM820600776, 2850DY0SM820600777, 2850DY0SM820600778, 2850DY0SM820600779, 2850DY0SM820600780, 2850DY0SM820600782, 2850DY0SM820600783, 2850DY0SM820600784, 2850DY0SM820600785, 2850DY0SM820600786, 2850DY0SM820600787

**MSI VR ONE 7RE I7-7820HK 512/16-ITL** | 300 | 300 | 0 | $1,906.68 | $572,004.00
Mfg. Part#: VRONE065-SANDBOX
CDW #: 5574467

**Serial Numbers:** K1902N0018094, K1902N0018095, K1902N0018096, K1902N0018097, K1902N0018098, K1902N0018099, K1902N0018100, K1902N0018101, K1902N0018102, K1902N0018103, K1902N0018104, K1902N0018105, K1902N0018106, K1902N0018107, K1902N0018108, K1902N0018109, K1902N0018110, K1902N0018111, K1902N0018112, K1902N0018113, K1902N0018114, K1902N0018115, K1902N0018116, K1902N0018117, K1902N0018118, K1902N0018119, K1902N0018120, K1902N0018121, K1902N0018122, K1902N0018123, K1902N0018124, K1902N0018125, K1902N0018126, K1902N0018127, K1902N0018128, K1902N0018129, K1902N0018130, K1902N0018131, K1902N0018132, K1902N0018133, K1902N0018134, K1902N0018135, K1902N0018136, K1902N0018137, K1902N0018138, K1902N0018139, K1902N0018140, K1902N0018141, K1902N0018142, K1902N0018143, K1902N0018144, K1902N0018145, K1902N0018146, K1902N0018147, K1902N0018148, K1902N0018149, K1902N0018150, K1902N0018151, K1902N0018152, K1902N0018153, K1902N0018154, K1902N0018155, K1902N0018156, K1902N0018157,

K1902N0018158, K1902N0018159, K1902N0018160, K1902N0018161, K1902N0018162,
K1902N0018163, K1902N0018164, K1902N

| | | | | | |
|---|---|---|---|---|---|
| **TRIPP 15U WALLMOUNT RACK DRS & S-ITL** <br> Mfg. Part#: SRW15US-SANDBOX <br> CDW #: 5574481 | 8 | 8 | 0 | **$392.01** | **$3,136.08** |
| **TRIPP 42U RACK ENCLOSURE 32" DEP-ITL** <br> Mfg. Part#: SR42UBSD-SANDBOX <br> CDW #: 5575229 | 38 | 4 | 0 | **$964.09** | **$3,856.36** |
| **CISCO WS-C2960+48TC-S-DUP** <br> Mfg. Part#: WS-C2960+48TC-S-851263881 <br> CDW #: 5577707 | 8 | 8 | 0 | **$974.35** | **$7,794.80** |

**Serial Numbers:** SFOC2314Y46B, SFOC2314Y47D, SFOC2314Y47G, SFOC2314Y47N,
SFOC2314Y470, SFOC2314Y475, SFOC2314Y48G, SFOC2314Y484

| | | | | | |
|---|---|---|---|---|---|
| **CDW WDC STAGING- PER MONTH/PALLET** <br> Mfg. Part#: WDC STAGING-MONTH <br> CDW #: 1300623 | 186 | 186 | 0 | **$28.99** | **$5,392.14** |
| **CDW WDC STAGING LABOR /SHIPMENT** <br> Mfg. Part#: WDC STGNG LBR SHIP <br> CDW #: 1300636 | 8 | 8 | 0 | **$46.99** | **$375.92** |
| **ATTN: PICKING** <br> Mfg. Part#: PICKING <br> CDW #: 021862 | 3 | 1 | 0 | **$0.00** | **$0.00** |
| **REVERSE - CDW STAGNG AGREEMENT - WDC** <br> Mfg. Part#: STAGNG AGRMNT-WDC <br> CDW #: 4947557 | 1 | 1 | 0 | **$0.00** | **$0.00** |
| **CIS CS3 1YR SNET 8X5XNBD-DUP** <br> Mfg. Part#: CON-SSSNT-WSC2964S-851263881 <br> CDW #: 5577716 | 8 | 8 | 0 | **$105.00** | **$840.00** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | |
|---|---|
| **Subtotal** | $1,170,374.88 |
| **Sales Tax** | $96,010.74 |
| **AMOUNT DUE** | **$1,266,385.62** |

| Purchaser Billing Info | Deliver To |
|---|---|
| **Billing Address:** | **Shipping Address:** |
| SANDBOX VR | SANDBOX VR |
| AP | ATTN: AP |
| 4695 CHARBOT DR STE 200 | 3201 E ALEXANDER RD |
| PLEASANTON, CA 94588-2756 | NORTH LAS VEGAS, NV 89030-7557 |
| **Payment Terms:** Prepay / Wire Transfer | **Shipping Method:** Best Way Custom Freight |

00092

**2 ways to GO GREEN with CDW!** Paperless billing and electronic payment transmission

☐ **TRANSMIT PAYMENTS ELECTRONICALLY** — Eliminate the hassle of paper checks by utilizing ACH for electronic bill pay.

**EMAIL REMITTANCE TO:** achremittance@cdw.com

**ACH INFORMATION:** The Northern Trust, 50 South LaSalle St., Chicago, IL 60675

**ROUTING NO.:** 071000152 | **ACCOUNT NAME:** CDW Direct | **ACCOUNT NO.:** 47910

☐ **PAPERLESS BILLING NOW AVAILABLE** — If you would like to start receiving your invoices as an emailed PDF, please contact us at paperlessbilling@cdw.com. Please include your customer number or an invoice number in your request for faster processing.

**Sales Contact Info**



**Anthony Capon** | (480) 270-7347 | anthcap@cdw.com

| Need Help? | | |
|---|---|---|
|  My Account |  Support |  Call 800.800.4239 |

About Us | Privacy Policy | Terms and Condition

This email was sent to sandboxvr@cdw.com. Please add cdwsales@cdwemail.com to your address book.

© 2019 200 N. Milwaukee Avenue, Vernon Hills, IL 60061
AS-I:001 | iSeries 004 | Customer#: 12844249 | 764C300B-6CB21A37-844C0004-AC1D9492

00093

| From: | CDW |
|---|---|
| To: | sandboxvr |
| Subject: | CDW Invoice #TKD0161 Detail |
| Date: | Tuesday, October 8, 2019 3:45:30 PM |

The copy of the invoice # you requested is now available. | View in browser

CDW



**HARDWARE | SOFTWARE | SOLUTIONS | CLOUD | BRANDS | BLOG | DEALS**

# CDW Invoice #TKD0161

Dick Lau,

Thank you for choosing CDW. The Invoice #TKD0161 from 08/07/2019 you requested is detailed below.
The total amount of **$75,760.63** is due by **09/06/2019**.

**Please remit payment to:**
CDW Direct - P.O. Box 75723 Chicago, IL 60675-5723

| Order # | Order Date | PO # | Customer # |
|---|---|---|---|
| KSFM795 | 06/28/2019 | HW ONLY | 12844249 |

| Due Date | Amount Due |
|---|---|
| 09/6/2019 | $75,760.63 |

### Order Details

| Item | Order Qty | Ship Qty | Open Qty | Unit Price | Ext. Price |
|---|---|---|---|---|---|
| **TRIPP 550VA UPS AVR 120V 5-15R 8 OUT**<br>Mfg. Part#: AVR550U<br>CDW #: 856572 | 8 | 8 | 0 | $63.61 | $508.88 |
| **TRIPP 42U RACK ENCLOSURE 32" DEP-ITL**<br>Mfg. Part#: SR42UBSD-SANDBOX<br>CDW #: 5575229 | 38 | 34 | 0 | $964.09 | $32,779.06 |

| | |
|---|---|
| Subtotal | $33,287.94 |
| Shipping | $39,726.44 |
| Sales Tax | $2,746.25 |
| **AMOUNT DUE** | **$75,760.63** |

| Purchaser Billing Info | Deliver To |
|---|---|
| **Billing Address:**<br>SANDBOX VR | **Shipping Address:**<br>SANDBOX VR |

00094

| AP | ATTN: AP |
|---|---|
| 4695 CHARBOT DR STE 200 | 3201 E ALEXANDER RD |
| PLEASANTON, CA 94588-2756 | NORTH LAS VEGAS, NV 89030-7557 |
| **Payment Terms:** Prepay / Wire Transfer | **Shipping Method:** Best Way Custom Freight |

**2 ways to GO GREEN with CDW!** Paperless billing and electronic payment transmission

☐ **TRANSMIT PAYMENTS ELECTRONICALLY** — Eliminate the hassle of paper checks by utilizing ACH for electronic bill pay.
**EMAIL REMITTANCE TO:** achremittance@cdw.com
**ACH INFORMATION:** The Northern Trust, 50 South LaSalle St., Chicago, IL 60675
**ROUTING NO.:** 071000152 | **ACCOUNT NAME:** CDW Direct | **ACCOUNT NO.:** 47910

☐ **PAPERLESS BILLING NOW AVAILABLE** — If you would like to start receiving your invoices as an emailed PDF, please contact us at paperlessbilling@cdw.com. Please include your customer number or an invoice number in your request for faster processing.



**Sales Contact Info**

**Anthony Capon** | (480) 270-7347 | anthcap@cdw.com

| Need Help? | | |
|---|---|---|
|  My Account |  Support |  Call 800.800.4239 |

About Us | Privacy Policy | Terms and Condition

This email was sent to sandboxvr@cdw.com. Please add cdwsales@cdwemail.com to your address book.

© 2019 200 N. Milwaukee Avenue, Vernon Hills, IL 60061
AS-I:001 | iSeries 004 | Customer#: 12844249 | C90D400B-6CB01A37-844C0004-AC1D9492

| | |
|---|---|
| **From:** | CDW |
| **To:** | sandboxvr |
| **Subject:** | CDW Invoice #TQD0652 Detail |
| **Date:** | Tuesday, October 8, 2019 3:43:12 PM |

The copy of the invoice # you requested is now available.  |  View in browser



CDW

**HARDWARE** | **SOFTWARE** | **SOLUTIONS** | **CLOUD** | **BRANDS** | **BLOG** | **DEALS**

# CDW Invoice #TQD0652

Marco Chung,

Thank you for choosing CDW. The Invoice #TQD0652 from 08/24/2019 you requested is detailed below.
The total amount of **$573.96** is due by **09/23/2019**.

**Please remit payment to:**
CDW Direct - P.O. Box 75723 Chicago, IL 60675-5723

| Order # | Order Date | PO # | Customer # |
|---|---|---|---|
| KTPQ246 | 08/1/2019 | HW ONLY | 12844249 |

| Due Date | Amount Due |
|---|---|
| 09/23/2019 | **$573.96** |

| **Order Details** | | | | | |
|---|---|---|---|---|---|
| **Item** | **Order Qty** | **Ship Qty** | **Open Qty** | **Unit Price** | **Ext. Price** |
| **TRIPP 1000VA UPS SMART 120V 2URM TAA**<br>Mfg. Part#: SM1000RM2UTAA<br>CDW #: 1923328 | 1 | 1 | 0 | **$508.88** | **$508.88** |
| **CDW WDC ONLY CONFIGURATION**<br>Mfg. Part#: WDC CADCONFIG<br>CDW #: 1242269 | 1 | 1 | 0 | **$0.00** | **$0.00** |
| **FILL IN THIS AREA**<br>Mfg. Part#: MISC<br>CDW #: MISC07 | 1 | 1 | 0 | **$0.00** | **$0.00** |
| **ATTN: PICKING**<br>Mfg. Part#: PICKING<br>CDW #: 021862 | 1 | 1 | 0 | **$0.00** | **$0.00** |

| | |
|---|---|
| **Subtotal** | $508.88 |
| **Shipping** | $16.74 |
| **Sales Tax** | $48.34 |

00096

**AMOUNT DUE**                                    **$573.96**

| Purchaser Billing Info | Deliver To |
|---|---|
| **Billing Address:** | **Shipping Address:** |
| SANDBOX VR | SANDBOX VR |
| AP | ATTN: CAMERON ROACHX |
| 4695 CHARBOT DR STE 200 | 6316 TOPANGA CANYON BLVD STE 1120 |
| PLEASANTON, CA 94588-2756 | WOODLAND HILLS, CA 91367-2292 |
| **Payment Terms:** Prepay / Wire Transfer | **Shipping Method:** UPS Ground (1 - 2 Day) |

**2 ways to GO GREEN with CDW!** Paperless billing and electronic payment transmission

☐ **TRANSMIT PAYMENTS ELECTRONICALLY** — Eliminate the hassle of paper checks by utilizing ACH for electronic bill pay.
**EMAIL REMITTANCE TO:** achremittance@cdw.com
**ACH INFORMATION:** The Northern Trust, 50 South LaSalle St., Chicago, IL 60675
**ROUTING NO.:** 071000152  |  **ACCOUNT NAME:** CDW Direct  |  **ACCOUNT NO.:** 47910

☐ **PAPERLESS BILLING NOW AVAILABLE** — If you would like to start receiving your invoices as an emailed PDF, please contact us at paperlessbilling@cdw.com. Please include your customer number or an invoice number in your request for faster processing.

**Sales Contact Info**

**Anthony Capon**  |  (480) 270-7347  |  anthcap@cdw.com

| Need Help? | | |
|---|---|---|
| My Account | Support | Call 800.800.4239 |

About Us | Privacy Policy | Terms and Condition

This email was sent to sandboxvr@cdw.com. Please add cdwsales@cdwemail.com to your address book.

© 2019 200 N. Milwaukee Avenue, Vernon Hills, IL 60061
AS-I:001 | iSeries 004 | Customer#: 12844249 | A8D0600B-6CA81A37-844C0004-AC1D9492



**CDW Direct**
PO Box 75723
Chicago, IL 60675-5723

REMIT PAYMENT TO:

**INVOICE**

RETURN SERVICE REQUESTED

ACH INFORMATION:
US BANK
50 SOUTH LASALLE STREET
CHICAGO, IL 60675

Email Remittance To: achremittance@cdw.com
ROUTING NO.: 071000152
ACCOUNT NAME: CDW DIRECT
ACCOUNT NO.: 47910

| INVOICE NUMBER | INVOICE DATE | CUSTOMER NUMBER |
|---|---|---|
| TRF8515 | 08/28/19 | 12844249 |

| SUBTOTAL | SHIPPING | SALES TAX |
|---|---|---|
| $749.33 | $0.00 | $0.00 |

| DUE DATE | AMOUNT DUE |
|---|---|
| 09/27/19 | **$749.33** |

SANDBOX VR
AP
4695 CHABOT DR STE 200
PLEASANTON CA 94588-2756

CDW Direct
P.O. Box 75723
Chicago, IL  60675-5723

**PLEASE RETURN THIS PORTION WITH YOUR PAYMENT**

-----------------------------------------------------------------------------------------------

| INVOICE DATE | INVOICE NUMBER | PAYMENT TERMS | | DUE DATE |
|---|---|---|---|---|
| 08/28/19 | TRF8515 | Net 30 Days | | 09/27/19 |

| ORDER DATE | SHIP VIA | PURCHASE ORDER NUMBER | CUSTOMER NUMBER |
|---|---|---|---|
| 07/31/19 | WILL CALL | HW ONLY | 12844249 |

| ITEM NUMBER | DESCRIPTION | QTY ORD | QTY SHIP | QTY B/O | UNIT PRICE | TOTAL |
|---|---|---|---|---|---|---|
| 3657907 | BELKIN 4PT USB 2.0 HUB<br>Manufacturer Part Number: F4U020TT<br>line 4 on KSFM795.   Cancelled off<br>primary order. | 31 | 31 | 0 | 15.71 | 487.01 |
| 1630102 | TRIPP 6FT USB CABLE A/MICRO-B M/M<br>Manufacturer Part Number: U050-006<br>line 14.  qty dropped for child<br>order. | 40 | 40 | 0 | 3.56 | 142.40 |
| 1262323 | C2G 11.5IN BLK CAB TIES 100PK<br>Manufacturer Part Number: 43039<br>line 24.<br>qty dropped for child order. | 8 | 8 | 0 | 14.99 | 119.92 |
| 021862 | ATTN: PICKING<br>Manufacturer Part Number: PICKING<br>Child Order for KSFM795<br>B&H - 12844249 - (KRRD523) -<br>SANDBOX<br>VR ** REVERSE ** RITM0603600 | 1 | 1 | 0 | 0.00 | 0.00 |
| 4947557 | REVERSE - CDW STAGNG AGREEMENT - WDC<br>Manufacturer Part Number: STAGNG AGRMNT-WDC<br>Child Order for KSFM795<br>B&H - 12844249 - (KRRD523) -<br>SANDBOX<br>VR ** REVERSE ** RITM0603600 | 1 | 1 | 0 | 0.00 | 0.00 |

| ACCOUNT MANAGER | SHIPPING ADDRESS: | | |
|---|---|---|---|
| ANTHONY CAPON<br>480-270-7347<br>anthcap@cdw.com | SANDBOX VR<br>AP<br>3201 E ALEXANDER RD<br>NORTH LAS VEGAS NV 89030-7557 | SUBTOTAL | $749.33 |
| | | SHIPPING | $0.00 |
| **SALES ORDER NUMBER** | | SALES TAX | $0.00 |
| KTNP344 | | **AMOUNT DUE** | **$749.33** |



HAVE QUESTIONS ABOUT YOUR ACCOUNT?
PLEASE EMAIL US AT credit@cdw.com
VISIT US ON THE INTERNET AT www.cdw.com

ISO 9001 and ISO 14001 Certified
CDW DIRECT FEIN 36-4530079

00098                                Page 1 of 1



**CDW Direct**
PO Box 75723
Chicago, IL 60675-5723

**RETURN SERVICE REQUESTED**



**ACH INFORMATION**
50 NORTHERN TRUST
50 SOUTH LASALLE STREET
CHICAGO, IL 60675

Email Remittance To: techremittance@cdw.com
ROUTING NO.: 071000152
ACCOUNT NAME: CDW DIRECT
ACCOUNT NO.: 47910

| INVOICE NUMBER | INVOICE DATE | CUSTOMER NUMBER |
|---|---|---|
| TRF8613 | 08/28/19 | 12844249 |
| SUBTOTAL | SHIPPING | SALES TAX |
| $28,212.00 | $0.00 | $0.00 |
| DUE DATE | | AMOUNT DUE |
| 09/27/19 | | **$28,212.00** |

SANDBOX VR
AP
4695 CHABOT DR STE 200
PLEASANTON CA 94588-2756

CDW Direct
P.O. Box 75723
Chicago, IL  60675-5723

**PLEASE RETURN THIS PORTION WITH YOUR PAYMENT**

--------------------------------------------------------------------------

| INVOICE DATE | INVOICE NUMBER | PAYMENT TERMS | DUE DATE |
|---|---|---|---|
| 08/28/19 | TRF8613 | Net 30 Days | 9/27/19 |

| ORDER DATE | SHIP VIA | PURCHASE ORDER NUMBER | CUSTOMER NUMBER |
|---|---|---|---|
| 08/02/19 | WILL CALL | HW ONLY | 12844249 |

| ITEM NUMBER | DESCRIPTION | QTY ORD | QTY SHIP | QTY B/O | UNIT PRICE | TOTAL |
|---|---|---|---|---|---|---|
| 5575224 | SUPERMICRO MB X11SCA-O ATX LGA 1-ITL<br>Manufacturer Part Number: 8600291654-SANDBOX<br>line 42 on KSFM795.  Cancelled off<br>primary order to ship direct to cust<br>loc b/c of availability. | 12 | 12 | 0 | 2,351.00 | 28,212.00 |
| 021862 | ATTN: PICKING<br>Manufacturer Part Number: PICKING<br>Child Order for KSFM795<br>B&H - 12844249 - (KRRD523) -<br>SANDBOX<br>VR ** REVERSE ** RITM0603600 | 1 | 1 | 0 | 0.00 | 0.00 |
| 4947557 | REVERSE - CDW STAGNG AGREEMENT - WDC<br>Manufacturer Part Number: STAGNG AGRMNT-WDC<br>Child Order for KSFM795<br>B&H - 12844249 - (KRRD523) -<br>SANDBOX<br>VR ** REVERSE ** RITM0603600 | 1 | 1 | 0 | 0.00 | 0.00 |

**GO GREEN!**
CDW is happy to announce that paperless billing is now available!  If you would like to start receiving your invoices as an emailed PDF, please email CDW at paperlessbilling@cdw.com.  Please include your Customer number or an Invoice number in your email for faster processing.

**REDUCE PROCESSING COSTS AND ELIMINATE THE HASSLE OF PAPER CHECKS!**
Begin transmitting your payments electronically via ACH using CDW's bank and remittance information located at the top of the attached payment coupon.  Email credit@cdw.com with any questions.

| ACCOUNT MANAGER | SHIPPING ADDRESS: | | |
|---|---|---|---|
| ANTHONY CAPON<br>480-270-7347<br>anthcap@cdw.com | SANDBOX VR<br>AP<br>3201 E ALEXANDER RD<br>NORTH LAS VEGAS NV 89030-7557 | SUBTOTAL | **$28,212.00** |
| **SALES ORDER NUMBER** | | SHIPPING | $0.00 |
| KTRN283 | | SALES TAX | $0.00 |
| | | **AMOUNT DUE** | **$28,212.00** |



**HAVE QUESTIONS ABOUT YOUR ACCOUNT?**
**PLEASE EMAIL US AT credit@cdw.com**
VISIT US ON THE INTERNET AT www.cdw.com

**ISO 9001 and ISO 14001 Certified**
**CDW DIRECT FEIN 36-4530079**

00099                    Page 1 of 1

The copy of the invoice # you requested is now available. | View in browser

CDW 

HARDWARE | SOFTWARE | SOLUTIONS | CLOUD | BRANDS | BLOG | DEALS

# CDW Invoice #VBC9141

Marco Chung,

Thank you for choosing CDW. The Invoice #VBC9141 from 09/23/2019 you requested is detailed below.
The total amount of **$30,539.49** is due by **10/23/2019**.

**Please remit payment to:**
CDW Direct - P.O. Box 75723 Chicago, IL 60675-5723

| Order # | Order Date | PO # | Customer # |
|---|---|---|---|
| KVTD227 | 08/27/2019 | BILL ONLY | 12844249 |

| Due Date | Amount Due |
|---|---|
| 10/23/2019 | **$30,539.49** |

## Order Details

| Item | Order Qty | Ship Qty | Open Qty | Unit Price | Ext. Price |
|---|---|---|---|---|---|
| **SUPERMICRO MB X11SCA-O ATX LGA 1-ITL** <br> Mfg. Part#: 8600291654-SANDBOX <br> CDW #: 5575224 <br> line 42 on KSFM795. Cancelled off, primary order need 12 servers to be, Shipped on on 8/28 with updated, staging request. | 12 | 12 | 0 | $2,351.00 | $28,212.00 |

| | |
|---|---|
| Subtotal | $28,212.00 |
| Sales Tax | $2,327.49 |
| **AMOUNT DUE** | **$30,539.49** |

| Purchaser Billing Info | Deliver To |
|---|---|
| **Billing Address:** <br> SANDBOX VR <br> AP <br> 4695 CHARBOT DR STE 200 | **Shipping Address:** <br> SANDBOX VR <br> ATTN: AP <br> 3201 E ALEXANDER RD |

| PLEASANTON, CA 94588-2756 | NORTH LAS VEGAS, NV 89030-7557 |
|---|---|
| **Payment Terms:** Prepay / Wire Transfer | **Shipping Method:** DROP SHIP-GROUND |

**2 ways to GO GREEN with CDW!** Paperless billing and electronic payment transmission

☐ **TRANSMIT PAYMENTS ELECTRONICALLY** — Eliminate the hassle of paper checks by utilizing ACH for electronic bill pay.

**EMAIL REMITTANCE TO:** achremittance@cdw.com

**ACH INFORMATION:** The Northern Trust, 50 South LaSalle St., Chicago, IL 60675
**ROUTING NO.:** 071000152  |  **ACCOUNT NAME:** CDW Direct  |  **ACCOUNT NO.:** 47910

☐ **PAPERLESS BILLING NOW AVAILABLE** — If you would like to start receiving your invoices as an emailed PDF, please contact us at paperlessbilling@cdw.com. Please include your customer number or an invoice number in your request for faster processing.



### Sales Contact Info

**Anthony Capon**  |  (480) 270-7347  |  anthcap@cdw.com

| Need Help? | | |
|---|---|---|
|  My Account |  Support |  Call 800.800.4239 |

About Us | Privacy Policy | Terms and Condition

This email was sent to sandboxvr@cdw.com. Please add cdwsales@cdwemail.com to your address book.

© 2019 200 N. Milwaukee Avenue, Vernon Hills, IL 60061
AS-I:001 | iSeries 004 | Customer#: 12844249 | 660C000B-6CA21A37-844C0004-AC1D9492

000101

**INVOICE**

**CDW Direct**
PO Box 75723
Chicago, IL 60675-5723

REMIT PAYMENT TO:

RETURN SERVICE REQUESTED

ACH INFORMATION
50 NORTH TRUST
50 SOUTH LASALLE STREET
CHICAGO, IL 60675

Email Remittance To: achremittance@cdw.com
ROUTING NO.: 071000152
ACCOUNT NAME: CDW DIRECT
ACCOUNT NO.: 47910

| INVOICE NUMBER | INVOICE DATE | CUSTOMER NUMBER |
|---|---|---|
| VCT6591 | 09/27/19 | 12844249 |
| SUBTOTAL | SHIPPING | SALES TAX |
| $211,590.00 | $0.00 | $0.00 |
| DUE DATE | AMOUNT DUE | |
| 10/27/19 | **$211,590.00** | |

SANDBOX VR
AP
4695 CHARBOT DR STE 200
PLEASANTON CA 94588-2756
USA

CDW Direct
P.O. Box 75723
Chicago, IL  60675-5723

**PLEASE RETURN THIS PORTION WITH YOUR PAYMENT**

---

| INVOICE DATE | INVOICE NUMBER | PAYMENT TERMS | | DUE DATE |
|---|---|---|---|---|
| 09/27/19 | VCT6591 | Net 30 Days | | 10/27/19 |

| ORDER DATE | SHIP VIA | PURCHASE ORDER NUMBER | CUSTOMER NUMBER |
|---|---|---|---|
| 08/30/19 | WILL CALL | HW ONLY | 12844249 |

| ITEM NUMBER | DESCRIPTION | QTY ORD | QTY SHIP | QTY B/O | UNIT PRICE | TOTAL |
|---|---|---|---|---|---|---|
| 5575224 | SUPERMICRO MB X11SCA-O ATX LGA 1-ITL Manufacturer Part Number: 8600291654-SANDBOX line 42 on KSFM795.   Cancelled off primary order. | 90 | 90 | 0 | 2,351.00 | 211,590.00 |
| 021862 | ATTN: PICKING Manufacturer Part Number: PICKING Child Order for KSFM795 B&H - 12844249 - (KRRD523) - SANDBOX VR ** REVERSE ** RITM0603600 | 1 | 1 | 0 | 0.00 | 0.00 |
| 4947557 | REVERSE - CDW STAGNG AGREEMENT - WDC Manufacturer Part Number: STAGNG AGRMNT-WDC Child Order for KSFM795 B&H - 12844249 - (KRRD523) - SANDBOX VR ** REVERSE ** RITM0603600 | 1 | 1 | 0 | 0.00 | 0.00 |

**GO GREEN!**
CDW is happy to announce that paperless billing is now available!  If you would like to start receiving your invoices as an emailed PDF, please email CDW at paperlessbilling@cdw.com.  Please include your Customer number or an Invoice number in your email for faster processing.

**REDUCE PROCESSING COSTS AND ELIMINATE THE HASSLE OF PAPER CHECKS!**
Begin transmitting your payments electronically via ACH using CDW's bank and remittance information located at the top of the attached payment coupon.  Email credit@cdw.com with any questions.

| ACCOUNT MANAGER | SHIPPING ADDRESS: | | |
|---|---|---|---|
| ANTHONY CAPON 480-270-7347 anthcap@cdw.com | SANDBOX VR AP 3201 E ALEXANDER RD NORTH LAS VEGAS NV 89030-7557 | SUBTOTAL | $211,590.00 |
| | | SHIPPING | $0.00 |
| **SALES ORDER NUMBER** | | SALES TAX | $0.00 |
| KVZJ230 | | **AMOUNT DUE** | **$211,590.00** |



**HAVE QUESTIONS ABOUT YOUR ACCOUNT?**
**PLEASE EMAIL US AT credit@cdw.com**
VISIT US ON THE INTERNET AT www.cdw.com

ISO 9001 and ISO 14001 Certified
CDW DIRECT FEIN 36-4530079

000102          Page 1 of 1

**Michael Heater**

| | |
|---|---|
| **From:** | CDW <cdwsales@cdwemail.com> |
| **Sent:** | Monday, November 11, 2019 10:36 AM |
| **To:** | Will Sharif |
| **Subject:** | CDW Invoice #SZL8330 Detail |

The copy of the invoice # you requested is now available. | View in browser



**HARDWARE** | **SOFTWARE** | **SOLUTIONS** | **CLOUD** | **BRANDS** | **BLOG** | **DEALS**

# CDW Invoice #SZL8330

Dick Lau,

Thank you for choosing CDW. The Invoice #SZL8330 from 07/09/2019 you requested is detailed below. The total amount of **$352.66** is due by **08/08/2019**.

**Please remit payment to:**

CDW Direct - P.O. Box 75723 Chicago, IL 60675-5723

| Order # | Order Date | PO # | Customer # |
|---|---|---|---|
| KSFM795 | 06/28/2019 | HW ONLY | 12844249 |

| Due Date | Amount Due |
|---|---|
| 08/8/2019 | $352.66 |

**Order Details**

| Item | Order Qty | Ship Qty | Open Qty | Unit Price | Ext. Price |
|---|---|---|---|---|---|
| **BELKIN 7PT USB 2.0 HUB**<br>Mfg. Part#: F4U022TT<br>CDW #: 3708710 | 38 | 14 | 0 | **$22.52** | **$315.28** |
| **ATTN: PICKING**<br>Mfg. Part#: PICKING<br>CDW #: 021862 | 3 | 1 | 0 | **$0.00** | **$0.00** |

| | |
|---|---|
| **Subtotal** | $315.28 |
| **Shipping** | $11.37 |
| **Sales Tax** | $26.01 |
| **AMOUNT DUE** | **$352.66** |

1

000103

| Purchaser Billing Info | Deliver To |
|---|---|
| **Billing Address:**<br>SANDBOX VR<br>AP<br>4695 CHARBOT DR STE 200<br>PLEASANTON, CA 94588-2756<br>**Payment Terms:** Prepay / Wire Transfer | **Shipping Address:**<br>SANDBOX VR<br>ATTN: AP<br>3201 E ALEXANDER RD<br>NORTH LAS VEGAS, NV 89030-7557<br>**Shipping Method:** Best Way Custom Freight |

**2 ways to GO GREEN with CDW!** Paperless billing and electronic payment transmission

**TRANSMIT PAYMENTS ELECTRONICALLY** — Eliminate the hassle of paper checks by utilizing ACH for electronic bill pay.

**EMAIL REMITTANCE TO:** achremittance@cdw.com

**ACH INFORMATION:** The Northern Trust, 50 South LaSalle St., Chicago, IL 60675

**ROUTING NO.:** 071000152  |  **ACCOUNT NAME:** CDW Direct  |  **ACCOUNT NO.:** 47910

**PAPERLESS BILLING NOW AVAILABLE** — If you would like to start receiving your invoices as an emailed PDF, please contact us at paperlessbilling@cdw.com. Please include your customer number or an invoice number in your request for faster processing.



**Sales Contact Info**

**Anthony Capon** | (480) 270-7347 | anthcap@cdw.com

| Need Help? | | |
|---|---|---|
| ▶ My Account | ⚙ Support | ☎ Call 800.800.4239 |

About Us | Privacy Policy | Terms and Condition

This email was sent to wilshar@cdw.com. Please add cdwsales@cdwemail.com to your address book.

© 2019 200 N. Milwaukee Avenue, Vernon Hills, IL 60061

AS-I:001 | iSeries 004 | Customer#: 12844249 | 8189000B-14551A3A-844E0004-AC1D9492

000104

**Michael Heater**

| | |
|---|---|
| **From:** | CDW <cdwsales@cdwemail.com> |
| **Sent:** | Monday, November 11, 2019 10:36 AM |
| **To:** | Will Sharif |
| **Subject:** | CDW Invoice #SZT7435 Detail |

The copy of the invoice # you requested is now available. | View in browser



**HARDWARE** | **SOFTWARE** | **SOLUTIONS** | **CLOUD** | **BRANDS** | **BLOG** | **DEALS**

# CDW Invoice #SZT7435

Dick Lau,

Thank you for choosing CDW. The Invoice #SZT7435 from 07/10/2019 you requested is detailed below.
The total amount of **$251.88** is due by **08/09/2019**.

**Please remit payment to:**

CDW Direct - P.O. Box 75723 Chicago, IL 60675-5723

| Order # | Order Date | PO # | Customer # |
|---|---|---|---|
| KSFM795 | 06/28/2019 | HW ONLY | 12844249 |

| Due Date | Amount Due |
|---|---|
| 08/9/2019 | **$251.88** |

### Order Details

| Item | Order Qty | Ship Qty | Open Qty | Unit Price | Ext. Price |
|---|---|---|---|---|---|
| **BELKIN 7PT USB 2.0 HUB**<br>Mfg. Part#: F4U022TT<br>CDW #: 3708710 | 38 | 10 | 0 | **$22.52** | **$225.20** |
| **ATTN: PICKING**<br>Mfg. Part#: PICKING<br>CDW #: 021862 | 3 | 1 | 0 | **$0.00** | **$0.00** |

| | |
|---|---|
| **Subtotal** | $225.20 |
| **Shipping** | $8.10 |
| **Sales Tax** | $18.58 |
| **AMOUNT DUE** | **$251.88** |

1

000105

| Purchaser Billing Info | Deliver To |
|---|---|
| **Billing Address:**<br>SANDBOX VR<br>AP<br>4695 CHARBOT DR STE 200<br>PLEASANTON, CA 94588-2756<br>**Payment Terms:** Prepay / Wire Transfer | **Shipping Address:**<br>SANDBOX VR<br>ATTN: AP<br>3201 E ALEXANDER RD<br>NORTH LAS VEGAS, NV 89030-7557<br>**Shipping Method:** Best Way Custom Freight |

**2 ways to GO GREEN with CDW!** Paperless billing and electronic payment transmission

**TRANSMIT PAYMENTS ELECTRONICALLY** — Eliminate the hassle of paper checks by utilizing ACH for electronic bill pay.
**EMAIL REMITTANCE TO:** achremittance@cdw.com
**ACH INFORMATION:** The Northern Trust, 50 South LaSalle St., Chicago, IL 60675
**ROUTING NO.:** 071000152 | **ACCOUNT NAME:** CDW Direct | **ACCOUNT NO.:** 47910

**PAPERLESS BILLING NOW AVAILABLE** — If you would like to start receiving your invoices as an emailed PDF, please contact us at paperlessbilling@cdw.com. Please include your customer number or an invoice number in your request for faster processing.



**Sales Contact Info**

**Anthony Capon** | (480) 270-7347 | anthcap@cdw.com

### Need Help?

|  My Account | Support | Call 800.800.4239 |
|---|---|---|

About Us | Privacy Policy | Terms and Condition

This email was sent to wilshar@cdw.com. Please add cdwsales@cdwemail.com to your address book.

© 2019 200 N. Milwaukee Avenue, Vernon Hills, IL 60061
AS-I:001 | iSeries 004 | Customer#: 12844249 | BD1FF00B-14561A3A-844E0004-AC1D9492

000106

**Anthony Capon**

| | |
|---|---|
| **From:** | CDW <cdwsales@cdwemail.com> |
| **Sent:** | Monday, November 11, 2019 10:37 AM |
| **To:** | Will Sharif |
| **Subject:** | CDW Invoice #TCG8613 Detail |

The copy of the invoice # you requested is now available. | View in browser



**HARDWARE** | **SOFTWARE** | **SOLUTIONS** | **CLOUD** | **BRANDS** | **BLOG** | **DEALS**

# CDW Invoice #TCG8613

Dick Lau,

Thank you for choosing CDW. The Invoice #TCG8613 from 07/16/2019 you requested is detailed below. The total amount of **$18,660.79** is due by **08/15/2019**.

**Please remit payment to:**

CDW Direct - P.O. Box 75723 Chicago, IL 60675-5723

| Order # | Order Date | PO # | Customer # |
|---|---|---|---|
| KSFM795 | 06/28/2019 | HW ONLY | 12844249 |

| Due Date | Amount Due |
|---|---|
| 08/15/2019 | **$18,660.79** |

**Order Details**

| Item | Order Qty | Ship Qty | Open Qty | Unit Price | Ext. Price |
|---|---|---|---|---|---|
| **TRIPP HDMI/USB KVM SWITCH A/V 4-PORT**<br>Mfg. Part#: B004-HUA4-K<br>CDW #: 5448938 | 46 | 46 | 0 | **$282.99** | **$13,017.54** |
| **BELKIN 7PT USB 2.0 HUB**<br>Mfg. Part#: F4U022TT<br>CDW #: 3708710 | 38 | 14 | 0 | **$22.52** | **$315.28** |
| **TRIPP RACK CANTILEVER FIXED SHELF 1U**<br>Mfg. Part#: SRSHELF2P1UTM<br>CDW #: 3614412 | 54 | 54 | 0 | **$61.99** | **$3,347.46** |

| | | |
|---|---|---|
| **Subtotal** | | $16,680.28 |

1

| | |
|---|---|
| Shipping | $604.38 |
| Sales Tax | $1,376.13 |
| **AMOUNT DUE** | **$18,660.79** |

| Purchaser Billing Info | Deliver To |
|---|---|
| **Billing Address:** | **Shipping Address:** |
| SANDBOX VR | SANDBOX VR |
| AP | ATTN: AP |
| 4695 CHARBOT DR STE 200 | 3201 E ALEXANDER RD |
| PLEASANTON, CA 94588-2756 | NORTH LAS VEGAS, NV 89030-7557 |
| **Payment Terms:** Prepay / Wire Transfer | **Shipping Method:** Best Way Custom Freight |

**2 ways to GO GREEN with CDW!** Paperless billing and electronic payment transmission

**TRANSMIT PAYMENTS ELECTRONICALLY** — Eliminate the hassle of paper checks by utilizing ACH for electronic bill pay.

**EMAIL REMITTANCE TO:** achremittance@cdw.com

**ACH INFORMATION:** The Northern Trust, 50 South LaSalle St., Chicago, IL 60675

**ROUTING NO.:** 071000152  |  **ACCOUNT NAME:** CDW Direct  |  **ACCOUNT NO.:** 47910

**PAPERLESS BILLING NOW AVAILABLE** — If you would like to start receiving your invoices as an emailed PDF, please contact us at paperlessbilling@cdw.com. Please include your customer number or an invoice number in your request for faster processing.



**Sales Contact Info**

**Anthony Capon** | (480) 270-7347 | anthcap@cdw.com

| Need Help? | | |
|---|---|---|
| My Account | Support | Call 800.800.4239 |

About Us | Privacy Policy | Terms and Condition

This email was sent to wilshar@cdw.com. Please add cdwsales@cdwemail.com to your address book.

© 2019 200 N. Milwaukee Avenue, Vernon Hills, IL 60061

AS-I:001 | iSeries 004 | Customer#: 12844249 | B51AF00B-14571A3A-844E0004-AC1D9492

000108